## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| ANNA M. WHITE, | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 15 C 8185** |
| | ) | |
| v. | ) | **Magistrate Judge Sidney Schenkier** |
| | ) | |
| ELIZABETH K. RICHERT, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER[1]

At the center of this case is a family dispute over the proceeds of the Robert L. Richert Trust (the "Robert Trust")—a trust created by the deceased brother and uncle of the plaintiff and defendant, respectively—and which version of the Robert Trust is indeed the genuine version. To that end, each party engaged a forensic document examiner to opine on the authenticity of portions of what has generally been referred to throughout this matter as the Robert Trust Version C (doc. # 173, Am. Compl., Ex. C: Robert Trust Version C).

A bench trial is scheduled to begin on September 9, 2019. The parties agreed by stipulation to present their written expert witness reports at trial in lieu of live testimony (doc. # 296). Now, each party has moved to strike the other party's handwriting expert's report. Before the Court is plaintiff's motion to strike the expert report of Thomas W. Vastrick (doc. # 314: Pl.'s Mot.), defendant's motion to strike the expert report of Robin D. Williams (doc. # 315: Def.'s Mot.) and both parties' responses to the motions (doc. # 317: Pl.'s Resp.; doc. # 318: Def.'s Resp.). For the reasons set forth below, we grant in part and deny in part plaintiff's motion to strike and deny defendant's motion to strike.

---

[1]On November 30, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 26).

## I.

For the relevant background, we refer in large part to our previous memorandum opinion and order granting defendant summary judgment as to Count I of plaintiff's Amended Complaint and denying summary judgment as to Count II of the Amended Complaint. *See White v. Richert*, No. 15 C 8185, 2018 WL 4101512 (N.D. Ill. Aug. 28, 2018). In June 2008, Robert Richert (plaintiff's brother and defendant's uncle) executed the Robert Trust and put the title to his residence in Arizona into the trust. *White*, 2018 WL 4101512, at *2. Discovery in the case revealed three versions of the Robert Trust, which we will call versions A, B and C. *Id.*[2] Versions A and B were produced by a third party, Fidelity, in response to a subpoena from plaintiff. *Id.* at *7. Version C was produced by defendant. *Id.* When deposed, defendant testified that the original Version C was stolen by unknown persons prior to the filing of this lawsuit and then, shortly before her deposition, a copy of Version C was placed in her mailbox by some also unknown person. *Id.*

In both Versions A and B of the Robert Trust, Paragraph 5.4.1 states that:

> If the Settlor's residence is part of the trust estate or is owned by the Settlor at the time of his death, then the Settlor's residence, personal effects, household goods, automobile(s), and any interest he may have in any insurance policies thereon, shall be distributed to Elizabeth K. Richert, the Settlor's niece. *If at the time of the Settlor's death, the Settlor's residence is not part of the trust estate or is not owned by the Settlor, then forty-seven percent (47%) of the trust estate shall be distributed to Elizabeth K. Richert, the Settlor's niece.*

*Id.* at *3 (emphasis added).[3] By contrast, in Version C of the Robert Trust, Paragraph 5.4.1 states that:

> If the Settlor's residence is part of the trust estate or is owned by the Settlor at the time of his death, then the Settlor's residence, personal effects, household goods, automobile(s), and any interest he may have in any insurance policies thereon, shall

---

[2] Plaintiff attached three versions of the Robert Trust as Exhibits A, B, and C to her Amended Complaint (*see* doc. # 173). The version letters we use correspond to the exhibit letters used by plaintiff.

[3] The printed text of Versions A and B are identical, except Version A contains photocopies of post-it notes that do not appear on Version B (doc. # 173: Am. Compl., Exs. A and B).

be distributed to Elizabeth K. Richert, the Settlor's niece. *In addition to the Settlor's residence, forty-seven percent (47%) of the trust estate shall be distributed to Elizabeth K. Richert, the Settlor's niece.*

*Id.* (emphasis added).

It is undisputed that when Mr. Richert died on November 9, 2009, his Arizona residence was part of the Robert Trust. *White*, 2018 WL 4101512, at *3. That means that under any version of the Robert Trust, Mr. Richert's "residence, personal effects, household goods, automobile(s), and any interest he may have in any insurance policies thereon" were to be distributed to defendant. *See id.*

This is where the differences between paragraph 5.4.1 in Versions A and B and paragraph 5.4.1 in Version C come into play. Under Versions A and B of the Robert Trust, if Mr. Richert's residence was *not* part of the trust estate or owned by him when he died, only then was defendant entitled to 47 percent of the trust estate. But as already noted, the residence was part of the trust estate; thus, according to paragraph 5.4.1 of Versions A and B, the 47 percent estate distribution to defendant was not triggered. Under paragraph 5.4.1 of Version C, though, 47 percent of the trust estate is to be distributed to defendant regardless of whether Mr. Richert's residence was part of the trust estate. In short, pursuant to paragraph 5.4.1 of Version C, defendant is entitled to 47 percent of Mr. Richert's trust estate; under paragraph 5.4.1 of Versions A and B, she is not. *See also White*, 2018 WL 4101512, at *8.

Plaintiff's sole remaining count against defendant in this case (Count II) arises out of these differences (*see* doc. # 173: Am. Compl.). Plaintiff alleges that defendant breached her fiduciary duty as trustee of the Robert Trust "by creating a 'counterfeit' version of the Robert Trust (Version C), which she allegedly 'altered and forged' to 'aggrandize and unlawfully take 47% of the trust proceeds she was not entitled to.'" *White*, 2018 WL 4101512, at *6 (quoting Am. Compl., ¶¶ 27-

28). Plaintiff engaged Mr. Williams and defendant engaged Mr. Vastrick as forensic document examiners to opine about certain handwriting on the different versions of the trust.

## II.

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) govern the admissibility of expert testimony including when, as here, jurisdiction rests on diversity. *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 778 (7th Cir. 2017). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>>
>> (b) the testimony is based on sufficient facts or data;
>>
>> (c) the testimony is the product of reliable principles and methods; and
>>
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

"In *Daubert*, the Supreme Court interpreted Rule 702 to require the district court to act as an evidentiary gatekeeper, ensuring that an expert's testimony rests on a reliable foundation and is relevant to the task at hand." *Gopalratnam*, 877 F.3d at 778 (internal quotations omitted). In performing our gatekeeping role under Rule 702 and *Daubert*, we must "engage in a three-step analysis before admitting expert testimony." *Id.* at 779 (internal quotations omitted). Specifically, we "must evaluate: (1) the proffered expert's *qualifications*; (2) the *reliability* of the expert's methodology; and (3) the *relevance* of the expert's testimony." *Id.* (emphases in original). As the gatekeeper, we have "'broad latitude' to determine how to evaluate expert testimony," *United*

*States v. Hill*, 818 F.3d 289, 297 (7th Cir. 2016) (citation omitted), particularly where "the usual concerns of [Rule 702]—keeping unreliable expert testimony from the jury—are not present," as is the case in a bench trial. *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 760 (7th Cir. 2010). Indeed, for a bench trial, our gatekeeping role is "necessarily different"; because we are both the gatekeeper and factfinder, "the need to make such decisions prior to hearing the testimony is lessened." *In re Salem*, 465 F.3d 767, 777 (7th Cir. 2006), *disapproved of on other grounds by In re Anderson*, 917 F.3d 566, 569-71 (7th Cir. 2019).

"[T]he party seeking to introduce the expert witness testimony bears the burden of demonstrating that the expert witness testimony satisfies the [*Daubert*] standard by a preponderance of the evidence." *Gopalratnam*, 877 F.3d at 782 (second alteration in original and internal quotations omitted). However, "rejection of expert testimony is the exception rather than the rule." Fed. R. Evid. 702 advisory committee's note to 2000 amendment.

### A.

Neither party develops an argument challenging Mr. Vastrick's or Mr. Williams's qualifications. Therefore, the first aspect of our gatekeeper role (evaluating proffered expert's qualifications) is not at issue. Regardless, the materials submitted with the expert reports show that both Mr. Vastrick's and Mr. Williams's qualifications are sufficient to satisfy Rule 702 in the area of forensic document evaluation.

### B.

Turning to the reliability of an expert's methodology, courts must take a "flexible" approach and gear the analysis "toward the precise sort of testimony at issue and not on any fixed evaluative factors." *Gopalratnam*, 877 F.3d at 780 (internal quotations omitted). In keeping with the Court's gatekeeping role, our inquiry focuses on the experts' "principles and methodology, not

on the conclusions that they generate." *Id.* at 781 (internal quotations omitted). Recognizing that the line between conclusions and methodology is not always easy to draw, the Seventh Circuit has explained that "there must be a rational connection between the data and the opinion." *Id.* (citations and quotations omitted).

An expert's report "is not unreliable simply because it is founded on his experience rather than on data," as Rule 702 allows a witness to be qualified as an expert on the basis of his experience. *Metavante Corp.*, 619 F.3d at 761. "Rule 702 does require, however, that the expert explain the methodologies and principles that support his opinion; he cannot simply assert a bottom line." *Id.* (quotations omitted).[4]

## C.

Under Rule 702, an expert's testimony is relevant if "it assists the [factfinder] in determining any fact at issue in the case." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). "Where an expert's hypothetical explanation of the possible or probable causes of an event would aid the [factfinder], that testimony satisfies *Daubert*'s relevancy requirement." *Id.* (internal quotations omitted). Whether the expert's theory is correct is a factual question left to the factfinder to decide. *Id.*

## III.

With those principles in mind, we turn first to plaintiff's motion to strike the defendant's expert report. Plaintiff seeks to strike the February 27, 2018 "Forensic Document Examination Report" of Mr. Vastrick ("Vastrick Report") pursuant to Federal Rules of Civil Procedure

---

[4] Although we note that the Seventh Circuit has not conclusively opined on the reliability of handwriting analysis post-*Daubert*, *see Deputy v. Lehman Bros. Inc.*, 345 F.3d 494, 509 (7th Cir. 2003), at least seven other circuits have determined that expert testimony on handwriting analysis can satisfy the reliability threshold. *See United States v. Prime*, 431 F.3d 1147, 1154 (9th Cir. 2005); *United States v. Crisp*, 324 F.3d 261, 269-70 (4th Cir. 2003); *United States v. Mooney*, 315 F.3d 54, 63 (1st Cir. 2002); *United States v. Jolivet*, 224 F.3d 902, 906 (8th Cir. 2000); *United States v. Paul*, 175 F.3d 906, 911 (11th Cir. 1999); *United States v. Jones*, 107 F.3d 1147, 1161 (6th Cir. 1997); *United States v. Velasquez*, 64 F.3d 844, 850-52 (3d Cir. 1995).

26(a)(2)(B)(iii) and 37(c)(1) and Federal Rules of Evidence 401(a), 702 and 1003 (Pl.'s Mot. at 1; doc. # 314-1: Vastrick Report).

## A.

Plaintiff first argues that *materials* related to the Vastrick Report were not timely produced and, thus, the entire *report* should be excluded from trial (Pl.'s Mot. at 3). Although Plaintiff does not dispute that she timely received the Vastrick Report itself, she complains that she did not receive other information required by Rule 26(a)(2)(B)—such as a list of other cases where Mr. Vastrick gave testimony, Mr. Vastrick's qualifications, and his fee schedule—until three days after the experts' depositions were to be taken, and that she did not receive a copy of the Scientific Working Group for Forensic Document Examination ("SWGDOC") standards referred to in the Vastrick Report until a short time after that (*Id.*; doc. # 314-2).

Federal Rule of Civil Procedure 37 provides in pertinent part that a party failing to provide information as required by Rule 26(a) or (e) is not allowed to use that information at trial "unless the failure was … harmless." Fed. R. Civ. P. 37(c)(1). We have broad discretion in determining whether such a violation is harmless. *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003). The factors that guide this discretion are: "(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or willfulness involved in not disclosing the evidence at an earlier date." *Id.*

Here, defendant's production of Mr. Vastrick's materials three days after the expert deposition deadline and the SWGDOC standards a short time thereafter was harmless. *First*, it appears that plaintiff did not, in fact, take Mr. Vastrick's deposition (*see* Def.'s Resp. at 6); indeed, neither party has cited to deposition testimony for Mr. Vastrick, as we would expect if indeed he

had been deposed. Thus, the production of materials after "the depositions *were to have been taken*" (Pl.'s Mot. at 3) (emphasis added) is of no consequence. Moreover, the Vastrick Report itself was produced well before the expert deposition deadline (*Id.*). *Second*, any arguable prejudice to plaintiff in not receiving these materials along with the Vastrick Report was cured when plaintiff received these materials shortly thereafter. *Third*, there is no disruption to the trial scheduled for September 9, 2019, well over a year after the materials were produced. *Finally*, plaintiff did not allege that defendant's failure to disclose the materials earlier was due to bad faith or willfulness. Because defendant's failure to timely produce the materials related to Mr. Vastrick's report is harmless, plaintiff's motion to strike on that basis is denied.

### B.

Plaintiff next argues that although both parties' experts relied upon documents exchanged in discovery, Mr. Vastrick also relied upon a document described as "K-2c Copy of one sheet of paper bearing multiple request verbatim specimens purportedly executed on February 27, 2018," which was not produced in discovery (Pl.'s Mot. at 4 (citing Vastrick Report at 1)). Because this document was not produced in discovery, plaintiff asks us to exclude the entire Vastrick Report from trial or, alternatively, to strike the final paragraph of the Vastrick Report, which relies upon the K-2c document (*Id.*).

"A litigant is required to disclose to his opponent any information 'considered' by the litigant's testifying expert." *Fidelity Nat. Title Ins. Co. of New York v. Intercounty Nat. Title Ins. Co.*, 412 F.3d 745, 750 (7th Cir. 2005); *see* Fed. R. Civ. P. 26(a)(2)(B)(ii). It is clear on the face of the Vastrick Report that Mr. Vastrick "considered" the handwriting specimen of defendant identified as K-2c; as such, that specimen was required to be produced to plaintiff. It is equally clear that defendant did not produce the K-2c document to plaintiff, as defendant outright admits

that the K-2c document was used by her expert but was "not 'produced' to [plaintiff's] attorneys" (*see* Def.'s Resp. at ¶ 10). Because the K-2c document was not produced to plaintiff, the final paragraph of the Vastrick Report that relies on the K-2c document is stricken. *See Fidelity Nat. Title Ins. Co. of New York*, 412 F.3d at 752 (finding that "the punishment should fit the crime" in administering sanctions for pretrial discovery rules violations). The failure to produce the K-2c document does not warrant striking the remainder of the report.

## C.

Plaintiff argues that Mr. Vastrick "eyeballed" the documents to reach his conclusion and utilized no scientific equipment while, on the other hand, plaintiff's expert used a microscope to perform his analysis (Pl.'s Mot. at 4). As discussed above, we take a "flexible" approach to testing an expert's reliability, and we limit our gatekeeping inquiry to evaluating the expert's "principles and methodology, not the conclusions that they generate." *Gopalratnam*, 877 F.3d at 780-81 (internal quotations omitted).

In his report, Mr. Vastrick explained that his examination was "conducted utilizing published standard methodologies as prescribed by . . . SWGDOC" (Vastrick Report at 2). And Mr. Vastrick used the SWGDOC terminology in his conclusion, reasons and bases for his opinion (*Id.* at 2-3). Moreover, plaintiff cites nothing to show that the SWGDOC standards always require use of a microscope (*see* doc. # 314-2 at 19: SWGDOC Standard for Examination of Handwritten Items, ¶ 6). In this case, neither expert was provided an original of the Version C trust. Because the original paper, pen color, and signature (including any variations in the ink) were not available for examination, we are not convinced that a microscope offered any additional benefit. Therefore, we deny plaintiff's motion to strike on this basis.

**D.**

Plaintiff also claims the Vastrick Report lacks probative value for four reasons. *First*, Mr. Vastrick's report did not contain the "limiting words or phrases" that the SWGDOC standards prescribe. Plaintiff contends that this creates a risk that the report's conclusion will be misinterpreted (Pl.'s Mot. at 5). *Second*, Mr. Vastrick's finding that the slant of the middle initial "L" in "RLR" on page three of Version C is different from the other, authenticated Robert L. Richert initials—which plaintiff argues is more helpful to her case—is in tension with his conclusion (*Id.* at 6). *Third*, Mr. Vastrick's opinion is not helpful and irrelevant under Federal Rule of Evidence 401(a) because although Mr. Vastrick opined that the initials "could" have been written by Mr. Richert, he further opined that an "alternative hypotheses," *i.e.*, that someone else forged or "transferred" the initials, "cannot be eliminated" (*Id.*). *Fourth*, although Mr. Vastrick agrees with plaintiff's expert that the at-issue initials are different, he claims the discrepancy may be the result of writer variation (*Id.*).

Plaintiff's first argument is factually incorrect. The Vastrick Report did include the limiting words and phrases proscribed by the SWGDOC, albeit in the section titled "Reasons and Bases" that appeared just below the section titled "Conclusions" (Vastrick Report at 2). Mr. Vastrick concluded that there are "indications" that Mr. Richert wrote the initials on page 3 of Version C and then went on to explain that "indications" is the "lowest level of confidence" within the SWGDOC list of standard terms (*Id.*). He also discussed the similarities and differences of the initials (*Id.* at 2-3). As for plaintiff's remaining arguments, all these arguments go to the weight of the evidence, not to its admissibility. Our role at this juncture is not as a factfinder that weighs the evidence. Therefore, plaintiff's motion to strike is denied on this basis as well.

## IV.

We now turn to defendant's motion to strike the report of plaintiff's expert, Mr. Williams. On May 18, 2017, Mr. Williams offered a "Report of Findings" regarding his examination of two versions of the Robert Trust: a version provided by Fidelity, which he referred to as Q-1.1, and a version provided by defendant's counsel, which he referred to as Q-1.2 (doc. # 315-3: Williams Report at 1). Document Q-1.1 appears to correspond with Version B of the Robert Trust, and document Q-1.2 appears to correspond with Version C of the Robert Trust (*compare* Am. Compl. Ex. B at 3, *and* Am. Compl. Ex. C at 3, *with* Williams Report at 4, 5, 7).[5] The purpose of Mr. Williams's examination was to determine whether the initials and signatures that purportedly belonged to Mr. Richert and the document text were similar between Versions B and C of the Robert Trust (Williams Report at 1). This "examination consisted of visual and microscopic study of the writing style, the discriminating writing characteristics, natural variations, spatial arrangement, letter formations, letter connections and other significant handwriting features" (*Id.*). Mr. Williams opined that the initials, signatures, and text on all pages of both versions were the same except for page 3—the page containing paragraph 5.4.1 (*Id.* at 2). According to Mr. Williams, neither Mr. Richert's purported initials ("RLR") nor the text of paragraph 5.4.1 on page 3 were similar between versions (*Id.*). Based on the differences between the initials and the text of paragraph 5.4.1 between Versions B and C of the Robert Trust, Mr. Williams concluded there was "a page substitution" with respect to page 3 of the Robert Trust (*Id.*). To reach his opinion, Mr. Williams examined "machine copies" of the documents at issue, which he assumed to be "accurate reproductions of the originals," but he did not believe his opinion would change even if he had the opportunity to examine the original documents (*Id.* at 3).

---

[5] For simplicity, we hereafter refer to Q-1.1 and Q-1.2 as Version B and Version C of the Robert Trust, respectively.

At the outset, we note that defendant is an attorney (doc. # 233). Thus, despite her *pro se* status (doc. # 287), she is "not entitled to the flexible treatment granted other *pro se* litigants." *Cole v. Comm'r of Internal Revenue*, 637 F.3d 767, 773 (7th Cir. 2011); *see Godlove v. Bamberger, Foreman, Oswald, & Hahn*, 903 F.2d 1145, 1148 (7th Cir. 1990) ("Ordinarily, we treat the efforts of *pro se* applicants gently, but a *pro se* lawyer is entitled to no special consideration"). Moreover, even a non-attorney *pro se* litigant must support her filings with legal argument and authority. *See Mathis v. New York Life Ins. Co.*, 133 F.3d 546, 548 (7th Cir. 1998) ("[E]ven pro se litigants . . . must expect to file a legal argument and some supporting authority") (internal quotations omitted).

Defendant's motion is devoid of any such argument or authority. She does not attempt to explain why Mr. Williams's expert report is inadmissible under Rule 702 or *Daubert*. Nor has she argued that any other rule or legal authority justifies excluding the report. Indeed, defendant's motion fails to cite a single federal rule or case to support her request to strike Mr. Williams's expert report. Defendant's motion is denied for this reason alone. Nonetheless, we have "address[ed] any cogent arguments we are able to discern" from defendant's motion. *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 811 (7th Cir. 2017). However, none of the arguments we have discerned warrants striking Mr. Williams's expert report.

### A.

We first address defendant's alleged inability "to provide her own expert with the original copy of the Trust for examination" (Def.'s Mot. at ¶ 11). On this point, defendant asserts the following.

The "original" of the Robert Trust (which defendant identifies as Exhibit C to the Amended Complaint, *i.e.*, Version C) that she produced to her attorney shortly before her deposition did not have lines down the left side of every page (Def.'s Mot. at ¶¶ 6, 8). At the insistence of plaintiff's

attorneys, defendant sent this original document to her former attorney, Jeffrey Jacobson, who then sent the document to Mr. Williams, as is shown by the fact that the Version C images in Mr. Williams's report do not have lines running down the left side of the pages (*Id.*). "For more than two years," defendant repeatedly asked Mr. Jacobson to return the original Version C document to her, and "Mr. Jacobson repeatedly told [her] that despite repeatedly asking," plaintiff's counsel had not returned the original to him (Mr. Jacobson) (*Id.* at ¶ 11). When another one of defendant's former attorneys, Douglas Cipriano,[6] emailed plaintiff's counsel in April 2019 asking for the original Version C document to be returned, plaintiff's attorney, Paul Kozacky, responded that Mr. Williams had returned the document directly to Mr. Jacobson in June 2017 (*Id.* at ¶ 12; doc. # 315-8 at 1). The response email from Mr. Kozacky "contain[ed] a cut and paste (not a direct forward of the original email) . . . allegedly from" Mr. Williams, "with a Fedex tracking number for the alleged return of the document" to Mr. Jacobson (Def.'s Mot. at ¶ 12; doc. # 315-8 at 1). Defendant then attempted to track the document using this tracking number (Def.'s Mot. at ¶ 13). On her first try, "the tracking number came back 'not found,'" and when she tried again "[s]everal weeks later" (on May 1, 2019), FedEx showed that the corresponding package was shipped from Philadelphia, Pennsylvania on April 30, 2019 to Edinboro, Pennsylvania, with an expected delivery date of May 2, 2019 (*Id.*; doc. # 315-9). In short, defendant argues that her counsel delivered the original Version C to plaintiff's counsel so that Mr. Williams could examine the document, but by doing so (coupled with the failure of plaintiff's counsel or Mr. Williams to return the document), defendant's own expert could not examine the original Version C document.

This argument does not warrant excluding Mr. Williams's report for several reasons. *First*, defendant's assertion that she gave the "original" Version C document to Mr. Jacobson directly

---

[6] Mr. Cipriano represented defendant for a period of time after Mr. Jacobson withdrew as her counsel in September 2018 (*see* docs. ## 233, 243).

contradicts her sworn deposition testimony from earlier in this case. Defendant testified that she did not know the whereabouts of the original Version C document,[7] as it was stolen from her house sometime after Mr. Richert died (doc. # 317-1: Richert Dep., at 118:15-120:19, 122:17-22, 126:25-127:15, 141:21-25, 313:19-24, 323:20-24). Instead, the Version C document that defendant provided to her counsel was a *copy* that was placed in her mailbox by an unknown individual shortly before her deposition (*Id.* at 121:24-122:5, 136:18-139:5, 141:21-25, 309:15-310:4). *See also White*, 2018 WL 4101512, at *7. Because defendant testified that she did not give the original Version C to Mr. Jacobson, he, in turn, could not have provided the original to Mr. Williams. Indeed, Mr. Williams's report specifically notes that he examined "machine copies of the documents," not the original documents themselves (Williams Report at 3).

*Second*, the filings in the docket indicate that Mr. Williams did, in fact, return the Version C document that Mr. Jacobson provided to him. On June 23, 2017, Mr. Jacobson represented that plaintiff "turned over the trust document on June 20, 2017" (doc. # 161 at ¶¶ 2, 7). A FedEx tracking inquiry filed by plaintiff a few days later confirms this representation; it shows that on June 20, 2017, Mary Sparrow, an associate of Mr. Jacobson who also represented defendant during this litigation, signed for a package that was shipped the same day Mr. Williams said he sent the Version C document in his possession to Mr. Jacobson (June 19, 2017) and had the same tracking number (786920306155) as the number provided by Mr. Williams for that shipment (doc. # 163-1; doc. # 315-8 at 1; Richert Dep. at 2:11-14).[8]

---

[7] The Version C document shown to defendant at her deposition was marked as Exhibit 7 (*see* doc. # 317-1: Richert Dep., at 118:5-23; doc. # 319). This appears to be the same document (minus the exhibit sticker) as Exhibit C to plaintiff's Amended Complaint (*compare* doc. # 319, *with* Am. Compl. Ex. C).

[8] The FedEx package was delivered to Wheaton, Illinois (where Mr. Jacobson's office was located) and signed for by "M. Sparrow" (docs. ## 119, 163-1).

Defendant's unverified assertions that Mr. Jacobson told her that the original Version C document had not been returned, which are offered for the truth of the matter asserted, do not convince us otherwise. *See Burton v. Kohn Law Firm, S.C.*, --- F.3d ----, 2019 WL 3757571, at *6 (7th Cir. Aug. 9, 2019) ("A statement made out of court and offered to prove the truth of the matter asserted is hearsay and is not admissible into evidence"); *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1086 (7th Cir. 2014) ("Nothing is simpler than to make an unsubstantiated allegation"). Nor do defendant's recent attempts to track the document. Although the shipment tracked by defendant in May 2019 obviously does not reflect Mr. Williams's June 2017 shipment, defendant has not shown that FedEx's tracking numbers are only ever used once and are not reused for different, later shipments. To the contrary, the FedEx system recycles some tracking numbers, and a tracking page "may display information from another shipment, in addition to, or instead of yours." FedEx – Customer Help – FAQs, http://www.fedex.com/ma/customer/faq/packagetracking.html (last visited Aug. 26, 2019). Put another way, the tracking number provided by Mr. Williams most likely referred to both a shipment he made in June 2017 and an entirely unrelated shipment made almost two years later, and defendant has not explained why that is not what happened here.

*Third*, even if we assume that Mr. Williams failed to return the Version C document in his possession, defendant does not explain why this failure now warrants striking his expert report under the federal rules, *Daubert*, or any other case precedent. If the Version C document examined by Mr. Williams was necessary for defendant's own expert's analysis, defendant's former attorneys should have made every attempt to ensure that the document was returned so Mr. Vastrick could review it before offering his report. For instance, nothing prevented defendant's attorneys from bringing to our attention Mr. Williams's alleged failure to return the Version C document at issue via a motion to compel or some other motion for relief. Defendant's attorneys

did not do so. "[C]lients are bound by their counsel's conduct," *In re Sterling*, --- F.3d ----, 2019 WL 3788242, at *3 (7th Cir. Aug. 13, 2019), and "[a] litigant bears the risk" of her chosen attorney's actions (or inactions), even when they cause substantial harm. *Wade v. Soo Line R.R. Corp.*, 500 F.3d 559, 564 (7th Cir. 2007). Thus, to the extent Mr. Vastrick did not examine the same Version C document examined by Mr. Williams, any resulting harm must be borne by defendant, not plaintiff.

Accordingly, defendant's alleged inability "to provide her own expert with the original copy of the Trust for examination" (Def.'s Mot. at ¶ 11) does not justify striking Mr. Williams's expert report.

### B.

We next turn to the trust document defendant attached to her motion, which she claims to be "an exact duplication of the Trust, as scanned by" Mr. Jacobson (Def.'s Mot. at ¶ 9; doc. # 315-7). Paragraph 5.4.1 of this document, which we will refer to as Version D, is the same as paragraph 5.4.1 of Version C (*compare* Am. Compl. Ex. C at 3, *with* doc. # 315-7 at 3).

Defendant asserts that in Version D, the initials on the bottom right-hand side of all pages with initials, including page 3, are dark and legible (Def.'s Mot. at ¶ 9). The initials on all three depictions of Versions B and C in Mr. Williams's report, however, are barely legible, even though the text of page 3 in all these depictions is dark and clear (*Id.*). Defendant goes on to explain that the text and initials on all initialed pages of Versions A and B are dark and legible, but only the text of Version C is likewise dark and legible; the initials on all pages of Version C are barely legible (*Id.*). Additionally, defendant asserts that every page of Version C has two lines down the left side of every page, but only one of these lines was created by Mr. Jacobson's scan of the copy delivered to him by defendant (*Id.* at ¶ 10).

Defendant, however, makes no attempt to explain why these alleged variations in darkness, legibility, and number of lines down the side of a page between various versions of the Robert Trust affect the admissibility of Mr. Williams's expert report under Rule 702 and *Daubert*. Even if we afford defendant the flexibility given to non-attorney *pro se* litigants, she still must provide some semblance of an argument for us to address. *See Anderson v. Hardman*, 241 F.3d 544, 545 (7th Cir. 2001) (explaining that the court cannot craft arguments and perform legal research for a *pro se* litigant); *Ward v. Kelly*, 599 F. App'x 587, 588 (7th Cir. 2015) ("[A]lthough we construe pro se filings liberally, pro se litigants must give some reason to disturb the district court's decision"); *see also Small v. Endicott*, 998 F.2d 411, 417-18 (7th Cir. 1993) ("While the courts liberally construe *pro se* pleadings as a matter of course, judges are not also required to construct a party's legal arguments for him") (internal citation omitted). Here, because defendant has not done so, the existence of Version D or the asserted differences between the various versions does not justify excluding Mr. Williams's expert report. We will consider the points defendant has raised in assessing the weight to be given to Mr. Williams's opinions.

## C.

Defendant asserts that the following statement made by Mr. Kozacky contradicts Mr. Williams's stated assignment in offering his expert opinion: "[i]t is not our position that [defendant] 'forged' any signatures thereon, only that she fabricated the distributive clause and snuck that between authentic pages and authentic signatures" (Def.'s Mot. at ¶ 14). Again, defendant does not provide any legal basis for striking Mr. Williams's entire report based on this purported contradiction, and we decline to do so on that basis alone. *See Anderson*, 241 F.3d at 545; *Pelfresne v. Vill. of Williams Bay*, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a

lack of supporting authority or in the face of contrary authority, forfeits the point. We will not do his research for him") (internal citations omitted).

Moreover, we do not see any contradiction between Mr. Williams's assignment and the quoted statement from plaintiff's counsel. Mr. Williams's stated purpose of examination was to evaluate the similarity of the signatures, initials, and text between Versions B and C (Williams Report at 1). His finding that the initials and text on page 3 differ between versions supports Mr. Kozacky's assertion that defendant "fabricated the distributive clause and snuck that between authentic pages and authentic signatures" (doc. # 315-8 at 2). Indeed, Mr. Williams's findings led him to believe that there was a "page substitution" (Williams Report at 2), which aligns with the assertion that a fabricated page was "snuck" in between other, authentic pages. Mr. Williams also found that all the signatures between Versions B and C were the same (recall that the only discrepancies he found were on page 3, which contains no signatures—only text and initials) (*Id.*; Am. Compl. Ex. C at 3). This likewise fits with Mr. Kozacky's statement that "[i]t is not our position that she 'forged' any *signatures* thereon" (doc. # 315-8 at 2 (emphasis added)). Notably, plaintiff's counsel did not disclaim the contention that defendant forged any *initials* on the trust document. Again, defendant's assertions do not justify striking Mr. Williams's expert report.

### D.

Defendant proceeds to contend that irrespective of her prior arguments (in paragraphs 6-14 of her motion), we narrowed plaintiff's Count II to the question of whether defendant altered or forged a document and that nothing in Mr. Williams's report indicates that she did anything wrong (Def.'s Mot. at ¶¶ 5, 15).[9] She reiterates this contention in her response to plaintiff's motion

---

[9] Defendant also contends that other alleged facts do not show wrongdoing: the fact that Mr. Richert "created a new Page 3 in the final version of his Trust" and the fact that Fidelity has not produced anything showing that Mr. Richert "gave a copy of the final version of his Trust to Fidelity" (Def.'s Mot. at ¶ 15). Whether the evidence establishes these alleged facts and, if so, their effect on the parties' claims are issues for us to decide in our role as the

to strike the Vastrick Report, and argues that Mr. Williams's report "has absolutely no probative value" (Def.'s Resp. at ¶¶ 8, 19). We construe these contentions as challenging the relevance of Mr. Williams's report. *See Gopalratnam*, 877 F.3d at 779 (explaining that a court must evaluate the relevance of an expert's testimony before admitting it).

To begin, we did not "narrow" Count II to the single issue of whether defendant altered or forged the Robert Trust, as she repeatedly asserts. The July 18, 2017 hearing upon which defendant relies for this supposed narrowing addressed plaintiff's June 2017 motion to amend her complaint to add Count II (doc. # 165; doc. # 192: 7/18/17 Hr'g Tr., at 2:7-9). Defendant opposed this motion by arguing, among other things, that it was "now too late to depose" plaintiff about the proposed claim, as plaintiff was no longer competent to testify (doc. # 169 at 5-6). We addressed this argument at the subsequent July 18 hearing. After noting "that the real issue that the plaintiff raises is whether [defendant] altered or forged a document," we expressed our uncertainty that plaintiff could provide "probative testimony about that" issue, and we ultimately concluded that her inability to testify did not prejudice defendant's ability to defend against Count II (7/18/17 Hr'g Tr. at 9:9-11:4). By stating that the "real issue" raised by Count II was defendant's alleged alteration or forgery, we merely sought to identify the main thrust of the proposed claim in the context of determining whether defendant would be prejudiced by her inability to depose plaintiff about the claim. We did not in any way limit the factual questions that must be resolved before plaintiff can ultimately prevail on Count II.

Turning to Mr. Williams's report itself, we find that it is relevant. An expert opinion is relevant if it "assist[s] the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam*, 877 F.3d at 779 (internal quotations and citations omitted); *see also* Fed. R. Evid.

---

finder of fact at the upcoming bench trial. These issues do not bear on whether, in our gatekeeper role, we should allow Mr. Williams's expert report to be used at trial.

401 (relevant evidence "has any tendency to make a fact [of consequence] more or less probable than it would be without the evidence"). Here, Mr. Williams concluded that the "RLR" initials on page 3 of Version C differ from the "RLR" initials found on page 3 of Version B (Williams Report at 2). As the parties do not appear to dispute that the latter set of initials (in Version B) are, in fact, Mr. Richert's initials, Mr. Williams's conclusion provides evidence upon which the trier of fact could rely to find that Mr. Richert did *not* initial page 3 of Version C. Such a finding would contradict defendant's apparent contention that the initials on page 3 of Version C were Mr. Richert's initials (*see* Def.'s Mot. at ¶ 15 (asserting that Mr. Richert "created a new Page 3 in the final version of his Trust")). And if Mr. Richert did not initial page 3 of Version C, that supports plaintiff's theory that someone else did so and that defendant breached her fiduciary duty by distributing the trust assets based on a version of the Robert Trust she knew to be phony.

True, Mr. Williams does not affirmatively conclude that *defendant* was the one who wrote Mr. Richert's initials on page 3 of Version C. But this was not necessary for his report to be relevant. An expert opinion may be just one piece of evidence that a party combines with other pieces of evidence "to string her case together[.]" *Jones v. Union Pac. R.R. Co.*, No. 12 C 771, 2016 WL 9776612, at *3 (N.D. Ill. Aug. 18, 2016); *see Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009) ("[P]eople often put a case together with testimony on one point from one expert, testimony on a second point from a second expert, etc., and evidence from non-experts"). Here, if accepted, Mr. Williams's opinion would support the conclusion that Mr. Richert did not initial page 3 of Version C, which would be one step toward proving plaintiff's claim that defendant breached her fiduciary duty as trustee by distributing the trust assets pursuant to a counterfeit trust. As such, we find that Mr. Williams's opinion meets the *Daubert* threshold of relevance.

## E.

Finally, defendant contends that Mr. Williams's expert report contains a misrepresentation and that the report should be stricken because Mr. Williams did not use the standard methodologies used by Mr. Vastrick (Def.'s Resp. at ¶¶ 12, 20). Defendant has forfeited these contentions: she did not raise them in her opening motion, and even when she did raise them for the first time in her response to plaintiff's motion to strike, she made no attempt to develop them in any manner (*see id.*). *See Wedemeyer v. CSX Transp., Inc.*, 850 F.3d 889, 897 (7th Cir. 2017) (finding that the plaintiffs forfeited an argument they did not make in their opening brief); *United States v. Cisneros*, 846 F.3d 972, 978 (7th Cir. 2017) ("We have repeatedly and consistently held that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived") (internal quotations omitted); *see also Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 689 n.6 (7th Cir. 2014) (noting that even *pro se* litigants are generally "subject to the same waiver rules that apply to parties who are represented by counsel") (internal quotations omitted). Defendant's claim that Mr. Williams's report should be stricken as a Rule 11 sanction and that she should be awarded fees is likewise undeveloped and unsupported by any pertinent authority (Def.'s Resp. at 11 (¶ 4)). It is forfeited as well.[10]

---

[10] Defendant's response also requests that we grant her renewed motion to dismiss or motion for summary judgment and grant her motion to apply Arizona law in this matter (Def.'s Resp. at ¶ 4 & 10-11). These requests are denied as improper and outside of the scope of the motions before us, which should only address the admissibility of the parties' expert reports at trial.

## CONCLUSION

For the foregoing reasons, plaintiff's motion to strike (doc. # 314) is granted in part and denied in part and defendant's motion to strike (doc. # 315) is denied.

**ENTER:**

SIDNEY I. SCHENKIER
**United States Magistrate Judge**

**DATED: August 28, 2019**