## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KATHLEEN WHITE MURPHY,
 CO-ADMINISTRATOR OF THE ESTATE OF
 ANNA M. WHITE, ET AL.,

      Plaintiffs,

      v.

ELIZABETH K. RICHERT,

      Defendant.

No. 15 CV 8185

Magistrate Judge McShain

### MEMORANDUM OPINION AND ORDER

This breach-of-fiduciary-duty and indemnification case arises out of a long-running and bitterly contested family dispute over the assets of the Robert L. Richert Trust (the Robert Trust) and which version of the trust instrument is authentic.

Plaintiffs Kathleen White Murphy and Thomas White are the co-administrators of the estate of their deceased mother Anna M. White, who was a named beneficiary of the Robert Trust. Defendant Elizabeth Richert, the plaintiffs' cousin and the niece of Anna White and Robert Richert, is the trustee of the Robert Trust. She is also an attorney who has been licensed to practice law in Florida since 1992. [449] 27.[1] After a nearly successful settlement conference, multiple rounds of motion practice, and lengthy delays due to defendant's medical condition and the COVID-19 pandemic, this case proceeded to a bench trial over nine days in

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings. The parties' trial exhibits will be cited as [PX __] for plaintiffs' exhibits and [DX __] for defendant's exhibits.

September, October, and November 2020 on two narrow claims: (1) plaintiffs' claim that defendant breached her fiduciary duty to Anna White by creating a counterfeit version of the Robert Trust that purported to distribute to defendant an additional forty-seven percent of the Robert Trust's assets to which she was not entitled under the genuine trust instrument; and (2) defendant's counterclaim that a contract between defendant and Anna White known as the Receipt and Release requires plaintiffs to indemnify her for the fees and costs she incurred in this case.

The Court has considered the evidence presented at trial, the parties' proposed findings of fact and conclusions of law [328, 329], and the parties' post-trial briefs and motions [447, 459, 460, 462]. The Court finds that plaintiffs proved by a preponderance of the evidence that defendant breached her fiduciary duty to Anna White by (1) creating a counterfeit version of the Robert Trust that purported to distribute to defendant an additional forty-seven percent of the trust assets to which she was not entitled, and (2) failing to distribute to Anna White, in accordance with the genuine version of the Robert Trust, her share of the forty-seven percent of the trust assets that defendant attempted to control via the counterfeit trust document. The Court then finds that the Receipt and Release, which also purports to extinguish any claim Anna had against defendant respecting the distribution of her share of the trust assets, does not bar plaintiffs' claim because (1) there was no consideration for Anna White's promise to release her claims against defendant, and (2) the release is ineffective because it is undisputed that Anna White was unaware that there were multiple versions of the Robert Trust and that the competing versions of the trust

documents might form the basis for a claim against defendant. Finally, the Court finds that plaintiffs proved by clear and convincing evidence that defendant's breach of fiduciary duty was reprehensible and conducted with an evil mind, such that an award of punitive damages on a 1:1 ratio with plaintiffs' compensatory damages is warranted under Arizona law, which governs plaintiffs' entitlement to punitive damages.

With respect to defendant's counterclaim, the Court finds that (1) defendant failed to prove by a preponderance of the evidence that Anna White intended the indemnification provision to apply to a claim brought by Anna, as opposed to a third party, against defendant; and (2) in any event, the Receipt and Release is unenforceable because there was no consideration for Anna's promise to indemnify defendant.

Civil Rule 52 provides that, "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). Thus, "[w]hen a federal judge is the trier of fact, [she] unlike a jury, is required to explain the grounds of h[er] decision." *Arpin v. United States*, 521 F.3d 769, 776 (7th Cir. 2008). Rule 52(a) also requires that, "[w]hen the issue is the amount of damages," the Court "must indicate the reasoning process that connects the evidence to the conclusion[.]" *Jutzi-Johnson v. United States*, 263 F.3d 753, 758 (7th Cir. 2001).

Below the Court describes the case's lengthy background, summarizes the Court's important pretrial rulings and the relevant evidence presented at trial, and

sets forth the findings of fact and conclusions of law that support the Court's judgment and award of damages to plaintiffs.

## Background

This case began in July 2015, when Anna White, then 91 years old, filed a petition for production of deed and accounting against defendant in the Circuit Court of Lake County, Illinois. [1-1]. Defendant subsequently removed the case to this Court based on diversity jurisdiction. [1].[2]

In brief, Anna's petition sought an order requiring defendant to transfer title to Anna's residence in Buffalo Grove, Illinois from defendant, who held title to the Buffalo Grove home in her capacity as trustee of the Robert Trust, to Anna. [1-1] 3-4. The petition also sought an accounting of the Robert Trust and an order dissolving the Receipt and Release, which purported to extinguish Anna's claim to further distributions from the Robert Trust.

## I.     The Robert Trust

Robert L. Richert was Anna White's brother and the uncle of both plaintiffs and defendant. [280] 4, ¶ 1.[3] Robert, who resided in Carefree, Arizona, created the Robert L. Richert Revocable Trust on June 12, 2008. [*Id.*] 4, ¶¶ 2-3. The trust named

---

[2] Subject-matter jurisdiction was proper at the time of removal because Anna White was an Illinois citizen, defendant was a Florida citizen, and the amount in controversy exceeded $75,000. *See* 28 U.S.C. 1332(a)(1); [1] 2. Complete diversity existed after Anna White's death because the legal representatives of her estate, Kathleen White Murphy and Thomas Murphy, are "deemed to be [ ] citizens only of the same State as" Anna White. 28 U.S.C. § 1332(c)(2). Defendant has argued that this case falls within the probate exception to federal jurisdiction, but the Court rejected that argument earlier in the litigation and sets forth in greater detail below its reasons for doing so.

[3] In their proposed final pretrial order, the parties stipulated to thirty facts [280] 3-6, and the Court admitted the stipulations into evidence at trial. [450] 118-19.

Robert as the settlor, trustee, and beneficiary of the trust and defendant as successor trustee. [PX 26] 30; *see also* [*id.*] 37; [PX 29] 59.

In September 2009, Robert underwent surgery at the Mayo Clinic in Phoenix for non-small cell carcinoma and became incapacitated. [449] 94; [PX 34] FIDELITY 0090. To become trustee during Robert's incapacitation, defendant submitted a Trustee Certification Form to Fidelity Investments, where Robert had established a trust account. [449] 94, 96-102; [PX 34] FIDELITY 0083-0088, 0090. The Certification Form, which was accompanied by a letter from Robert's doctors stating that he was unlikely to recover, instructed Fidelity to recognize defendant as trustee of the Robert Trust. [PX 34] FIDELITY 0083, 0088. This paperwork was signed by defendant and notarized on September 21, 2009, and it was faxed to a Fidelity branch in Arizona. [*Id.*] FIDELITY 0083, 0091. Although defendant testified she had no recollection of signing or submitting this paperwork to Fidelity, [449] 96-102, the Court finds that she did so in order to be recognized as the Robert Trust's successor trustee after Robert became incapacitated.

Robert died on November 9, 2009. [280] 4, ¶ 4.

A.    **The Robert Trust's Assets**

At the time of Robert's death, the Robert Trust held title to Robert's home in Carefree and $611,814.45 in the Fidelity account. [280] 4, ¶ 9. The parties stipulated

that, between November 17, 2009 and January 15, 2010, defendant wrote eight

checks on the Robert Trust's Fidelity account for a total of $622,364.91:[4]

| Date | Check No. | Payee | Amount |
|---|---|---|---|
| Nov. 17, 2009 | 1076 | Cash | $13,407.50 |
| Nov. 25, 2009 | 1077 | Cash | $3,178.57 |
| Dec. 28, 2009 | 1051 | Cash | $30,000.00 |
| Dec. 31, 2009 | 1078 | Cash | $8,646.47 |
| Jan. 7, 2010 | 1079 | Anna White | $30,000.00 |
| Jan. 15, 2010 | 1080 | Cash | $10,000.00 |
| Jan. 15, 2010 | 1081 | Anna White | $124,823.09 |
| Jan. 15, 2010 | 1082 | Cash | $402,309.28 |

[280] 5, ¶¶ 18-23.

It is undisputed that defendant made out six of the checks–totaling

$467,541.82–to cash. Despite disposing of nearly a half-million dollars (and slightly

more than seventy-five percent of the trust's cash assets) in this fashion, defendant

testified that she could not remember how the $467,541.82 had been spent. [450] 68-

72. Nor did defendant testify why she had made these checks out to cash, as opposed

to a specific payee. Defendant did testify that she initially deposited this money into

---

[4] The discrepancy between the parties' stipulation and the documented amount of money withdrawn appears to stem from the fact that the investment value of the Robert Trust account increased in November 2009, December 2009, and January 2010, even while money was being withdrawn. *See* [PX 16, PX 17, PX 18]. For example, although the account had $611,814.45 as of November 1, 2009, its value increased by $10,102.58 by November 30, 2009. [PX 16] 1.

a Chase bank account that "belonged to [her] uncle" and to which she added her name, [458] 17, but she produced no banking records to corroborate this claim. Two other checks, totaling $154,823.09, were made out to Anna White, and the parties stipulated that those checks were deposited into Anna's bank account. [280] 5, ¶¶ 16, 28. The Court accordingly finds that Anna White received $154,823.09 from the Robert Trust account.

On February 18, 2010, defendant closed out the Robert Trust account by writing a final check in the amount of $94.26 to cash. [280] 5, ¶ 24; [PX 30] 7; *see also* [PX 19] (showing zero balance for Robert Trust's Fidelity account as of February 28, 2010). Defendant testified that she acted with Anna White's knowledge when she closed the Fidelity account, and that she closed the account because she "was paying expenses for the estate, and Fidelity had a monthly check limit." [458] 17.

## B.    The Robert Trust Documents

During discovery, the parties produced three versions of the Robert Trust: Version A [PX 26] 5-33, Version B [PX 26] 37-63, and Version C [PX 29]. As the Court explained in its prior order granting in part and denying in part defendant's motion for summary judgment, Versions A and B are identical except that (1) Version A has two post-it notes, written by defendant, attached to page 4 of the trust instrument, [PX 26] 10; and (2) the word "FAXED" appears on the first page of Version B, and the date September 21, 2019, the time "17:06", a fax number with the Arizona area code 480, and the word "KINKOS" appears on each page of Version B, [*id.*] 37-63. *See White*

*v. Richert*, No. 15 CV 8185, 2018 WL 4101512, at \*2 (N.D. Ill. Aug. 28, 2018) (*White III*).

> In Versions A and B of the Robert Trust, paragraph 5.4.1 provides that:
>
> If the Settlor's residence is part of the trust estate or is owned by the Settlor at the time of his death, then the Settlor's residence, personal effects, household goods, automobiles(s), and any interest he may have in any insurance policies thereon, shall be distributed to ELIZABETH K. RICHERT, the Settlor's niece. If at the time of the Settlor's death, the Settlor's residence is not part of the trust estate or is not owned by the Settlor, then forty-seven percent (47%) of the trust estate shall be distributed to ELIZABETH K. RICHERT, the Settlor's niece.

[PX 26] 9 (Version A); [*id.*] 40 (Version B).

In contrast, paragraph 5.4.1 of Version C directed that defendant receive not only the Carefree home, but also an additional forty-seven percent of the Robert Trust's assets:

> If the Settlor's residence is part of the trust estate or is owned by the Settlor at the time of his death, then the Settlor's residence, personal effects, household goods, automobiles(s), and any interest he may have in any insurance policies thereon, shall be distributed to ELIZABETH K. RICHERT, the Settlor's niece. In addition to the Settlor's residence, forty-seven percent (47%) of the trust estate shall be distributed to ELIZABETH K. RICHERT, the Settlor's niece.

[PX 29] 3.

All versions of the Robert Trust provided that, if Anna White survived her brother, she would receive forty-seven percent of the trust estate. [PX 26] 9 (Version A); [*id.*] 40 (Version B); [PX 29] 3 (Version C). Likewise, all versions of the trust documents provided that six percent of the trust estate was to be distributed among three charitable organizations in Carefree, Arizona. [PX 26] 9-10 (Version A); [*id.*] 40-41 (Version B); [PX 29] 3-4 (Version C). However, Versions A and B failed to identify

a specific beneficiary to receive the remaining forty-seven percent of the trust's assets–the same forty-seven percent that Version C purports to distribute to defendant. Each version of the trust documents directed that, in the event that the trust failed to provide for "distribution of the trust estate or any part thereof, such interest shall be distributed to the intestate heirs of the Settlor, as then determined by the laws of the State of Arizona as then in effect." [PX 26] 10 (Version A); [*id.*] 41 (Version B); [PX 29] 4.

It is undisputed that the Robert Trust held title to the Carefree home at the time of Robert's death. [PX 11] 2-6. Consequently, title to the home passed to defendant in accordance with paragraph 5.4.1 of each version of the trust instrument.

The critical dispute in this case is which version of the Robert Trust instrument is genuine. If Versions A and B are authentic, then defendant was entitled to the Carefree home but not the additional forty-seven percent of the trust estate that Version C purports to distribute to her. Because Versions A and B did not provide for the distribution of forty-seven percent of the trust estate, moreover, paragraph 5.5 of Versions A and B obligated defendant to distribute that sum–$287,552.79–in accordance with then-applicable Arizona intestacy law. This would have required defendant to distribute a third of that sum–$95,850.83–to Anna White.[5] But if

---

[5] Under Ariz. Rev. Stat. § 14-2103(3), if a decedent is not survived by a descendant or a parent, the estate is distributed to "the descendants of the decedent's parents or either of them by representation." In Robert's case, that meant that each of his sisters, Anna White and Mary Jane Richert, was entitled to a one-third share of the forty-seven percent at issue, while the children of Robert's brother Thomas, defendant and David Richert, were each entitled to a one-sixth share. *See* [PX 23] (Richert-White family tree).

Version C were the genuine trust document, then defendant would have been entitled to the Carefree home and a further $287,552.79.

## 1. Production of Version C

At trial, defendant testified that she found Version C of the Robert Trust "months after [Robert] passed away in a locked floor safe in the master bedroom closet" of the Carefree home. [458] 14-15. When defendant read Version C, she understood it to accurately represent her uncle's wishes, which Robert had disclosed to her in prior conversations: defendant would receive title to the Carefree home, a small portion of the trust estate would be distributed to local charities, and the remainder would be divided equally between defendant and Anna White. [458] 10. Defendant testified that she retained the original of Version C and mailed a copy to Anna White. [*Id.*] 17.

Despite the importance of Version C to the claims in this case, defendant did not produce that document–or even mention that it existed–until February 2017, nearly two years into the litigation, and only because of a set of highly unusual–and, the Court finds, entirely falsified–circumstances.

On the eve of her deposition, defendant produced a PDF copy of Version C to plaintiffs' counsel. [451] 284-85. At trial, defendant explained that the original Version C had been stolen from her home in Florida, along with a set of silverware and several boxes of records, at a time she could not recall. [458] 25; *see also* [280] 5, ¶ 16 (stipulation that "[d]efendant does not remember the exact date that the original of [Version C] was stolen from her home"). Defendant suspected that one of her law

clients, who had repaired her kitchen cabinets in exchange for legal services, was the culprit. [458] 46. Defendant testified that she had a "good reason" for not reporting the burglary to the police, and that she does not disclose her address to anyone because of her past involvement in an abusive relationship. [451] 50; [458] 25. Defendant acknowledged that she did not disclose during discovery that Version C had been stolen from her home. [451] 50.

In a fortunate turn of events, however, a copy of Version C had "appeared in [defendant's] mailbox in an opaque plastic bag" sometime in early 2017. [458] 25. In defendant's telling, plaintiffs had likely taken the copy of Version C that defendant sent to Anna White and "had someone plant" it "into [her] mailbox to set me up[.]" [*Id.*]. According to defendant, "the only individuals who had a motive to put a copy of the trust into my mailbox were plaintiffs or their attorneys." [*Id.*] 27. Defendant testified that Thomas White had likely hired a private investigator to locate defendant and place the copy of Version C in her mailbox. [*Id.*] 25-27.

Defendant denied altering or forging anything related to the Robert Trust. [458] 36. Based on her conversations with her uncle, defendant believed that Version C was the authentic version of the trust, and that Robert had substituted a revised version of paragraph 5.4.1 distributing the additional forty-seven percent of the trust estate to defendant "rather than go to the trouble of re-executing a document and finding witnesses and a notary." [*Id.*] 37.

## 2. Production of Versions A and B

The discovery of Version C prompted plaintiffs to file in April 2017 a motion to compel a supplemental deposition of defendant and for leave to issue a subpoena to Fidelity to produce more legible copies of the checks that defendant had written on the Robert Trust's account. [146]. Regarding the latter request, the Court accepted plaintiffs' contention that more legible copies of the checks were relevant to discovering the bank accounts into which defendant had deposited funds from the Robert Trust. [*Id.*] 7; [158] 17-18. But the Court's minute entry authorizing this discovery contained two scrivener's errors, one concerning the party that had filed the motion and one regarding the content sought from Fidelity. The Court's order stated that "[t]he motion is granted in that the Court further gives leave for *defendant* to either subpoena or request from Fidelity more legible copies of *the Robert Trust*." [151] 1 (emphasis supplied). Relying on the expanded language of the Court's order, plaintiffs subpoenaed Fidelity for copies of the checks issued on the Robert Trust as well as the trust instrument itself. In May 2017, Fidelity produced Version A and Version B of the Robert Trust. *See* [PX 33] FIDELITY 0051-0079; [PX 34] FIDELITY 0091-0117.

At trial, defendant testified that she visited her uncle in Arizona after his cancer surgery and found Version A "on a desk in the office of [her] uncle's house, in a stack of papers and the papers were loose." [458] 12. Having already discussed with Robert how he wanted his property distributed after his death, defendant did not read Version A at that time. [*Id.*] 11-12.

### C.    Anna White's Expected Distributions from the Robert Trust

Kathleen White Murphy testified that, after Robert's death, she had several conversations with defendant about Anna White's share of the Robert Trust assets. [451] 62. Defendant told Kathleen that Anna would receive a one-half interest in both the Carefree home and the remainder of Robert's estate, while defendant would receive the other half. [*Id.*]. Defendant also told Kathleen that she and her son were making repairs to the Carefree home and planned to sell it. [*Id.*] 62-63. Defendant emailed Kathleen an appraisal of the home to show to Anna, who did not have a computer. [*Id.*] 63-64; [280] 4, ¶ 8. Kathleen testified that defendant was disappointed in the appraisal, which valued the home around $500,000, because she believed it was worth closer to $1 million. [451] 63-64. Defendant wanted to wait for the real estate market to pick up before trying to sell the Carefree home. [*Id.*] 64.

Thomas White also discussed the Robert Trust's assets with defendant after Robert died. According to Thomas, defendant said that Anna would receive a one-half interest in the Carefree home. [452] 36. Thomas asked defendant about her plans for selling the home, and defendant said that she "wanted to hold off on selling it because there was a lot of work that still had to be done on it," and "the market was not at a good point to be able to sell it at this time." [*Id.*] 39. Thomas testified that this conversation reassured him because the house would be sold and "soon enough my mom would realize from the sale of that house." [*Id.*].

Gary Steciuk, an independent financial advisor who was also Anna White's step-grandson, testified that he contacted defendant to discuss Anna's expected distribution from the Robert Trust. [449] 48; [454] 18. Defendant told Gary, who had

helped Anna with her financial affairs since 2007 or 2008, that "there was a bunch of money . . . that would be coming to Anna White as a result of the estate, and that there was a property in Arizona which Anna White would be entitled to half of it, once it was eventually sold." [454] 13, 15, 19. Gary likewise testified that defendant wanted to make repairs to the Carefree home and sell the property only after the market improved. [*Id.*] 20. Finally, defendant told Gary that she would make periodic distributions from the trust to Anna, but she needed to be careful not to dissipate the trust assets in case any claims were made against Robert's estate. [*Id.*] 19.

In 2014, Gary was arrested by federal authorities and charged with one count of mail fraud. [454] 13. After pleading guilty, he was sentenced to 105 months' imprisonment. [*Id.*]. Gary admitted that he had stolen more than $100,000 from Anna White as part of his crimes. [*Id.*]. He also acknowledged sending an email to Anna's family in August 2016 saying that he was remorseful and wanted to help them with their case against defendant. [DX 12]; [454] 89-90.

### D.    The Loan Agreement

In 2010, Anna and her husband James lived in a second-floor condominium in Arlington Heights, Illinois. [451] 64. They decided to sell the condo and buy a home without stairs because James, who was 89 years old, had difficulty navigating stairs. [*Id.*]. Anna and James ultimately purchased a house located at 49 Willow Parkway in Buffalo Grove, Illinois, using funds loaned to them by defendant. [458] 18-19.

The parties introduced conflicting evidence about whose idea it was for defendant to loan money to Anna and James. Kathleen White Murphy testified that

defendant proposed loaning $200,000 to Anna, and that Anna would repay the loan with the proceeds from the sale of the Arlington Heights condo. [451] 67-68. Defendant also told Kathleen that she needed to loan the funds to Anna, rather than releasing Anna's share of the Robert Trust funds, because "there might be other claimants against the trust[.]" [*Id.*] 67. Gary Steciuk also testified that it was defendant's idea to loan Anna $200,000 to purchase the home, and that defendant would "forgive the loan . . . once she could release the funds" from the Robert Trust. [454] 40-41. In contrast, defendant testified that it was Gary's idea that she loan the funds to Anna. [458] 17. Although Anna had money invested with Gary, Gary told defendant that Anna would incur "a lot of penalties and early termination fees" if she used those funds to purchase the house. [*Id.*] 17-18.

Defendant ultimately agreed to lend Anna the money, provided that the Buffalo Grove home would be "titled in my name individually, not as trustee of my uncle's trust, until the loan was repaid." [458] 19. Once the loan was repaid, defendant testified, she would "quitclaim the property to my aunt and uncle." [*Id.*].

On November 8, 2010, defendant and Anna White executed a Loan Agreement respecting the Buffalo Grove property. [DX 4]. Contrary to defendant's testimony, the agreement provided that the Buffalo Grove home would be titled in her name as trustee of the Robert Trust:

> This is to certify that Elizabeth K. Richert will be loaning funds in the sum of $200,000 from the Robert L. Richert Trust, Elizabeth K. Richert, Trustee, to Anna M. White for the purpose of purchasing an investment property at 49 Willow Parkway, Buffalo Grove, IL 60089. The property will be titled in the name of the Trust and Elizabeth K. Richert, Trustee,

until the loan is repaid in full. At the time the loan is repaid, the title to the property will be transferred to Anna M. White.

\* \* \*

As soon as the property at 1322 S. New Wilke Rd., in the names of Anna M. White and James F. White, is sold, the entire proceeds will be sent to Elizabeth K. Richert to repay a portion of the loan. The intent is that the remainder of the loan will be repaid upon distribution of the estate attached to Robert L. Richert.

However, Elizabeth K. Richert reserves the right to call the balance of the loan at any time, if necessary, and in such case funds will be liquidated by Gary C. Steciuk, Investment Representative, from Anna M. White's investments in order to repay the balance.

[DX 4].

The parties stipulated that defendant loaned Anna $200,000.00 to purchase the Buffalo Grove property. [280] 4, ¶ 6. However, no evidence was introduced to show the accounts from which defendant obtained these funds. Anna and James closed on the Buffalo Grove home in November 2010. Both the warranty deed, [PX 1], and the HUD-1 form prepared during the sale, [PX 9] 1, show that the Buffalo Grove home was transferred to defendant in her capacity as trustee of the Robert Trust.

E. **The Receipt and Release**

In July 2011, the White family threw a party for James White's ninetieth birthday. Both plaintiffs and their families attended, as did defendant, Gary Steciuk, and his wife Vicki Steciuk.

While defendant was present at Anna and James's home, she and Anna executed the Receipt and Release. [PX 14]. Defendant testified that she had discussed this agreement with Anna before traveling to Illinois. [458] 20-21. It was defendant's

understanding that obtaining a release from a trust beneficiary was "a standard procedure." [*Id.*] 21. Defendant testified that she asked Anna to sign the release "in case something should happen to her and her children decided to sue me so I would not have to be involved in another out-of-state lawsuit." [*Id.*].[6] According to defendant, Anna was "happy to execute the receipt and release for me." [*Id.*].

Vicki Steciuk, who was present when Anna and defendant executed the Receipt and Release, testified that she, too, had previously discussed the release with defendant. [456] 20. According to Vicki, defendant wanted the release in place to protect herself in the event of a dispute over the trust. [*Id.*] 21. Vicki also said that Anna White "didn't want any disputes with anything and she wanted to sign [the release] to protect [defendant] as well." [*Id.*] 26. Vicki believed that Anna and defendant were close and had a good relationship. [*Id.*] 36.

The Receipt and Release reflects that it was signed by Anna White and defendant and notarized on July 30, 2011. [PX 14] 2. A caption, "In the matter of the Accounting of: the Personal Representative and Trustee of the Estate of Robert Louis Richert, Deceased," appears in the top-left corner of the first page. [*Id.*] 1. The document then provides, in pertinent part:

> KNOW ALL MEN BY THESE PRESENTS that the undersigned, Anna M. White, being of full age, does hereby acknowledge receipt from Elizabeth K. Richert, as Personal Representative and Trustee of the Estate of Robert Louis Richert, deceased, of the Property she is entitled to receive under the Last Will and Testament of Robert Louis Richert and the Robert Louis Richert Revocable Trust Dated April 24, 2008, in

---

[6] Defendant testified that she had sued two different cousins in Colorado after discovering that they had stolen money from the estate of their mother, who was also defendant's maternal aunt. [458] 20.

full payment and satisfaction of the bequest(s) to her and in consideration thereof, the undersigned does hereby:

FIRST: Remise, release, and forever discharge the Personal Representative and Trustee, Elizabeth K. Richert, individually and as such Personal Representative and Trustee, of and from any every claim, demand, action, and cause of action, account, reckoning and liability of every kind and nature for and on account of any and every matter and thing whatever arising from or in any manner relating to, or connected with, the distribution of Property to the undersigned in full payment and satisfaction of the Bequest.

\*    \*    \*

THIRD: Agree that the undersigned does hereby indemnify and hold harmless the Personal Representative and Trustee, Elizabeth K. Richert, individually and as such Personal Representative and Trustee, of and from any and all liabilities, damages, losses, charges, fees, costs, and expenses of whatever kind or nature (including reasonable attorney fees) which the Personal Representative and Trustee shall at any time sustain by reason of any objection, demand, or claim of whatever kind or nature, for, upon, or by reason of, the distribution of the Property to the undersigned in full payment and satisfaction of the Bequest.

FOURTH: Agree that this Receipt and Release shall be binding upon the heirs, distributees, executors, administrators, legal representatives, and assigns of the undersigned, and shall inure to the benefit of the heirs, distributees, executors, administrators, legal representatives, and assigns of the Personal Representative and Trustee.

[PX 14] 1-2.

Neither Kathleen nor Thomas was present when Anna and defendant executed the Receipt and Release. [451] 73; [452] 34-35. Vicki testified that Anna "wanted to handle her affairs privately and she didn't want any of the children involved." [456] 29. Vicki also believed that Anna did not trust Kathleen's husband, and that it was a "complicated situation in keeping [Anna's] affairs private from her children and making them the way she wanted them." [*Id.*] 30-31.

18

### F.    The Quitclaim Deed

On the same day that defendant and Anna executed the Receipt and Release, defendant also prepared a quitclaim deed respecting the Buffalo Grove property. [PX 8]. The deed reflects that defendant, in her capacity as the trustee of the Robert Trust, transferred title to the home to the "Anna M. White Revoc. Trust." [*Id.*] 1.

Gary Steciuk, who observed defendant complete the quitclaim deed, testified that defendant directed him to retain the deed, rather than "file it with the proper reporting agency[.]" 454 [44]. According to Gary, defendant did not want to record the deed because, "if there was something that happened where Anna White needed care, and in a nursing home or something of that sort, that it was better if the house was not in her name." [*Id.*]. It is undisputed that the quitclaim deed was never recorded with the appropriate recorder of deeds, and that title to the Buffalo Grove remains in defendant's name as trustee of the Robert Trust. [451] 23.

### G.    Litigation History

On November 30, 2015, shortly after the case was removed to this Court, the parties consented to proceed before Magistrate Judge Schenkier, then the designated magistrate judge, for all further proceedings, including entry of final judgment. [23] 4; [26].[7] Judge Schenkier presided over a settlement conference with the parties on December 8, 2015 [27], after which, following several telephonic status conferences, it appeared that the parties were close to finalizing a settlement agreement. [32].

---

[7] The undersigned took over this case after Judge Schenkier's retirement in May 2020. [386]

Although the discussions continued through mid-April 2016, the parties ultimately concluded a settlement could not be reached, and the litigation began in earnest. [38].

### 1. First Motion to Dismiss

In June 2016, the Court issued its first memorandum opinion and order in this case, denying defendant's motion under Fed. R. Civ. P. 12(b)(6) to dismiss Anna's petition for failure to state a claim as well as her motion to dismiss the case for improper venue or to transfer venue. [48]; *White v. Richert*, No. 15 C 8185, 2016 WL 3582083 (N.D. Ill. June 28, 2016) (*White I*).

As relevant here, defendant argued that Anna's petition failed to state a claim because the Receipt and Release established as a matter of law that defendant could not be liable for any claims related to an accounting of, and the distribution of assets from, the Robert Trust. *White I*, 2016 WL 3582083, at *2. Defendant also contended that the petition was time-barred under the relevant Arizona statute of limitations. *Id.*, at *3. The Court held that Anna plausibly alleged that the Receipt and Release was the product of undue influence and therefore invalid, given Anna's allegations that defendant was acting as her attorney at the time. *Id.*[8] The Court also ruled that it would be premature to dismiss the case based on the statute of limitations, as it

---

[8] At trial, the parties offered conflicting evidence whether defendant had acted as Anna White's attorney in 2011 by preparing the documents in her estate plan. Although this evidence was arguably relevant to the validity and enforceability of the Receipt and Release, the Court need not address this evidence or resolve the conflict in light of its conclusion that the Receipt and Release is invalid on two separate grounds.

was unclear (1) if Arizona or Illinois law supplied the governing limitations period, and (2) whether, if Illinois law applied, Anna's petition was subject to a two-year limitations period specific to claims of professional misconduct or a catchall, five-year limitations period. *Id.*, at *3-5.

## 2. The Court's Ruling That the Receipt and Release Is Ambiguous

Shortly after the Court issued *White I*, defendant filed her first amended counterclaim. [51]. The counterclaim asserted eight counts, including the indemnification claim against Anna based on the Receipt and Release. [*Id.*] 10-11. Plaintiffs moved to dismiss the counterclaim, and the Court dismissed all but Count I, which alleged a breach of the loan agreement, and Count II, the indemnification count.[9] *White v. Richert*, No. 15 C 8185, 2016 WL 6139929, at *3-9 (N.D. Ill. Oct. 21, 2016) (*White II*). In holding that Count II survived, the Court determined that the Receipt and Release was ambiguous as to whether the parties intended to indemnify defendant only for claims raised by third parties or whether they also intended to indemnify her for claims raised by Anna herself:

> Anna contends that the point of the indemnity language in the Receipt and Release was to indemnify Richert only for claims brought by third parties. It was not intended, says Anna, to indemnify Richert for her costs and fees accrued in a lawsuit brought by Anna herself.

> Richert responds that the Receipt and Release squarely defines the situations under which Anna may be required to indemnify Richert[, including claims made by Anna herself].

> In Illinois, interpretation of a contract's terms is generally a question of law. *Fifth Third Mortgage Company v. Kaufman*, No. 12 C 4693, 2016 WL 2851554, *5 (N.D. Ill. May 14, 2016). If there is any ambiguity in the

---

[9] Defendant later voluntarily dismissed Count I of her counterclaim with prejudice. [330].

contract, however, proper resolution of that ambiguity becomes a question to be resolved by the trier of fact, and cannot be decided on a motion to dismiss. *Bank of America, N.A. v. Oberman, Tivoli & Pickert, Inc.*, 12 F. Supp. 3d 1092, 1100 (N.D. Ill. 2014). We apply that rule with special rigor in a fee-shifting provision, as Illinois law does not provide for fee shifting absent statute or a contractual agreement to do so. *United Labs., Inc. v. Savaiano*, 06 C 1442, 2007 WL 4557095 (N.D. Ill. Dec. 21, 2007).

In this case, the language of the indemnity agreement is ambiguous; we cannot determine whether it was intended to indemnify Richert for claims against her that were allegedly caused by her own behavior. It will be for Richert to ultimately offer evidence to show that both parties intended that result.

*   *   *

It is premature for the Court to decide now whether the indemnity in the Receipt and Release was intended to cover fees and expenses incurred by Richert as a result of the suit by Anna[.] *    *    * We therefore deny the motion to dismiss Count II of the counterclaim.

*White II*, 2016 WL 6139929, at *5.

### 3.      Plaintiffs' Amended Complaint

In the wake of the production of Versions A, B, and C of the Robert Trust in February and May 2017, plaintiffs moved for leave to file an amended complaint. [165]. The proposed amendment incorporated by reference Anna's original petition and added the claim for breach of fiduciary duty as trustee that was the subject of the bench trial. Plaintiffs alleged that Version C was "a counterfeit document which Elizabeth Richert altered and forged by replacing the dispositional language in the authentic Robert Trust[.]" [173] 3, ¶ 28. Plaintiffs claimed that defendant had "altered and forged Exhibit C to aggrandize and unlawfully take 47% of the trust proceeds she was not entitled to." [*Id.*] 3, ¶ 29. Their prayer for relief sought a

judgment "disgorging the trust proceeds to which Elizabeth Richert was not entitled" and awarding punitive damages, attorney's fees, and costs. [*Id.*] 3.

The parties discussed the proposed amendment at a hearing on July 18, 2017. [192]. Plaintiffs acknowledged that the remedies they sought for the breach-of-fiduciary-duty claim were different from the remedies sought by Anna's original petition. [*Id.*] 14. With respect to the fiduciary-duty claim, plaintiffs specifically stated that "[w]e are asking for . . . that portion of the 47 percent that Anna White would have been entitled to" under Versions A and B of the trust documents. [*Id.*] 14-15, 17-18. Plaintiffs also agreed that the Carefree home was "off the table" because it "goes to the defendant whether–under any of the three scenarios" established by the different versions of the trust instrument. [*Id.*] 16. On August 8, 2017, the Court granted leave to file the amended complaint. [172].

### 4. Defendant's Challenge to the Court's Subject-Matter Jurisdiction

Defendant moved to dismiss the amended complaint on multiple grounds, including for lack of subject-matter jurisdiction. [176]. In particular, defendant argued that the fiduciary-duty claim fell within the probate exception to federal jurisdiction because the claim asked the Court to invalidate one version of the Robert Trust, disgorge trust property from defendant, and distribute that property to Anna White. [*Id.*] 12.

At a hearing on defendant's motion, the Court rejected this argument principally because the Court had "not been provided with the factual information that I find necessary to fully address the argument," such as whether the Robert

Trust "was handled through state probate courts[.]" [193] 7. The Court permitted defendant to renew the issue on summary judgment so that the Court could "assess the claim on a factual record, and the parties can fully address issues such as whether the case law treats a claim for a breach of fiduciary duty by altering a trust document as a claim that falls within that exception." [*Id.*]. However, defendant introduced no evidence—either at summary judgment or at trial—to show that the Arizona probate courts conducted any proceedings related to Robert Richert's will or trust.

### 5. Summary Judgment Rulings

In May 2018, defendant moved for summary judgment, arguing that both counts of the amended complaint were untimely and, alternatively, there was no genuine factual dispute that Version C was the authentic version of the Robert Trust. The Court granted the motion in part and denied it in part. *White III*, 2018 WL 4101512.

First, the Court granted summary judgment to defendant on Count I, finding that there was no genuine dispute that the claim was untimely under Illinois law.

The Court found that Count I, which "alleges that Ms. Richert breached her 'duty of honesty and loyalty' in her role as Ms. White's attorney" and sought "legal title to the BG [*i.e.*, Buffalo Grove] property, dissolution of the Receipt and Release, and an accounting of the Robert Trust," was "'[a]n action for damages based on tort, contract, or otherwise (i) against an attorney arising out of an act or omission in the performance of professional services'" and was therefore subject to a two-year limitations period. *White III*, 2018 WL 4101512, at *5 (quoting 735 ILCS 5/13-214.3).

The Court held that Anna's allegation that she "discovered a problem with title to the BG property in February 2013" triggered the limitations period because by then Anna "knew or reasonably should have known that Ms. Richert allegedly violated her rights." *Id.*, at *6 (internal quotation marks omitted). Because Anna did not file her petition until July 17, 2015, more than two years after discovering defendant's alleged misconduct, the claim was untimely.

Second, the Court denied summary judgment on the breach-of-fiduciary-duty claim. The Court determined that this claim was timely under 735 ILCS 5/13-205, which establishes a five-year "catch-all" limitations period for breaches of fiduciary duty not addressed by a separate statute. *White III*, 2018 WL 4101512, at *6. Rejecting defendant's argument that Anna's execution of the Receipt and Release in July 2011 triggered the limitations period, the Court held that the statute did not start to run until Anna knew or should have known that multiple versions of the Robert Trust existed. *Id.*, at *7. Although defendant testified at her deposition that she showed Version C to Anna within a year of Robert Richert's death, the Court explained that it was not until after plaintiffs issued their subpoena to Fidelity in April 2017 that "it became evident . . . that there was more than one version of the Robert Trust" in existence. *Id.* For that reason, the Court ruled that Count II "did not accrue until sometime in 2017, and it is not time-barred." *Id.*

The Court then rejected defendant's argument that there was no genuine issue of material fact on the merits of the breach-of-fiduciary-duty claim. Although defendant contended that the Court could decide as a matter of law that Version C

was genuine, the Court held that "the existence of multiple versions of the Robert Trust, the unusual circumstances under which Ms. Richert says that Version C went missing and was then returned to her in time for her deposition, and the fact that Fidelity had copies of Versions A and B but not C, raise fact questions concerning which version is authentic and governing." *White III*, 2018 WL 4101512, at *8.

### 6. Death of Anna White

Anna White suffered from dementia, and Kathleen White Murphy testified that Anna's health began seriously declining in 2015. [455] 36, 44. On August 29, 2019–eleven days before the originally scheduled trial date of September 9, 2019– Anna passed away. [341] 1.

The Circuit Court of Lake County appointed Kathleen White Murphy and Thomas White as the representatives of Anna's estate, [344-1] 2, and this Court granted plaintiffs' ensuing motion to substitute themselves, in their representative capacity, as the plaintiffs in this case. [348]. The Court found that the substitution was proper because of Kathleen and Thomas's appointment as the co-administrators of Anna's estate and because the breach-of-fiduciary-duty claim survived Anna's death. [*Id.*] 1. But the Court also ruled that Anna's claim for punitive damages did not survive her death as a matter of Illinois law. As the Court explained, "[u]nder Illinois law, any right to common law punitive damages is lost once the injured party has died[,]' and a request for punitive damages will survive the injured party's death only if it is expressly authorized by statute." [*Id.*] 2 (quoting *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 617 (Ill. 2011)). Because plaintiffs' claim rested on

the common law, and because they had not cited a statute that expressly authorized punitive damages, the Court held that plaintiffs would not be entitled to punitive damages if they prevailed on the breach-of-fiduciary-duty claim.[10]

## Discussion

## I.    Subject-Matter Jurisdiction

In her post-trial brief, defendant renews her argument that the Court lacks subject-matter jurisdiction over plaintiffs' breach-of-fiduciary-duty claim because the claim "ask[s] an Illinois District Court to probate an Arizona trust, in violation of the probate exception to federal jurisdiction[.]" [462] 7. For the reasons that follow, the Court concludes that it has subject-matter jurisdiction over plaintiffs' claim.

### A.    The Probate Exception

The probate exception to federal subject-matter jurisdiction "precludes federal courts from interfering with persons and property that are in the custody of a state probate court." *Sykes v. Cook Cnty. Circuit Court Probate Div.*, 837 F.3d 736, 741 (7th Cir. 2016).

The exception applies in only two situations. "First, the exception 'reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate.'" *Allian v. Allian*, No. 18 C 3825, 2018 WL 6591422, at *3 (N.D. Ill. Dec. 14, 2018) (quoting *Marshall v. Marshall*, 547 U.S. 293, 311 (2006)). Second, and "in line with 'the general principle that, when one court is exercising *in rem*

---

[10] This decision was without prejudice to plaintiffs' ability to file a memorandum "setting forth the basis for any assertion that a claim for punitive damages survives" Anna's death. [348] 3. Plaintiffs filed a memorandum arguing that the availability of punitive damages was governed by Arizona law [361], to which defendant did not respond.

jurisdiction over a *res*, a second court will not assume *in rem* jurisdiction over the same *res*,' the exception 'precludes federal courts from endeavoring to dispose of property that is in the custody of a state probate court." *Id.* (quoting *Marshall*, 547 U.S. at 311-12).

"The exception 'does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.'" *Allian*, 2018 WL 6591422, at *3 (quoting *Marshall*, 547 U.S. at 312). Moreover, "as a judicially created exception to the statutory grant of diversity jurisdiction, the probate exception should be narrowly construed." *Sykes*, 837 F.3d at 741.

### B. The Probate Exception Does Not Apply to a Claim Challenging the Authenticity of a Trust Instrument.

The probate exception does not bar this Court from adjudicating the breach-of-fiduciary-duty claim because that claim does not seek to probate or annul a will, nor does it seek to dispose of or otherwise affect property in the custody of a state probate court. Rather, plaintiffs' claim for breach of fiduciary duty is an "*in personam* claim [ ]" that "seek[s] only compensatory and punitive damages from [defendant] personally." *Allian*, 2018 WL 6591422, at *3. Such a claim falls outside the narrow scope of the probate exception. *See id.* (rejecting argument that breach-of-fiduciary-duty claim against trustee fell within probate exception); *Stiles v. Whalen*, No. 13 C 3516, 2013 WL 6730797, at *4 (N.D. Ill. Dec. 20, 2013) (breach-of-fiduciary-duty claim alleging defendant "breached his fiduciary duty to the trusts" and "seeking only an accounting and damages from [defendant] personally" was outside scope of probate exception).

Importantly, defendant has introduced no evidence that the assets of the Robert Trust have ever been in the custody or under the control of the Arizona probate courts. When the Court rejected defendant's argument about the probate exception earlier in the litigation, the Court emphasized that it had "not been provided with the factual information that I find necessary to fully address the argument," such as whether the Robert Trust "was handled through state probate courts[.]" [193] 7. To this day, the record remains empty on the question whether the Arizona probate courts ever handled the Robert Trust, and this hole in the record supports the Court's conclusion that the probate exception does not apply. *See Stiles*, 2013 WL 6730797, at *4 (finding that claim was not within probate exception, in part because "there are no pending probate or other state court proceedings involving the wills or trusts" that were subject of plaintiff's claims).

The Court acknowledges that it cannot resolve plaintiffs' claim without deciding which version of the Robert Trust is genuine and which is counterfeit. If plaintiffs' claim had raised a similar issue about the authenticity of competing versions of Robert Richert's will, for example, the probate exception might apply. *Cf. Dragan v. Miller*, 679 F.2d 712, 716-17 (7th Cir. 1982) (challenge to validity of a will, although pleaded as a tort claim of undue influence, was in substance a will contest that was barred by probate exception); *see, e.g., Wisecarver v. Moore*, 489 F.3d 747, 751 (6th Cir. 2007) (claims seeking "money damages and other remedies relating to the procurement and promotion of a false will, are barred by the probate exception" because they "challenge the validity of [the] will and would require the district court

to 'disturb or affect the possession of property in the custody of a state court' because the state court already probated [the decedent's] estate") (quoting *Jones v. Brennan*, 465 F.3d 304, 307-08 (7th Cir. 2006)).

But the Court is not persuaded that the probate exception requires a similar result in this case, which concerns the authenticity of a trust rather than a will. Most importantly, the Supreme Court's decision in *Marshall* limited the probate exception to cases involving "the probate or annulment of a will and the administration of a decedent's estate," which are not at issue here. *Marshall*, 547 U.S. at 311. Nor, given defendant's failure to introduce evidence that the Arizona probate courts are exercising, or have ever exercised, jurisdiction over Robert's estate, is this a case where two courts are exercising jurisdiction over the same *res. See id.* at 312.

## C. *Storm v. Storm* Does Not Require a Different Result.

Moreover, the Court is unaware of a post-*Marshall* decision from the Seventh Circuit holding that the probate exception applies to a tort claim involving the validity of a trust document. Before *Marshall*, the Seventh Circuit held that a claim for tortious interference with an inheritance expectancy, which alleged that the defendant exerted undue influence on his mother by persuading her to change the terms of her will and trust, fell within the probate exception. *Storm v. Storm*, 328 F.3d 941, 945-47 (7th Cir. 2003). Because the claim sought "a legal determination that the terms of the [testator's] final will *and trust* . . . [were] invalid because they were allegedly procured through the exertion of undue influence," the Seventh Circuit concluded that "the practical effect of [the plaintiff's] lawsuit would be similar to that

of a will contest" and was thus barred by the probate exception. *Id.* at 945 (emphasis supplied).

In so holding, the Seventh Circuit took "a practical approach to determining the boundaries of the probate exception" and considered "the policy goals underlying the exception." *Storm*, 328 F.3d at 944. Those goals included the need "to encourage legal certainty," "promote judicial economy," and acknowledge the relative expertise of state court judges in probate law. *Id.*

After *Marshall*, however, it is unclear whether a court should apply *Storm*'s "practical approach" to the probate exception. In this respect, the Court observes that *Marshall* cited *Storm* as an example of a case that applied–improperly, *Marshall* implies–the exception "to block federal jurisdiction over a range of matters well beyond probate of a will or administration of a decedent's estate." *Marshall*, 547 U.S. at 311. Decisions from the Northern District of Illinois have thus questioned *Storm*'s continued vitality after *Marshall*. *See Singer v. Massachusetts Mut. Life Ins. Co.*, 335 F. Supp. 3d 1023, 1029 (N.D. Ill. 2018) ("The *Storm* framework, however, has given way to the clearer skies of *Marshall v. Marshall*[.]"); *In re Emerald Casino, Inc.*, 223 F. Supp. 3d 740, 749 (N.D. Ill. 2016) ("Indeed, although the Seventh Circuit has continued, since *Marshall*, to cite the *Storm* factors, their importance appears to have been diminished in the wake of *Marshall*'s more straightforward rule that the probate exception is intended to prohibit concurrent jurisdiction over a *res*."). At the same time, however, the Seventh Circuit has continued to cite the *Storm* factors in post-

*Marshall* cases when considering whether the exception applies to "an issue that is ancillary to a core probate matter." *Sykes*, 837 F.3d at 741.

For the sake of completeness, the Court has considered whether plaintiffs' claim implicates the probate exception as understood by *Storm*. But the Court concludes that, even under this "practical approach," the probate exception does not apply. To begin, which version of the Robert Trust document is the authentic version "has nothing to do with probate law." *Sykes*, 837 F.3d at 944. Rather, that issue is nothing more than a credibility dispute that depends, not on the finer points of Arizona probate law, but on the Court's evaluation of the trial testimony and the documentary evidence concerning which trust instrument is authentic. Furthermore, there is no evidence in this case that the Arizona probate courts ever exercised jurisdiction over the Robert Trust. Consequently, there is no danger that the Court's decision here would "create dissonance in probate . . . rulings" in Arizona. *Id.*

The Court therefore concludes that the probate exception is inapplicable and the Court's subject-matter jurisdiction over plaintiffs' claim is secure.

## II.    Power of Attorney

On September 30, 2013, Anna White, using the Illinois Statutory Short Form Power of Attorney, executed a power of attorney that named her daughter Kathleen as her attorney-in-fact. [PX 27] 3. Among other things, the power of attorney authorized Kathleen to act for Anna with respect to "[c]laims and litigation" and to "investigate, manage, acquire information and receive the distributions from the

Estates of Robert Richert Trust and the Elizabeth Richert Trust on behalf of" Anna White. [PX 27] 2, 3.[11]

In the parties' proposed final pretrial order, defendant asserted that the power of attorney was invalid because of Anna's alleged "inability to understand what she was signing when the power of attorney was executed." [280] 19. Defendant also asserted, without elaboration, that the power of attorney was "unlawfully obtained." [*Id.*] 2. At the final pretrial conference on July 9, 2019, the Court explained that it would "allow evidence concerning the power of attorney at trial" and suggested that, in filing their proposed conclusions of law, the parties "cite whatever legal authority they have on either side of the question of the power of attorney." [311] 20-21.

In her proposed findings of fact and conclusions of law, defendant argued that the evidence would show that plaintiffs believed that Anna "was not competent prior to the filing of this lawsuit." [329] 3, ¶¶ 12, 13. Defendant also claimed that plaintiffs "fraudulently withheld the true nature of [Anna] White as Petitioner in this matter." [*Id.*] 3, ¶ 17. Defendant did not suggest what conclusion the Court should draw from these proposed findings or explain how they would affect the Court's resolution of the case. *See* [*id.*] 1-5. Defendant's post-trial brief all but ignores this issue, as it does not mention the power of attorney at all, *see* [462] 1-14, and refers to Anna White's competency only in connection with a vague request that the Court sanction plaintiffs, *see* [*id.*] 2.

---

[11] Although the copy of the power of attorney admitted at trial as PX 27 is not notarized, defendant used a notarized version of the power of attorney as an exhibit during her cross-examination of Kathleen White Murphy. [455] 18.

The Court concludes that defendant, by failing to develop any meaningful argument about the validity of the power of attorney or Anna White's capacity, has forfeited those arguments. *See Rezko v. Sirazi*, No. 08 C 5433, 2009 WL 1507660, at *5 (N.D. Ill. May 29, 2009) ("A party's 'failure to develop [an] argument in any meaningful way' may lead a court to conclude that the party has forfeited it.") (quoting *Bell v. DaimlerChrysler Corp.*, 547 F.3d 796, 807 (7th Cir. 2008)).[12] Nevertheless, even if defendant had preserved an argument relating to the power of attorney or Anna White's competency, such argument would not afford defendant any relief.

Under Illinois law, "[p]ersons of mature age are presumed to be mentally competent; their incompetence cannot be inferred merely from old age, physical illness or defective memory." *In re Estate of Gruske*, 534 N.E.2d 692, 695 (Ill. App. 1985). "The burden of proving mental incompetence is on the party seeking to set aside a transaction." *Id.*

Defendant failed to prove that Anna White was incompetent to execute the power of attorney in September 2013. To the contrary, the most credible evidence touching on this issue established that Anna was competent. Kathleen White Murphy, who accompanied her mother to an attorney's office where the power of attorney was executed, testified that she believed Anna was "of sound mind when she

---

[12] The Court recognizes that defendant, who was represented by five different attorneys during various stages of pretrial proceedings, acted pro se at trial and during post-trial litigation. As the Court has previously concluded, however, "even pro se litigants are generally 'subject to the same waiver rules that apply to parties who are represented by counsel.'" *White v. Richert*, No. 15 C 8185, 2019 WL 4062539, at *11 (N.D. Ill. Aug. 28, 2019) (quoting *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 689 n.6 (7th Cir. 2014)).

signed" the document. [451] 88. She based this opinion on "taking care of [Anna] for a long time" and by "[b]eing with her." [455] 24. Kathleen acknowledged that her mother's memory started to decline in 2011, but she reiterated that Anna "knew what she was signing" when she executed the power of attorney. [*Id.*] 29. Furthermore, a witness to the execution of the power of attorney "certifie[d]" that she believed Anna "to be of sound mind and memory," and that her signing of the power of attorney was a "free and voluntary act." [PX 27] 5. The Court credits Kathleen's testimony on this issue, as corroborated by the witness's attestation that Anna appeared competent to execute the power of attorney.

In contrast, only defendant testified that Anna was not competent to execute the power of attorney. Defendant based her opinion that Anna's memory was "diminished" by September 2013 on a conversation she had with Anna White where Anna told her that Kathleen wanted her to execute a power of attorney so that Kathleen could help Anna manage her credit card bills. [449] 64-65. But it is not clear to the Court that this testimony sheds any light on Anna White's competence, and in any event diminished memory alone does not support an inference that Anna was incompetent to execute the power of attorney. *See Estate of Gruske*, 534 N.E.2d at 695.

More to the point, the Court rejects defendant's testimony as biased and self-serving. As the Court explains below, defendant created a fake version of the Robert Trust to steal $287,552.79 of the trust's assets to which she was not entitled, including $95,850.83 that belonged to Anna White. Defendant therefore had a

powerful reason to testify that her elderly aunt was incompetent to execute the power of attorney because that testimony, if credited, might have called into question Kathleen's ability to help her mother vindicate a successful claim of breach of fiduciary duty by defendant. And while the Court recognizes that Kathleen's testimony about her mother's competency could be viewed as similarly self-serving, the Court found Kathleen to be a credible witness who, unlike defendant, engaged in no egregious misconduct that came at the expense of Anna White.

Because defendant has not established that the power of attorney is invalid, the Court has no basis to question Kathleen White Murphy's involvement in assisting her mother file this suit and litigate it. Nor does the Court have any basis to question Thomas White's role in controlling, managing, or helping to control and manage the litigation before he became a plaintiff. On April 20, 2017, Kathleen executed a "Limited Delegation of power of attorney for the care of Anna White to Thomas White." [PX 27] 7. By this delegation, Kathleen (1) appointed Thomas as her designee "to assist in the prosecution of the claims against Elizabeth Richert ('Richert') and defense of claim by Richert"; and (2) delegated to Thomas "full power to assist me in prosecuting the claim of Anna White against Richert and defending the claim of Richert against Anna White filed in the Circuit Court of Lake County, Illinois and removed to the Federal District Court for the Northern District of Illinois, Eastern Division, identified as case number 15 CV 8185." [*Id.*]. While defendant claims that this was an improper delegation [280] 19, she neither cited authority to support this claim nor presented any evidence to substantiate it.

The Court recognizes that Kathleen testified that she believed her mother was no longer competent by 2015, when this litigation began. *See, e.g.*, [455] 36; *see also* [*id.*] 44 (Kathleen agreeing that "Anna White was not competent and of sound mind in 2015 when [we] retained [attorney] Saternus for this case").[13] The Court doubts that this testimony would suffice to prove that Anna was legally incompetent under Illinois law. *See* Fed. R. Civ. P. 17(b)(1) (law of individual's domicile determines capacity to sue); *see also O'Toole v. Vill. of Downers Grove Police Dep't*, No. 85 C 7380, 1986 WL 8732, at *5 (N.D. Ill. Aug. 1, 1986) ("Under Illinois law, a person who is suffering from a mental illness has the capacity to sue provided that he has not been divested of his power to sue through an adjudication of incompetency and appointment of a guardian.") (citing *Logsdon v. Nolen*, 248 N.E.2d 525, 529 (Ill. App. 1969) and *Kirkland v. Kirkland*, 186 N.E.2d 794, 796 (Ill. App. 1962)). But even assuming that Kathleen's testimony were sufficient to establish that Anna was not competent, this evidence would have raised the question whether it would have been proper for Kathleen to bring the suit on Anna's behalf under the power of attorney. Because Kathleen held a valid power of attorney designating her as Anna's agent for litigation and claims, the Court sees no basis why, had there been a successful—and

---

[13] The Court also recognizes that, in January 2017, the Circuit Court of Lake County entered an order declaring Anna White to be a disabled person. [328] 2, at ¶ 7; *see also* [DX 26] (report of guardian ad litem). But that court declined to appoint a guardian ad litem for Anna because "Anna's interests are being well served with Kathy acting under the POA[.]" [DX 26] 4.

more timely–challenge to Anna's competency, Kathleen could not have brought this suit in her capacity as Anna's attorney-in-fact.[14]

For these reasons, the Court holds that defendant forfeited her arguments based on the power of attorney and Anna White's incompetency, and that such arguments provide no basis for relief.

## III.    Breach of Fiduciary Duty

Plaintiffs' sole claim for adjudication at the bench trial was their claim that defendant breached her fiduciary duty to Anna White by creating a counterfeit version of the Robert Trust and failing to distribute to Anna White her share of the forty-seven percent of the trust assets not distributed to a named beneficiary.

### A.    Choice of Law

"A federal court exercising diversity jurisdiction must apply the choice-of-law rules used by the state in which the court sits." *Kolchinsky v. W. Dairy Transp., LLC*, 949 F.3d 1010, 1013 n.2 (7th Cir. 2020). Under Illinois law, a court will engage in a choice-of-law analysis only "if there is a conflict between Illinois law and the law of another state such that 'a difference in law will make a difference in the outcome.'"

---

[14] If a suit is filed by an incompetent person, a district court should dismiss the case without prejudice. *See Johnson v. Collins*, 5 F. App'x 479, 485 (7th Cir. 2001). A general guardian, a committee, a conservator, or "a like fiduciary" may sue on behalf of an incompetent person. *See* Fed. R. Civ. P. 17(c)(1). Under Illinois law, "[a]n individual holding a power of attorney is a fiduciary as a matter of law." *Estate of Alford v. Shelton*, 89 N.E.3d 391, 397 (Ill. 2017). Absent an express statement to the contrary, moreover, a power of attorney authorizes an attorney-in-fact to act while the principal is incompetent. *In re Estate of Beetler*, 83 N.E.3d 1136, 1141 (Ill. App. 2017); *see also* 755 ILCS 45/2-5 ("Unless the agency states an earlier termination date, the agency continues until the death of the principal, notwithstanding any lapse of time, the principal's disability or incapacity or appointment of a guardian for the principal after the agency is signed."). Because the power of attorney held by Kathleen contains no such limitation, *see* [PX 27] 2-4, Kathleen had authority to sue on Anna's behalf.

*W. Side Salvage, Inc. v. RSUI Indem. Co.*, 878 F.3d 219, 223 (7th Cir. 2017) (quoting *Townsend v. Sears, Roebuck & Co.*, 879 N.E.2d 893, 898 (Ill. 2007)). Absent any such outcome-determinative conflict, "the court applies the law of the forum state." *Id.*

Neither side has identified a difference in the relevant laws of the three states that could apply to the breach-of-fiduciary-duty claim: Illinois (where Anna White resided), Arizona (where the trust was created and its assets were formerly located), or Florida (where defendant resides and Version C of the trust was held). The absence of such a conflict would ordinarily lead the Court to apply Illinois law, but the Court observes that all versions of the Robert Trust contain a choice-of-law provision stating that "[t]his Agreement shall be construed under and regulated by the laws of the State of Arizona as now or hereafter in effect." [PX 26] 30 (Version A); [*id.*] 63 (Version B); [PX 29] 17 (Version C).

Because Illinois courts generally honor choice-of-law provisions, *see Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 770 N.E.2d 177, 194 (Ill. 2002), and because the parties have not given the Court any reason to think an Illinois court would not enforce the Robert Trust's choice-of-law provision, the Court will apply Arizona law in deciding plaintiffs' fiduciary-duty claim. *See Life Plans, Inc. v. Sec. Life of Denver Ins. Co.*, 800 F.3d 343, 357 (7th Cir. 2015) ("Under Illinois choice-of-law rules . . . a court must honor a contractual choice of law unless the parties' choice

of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state.").[15]

## B. Standard of Proof

Before trial, the Court ruled that plaintiffs needed to prove their claim by a preponderance of the evidence. [449] 21-22. Defendant moved for reconsideration, arguing that plaintiffs' claim must be proved by clear and convincing evidence. [447]. The Court entered and continued the motion and instructed the parties to address the issue in their post-trial briefs. [453].

The Court adheres to its pretrial determination. Arizona law provides that "the typical evidentiary standard in civil cases is by a preponderance of the evidence[.]"[16] *Rasmussen by Mitchell v. Fleming*, 741 P.2d 674, 691 (Ariz. 1987) (internal quotation marks omitted). Defendant cites (and the Court's research has uncovered) no Arizona case law holding that a breach-of-fiduciary-duty claim must be proved by clear and convincing evidence. [447] 1-3.

Furthermore, defendant's argument that a provision in the Robert Trust requires the Court to apply a clear-and-convincing standard has no merit. Paragraph 6.13 of all versions of the Robert Trust provides that:

> Where the Trustee is related to the Settlor, the Settlor anticipates that the Trustee may have to exercise powers with respect to any business in which the Trustee will be individually interested as director, stockholder, officer, employee, creditor, partner, or otherwise, and that

[15] In *White III*, the Court applied Illinois law in holding that defendant was not entitled to summary judgment on the breach-of-fiduciary duty claim. 2018 WL 4101512, at *7-8. At that time, however, the parties did not engage in a choice-of-law analysis.

[16] Because the standard of proof is a substantive aspect of a claim, *see Raleigh v. Ill. Dep't of Rev.*, 530 U.S. 15, 20-21 (2000), the Court looks to Arizona law to resolve this issue.

the Trustee may, as a result, directly or indirectly benefit therefrom. The Settlor also anticipates that it may be desirable for the Trustee to make decisions, or refrain from making decisions, with respect to interests in any business, which are adverse in some respects to the short-term interests of the income beneficiaries. Accordingly, the Settlor fully authorizes the Trustee to act with respect to matters in which the Trustee may be individually interested, or the resolution of which is in some respects adverse to the short-term interests of some or all of the Trust beneficiaries, and that actions taken in these respects, absent clear and convincing evidence that establishes beyond a doubt that the Trustee is intentionally placing the Trustee's own interests above those of the Trust, shall be as conclusive as if no such relationship or conflict of interest existed.

[PX 26] 17-18 (Version A); [*id.*] 48-49 (Version B); [PX 29] 8-9 (Version C).

Although defendant cites this language in her motion, she makes no argument as to why it requires plaintiffs to prove their claim by clear and convincing evidence. Her "perfunctory and undeveloped" contention that plaintiffs' claim implicates Section 6.13 and is therefore subject to a clear-and-convincing standard of proof is forfeited. *Oneida Nation v. Vill. of Hobart*, 968 F.3d 664, 689 (7th Cir. 2020).

Forfeiture aside, plaintiffs' breach-of-fiduciary-duty claim does not present the kind of garden-variety dispute to which paragraph 6.13 would apply. The Court reads that language to govern disputes about the propriety of a trustee's decision, in the course of conducting ordinary trust business, that had the effect of favoring the trustee's own interests over those of the trust beneficiaries. Plaintiffs' claim, on the other hand, involves an allegation that defendant created a fake version of the Robert Trust to steal nearly half of the trust's assets to which, absent the forgery, she would not be entitled. The Court finds that such alleged conduct is far outside the scope of Section 6.13, and that section's clear-and-convincing standard is inapplicable.

Third, defendant's reliance on cases holding that a fraud claim must be pleaded with particularity is also misplaced. [447] 2-3. These cases address only the standard a plaintiff must meet to advance its claim past the Rule 12 plausibility stage, and this case long ago passed that threshold. And as noted above, substantive state law, not a federal pleading rule, determines the standard of proof.

For all these reasons, the Court denies defendant's motion to reconsider burden of proof. [447].[17]

## C.    Merits

The Court finds that plaintiffs have proved by a preponderance of the evidence that defendant breached her fiduciary duty to Anna White to administer the Robert Trust in accordance with Versions A and B of the Trust, and by counterfeiting Version C, thereby unlawfully appropriating to herself an additional forty-seven percent of the trust assets.

### 1.    Defendant Owed Anna White a Fiduciary Duty.

First, it is undisputed that defendant was the trustee of the Robert Trust at all times relevant to this case and remains the trustee to this date. It is also undisputed that Anna White was a beneficiary of the Robert Trust. [PX 26] 9 (Version A); [*id.*] 40

---

[17] Even if plaintiff's claim were subject to the clear-and-convincing standard, the Court's judgment would remain the same. As the Court explains below, the plaintiffs proved by clear and convincing evidence that defendant's breach of fiduciary duty–creating a fake trust instrument to steal forty-seven percent of the trust's assets–involved reprehensible and was committed with an evil mind. In light of those findings, and the Court's wholesale rejection of defendant's testimony surrounding Version C of the Robert Trust, the Court concludes that there is clear and convincing evidence to prove that defendant breached her fiduciary duty by creating a fake trust instrument and failing to distribute to Anna White her share of the forty-seven percent of the trust assets that Versions A and B did not distribute to a named beneficiary.

(Version B); [PX 29] 3 (Version C). A fiduciary duty therefore existed between defendant and Anna White as a matter of law. *See In re Naarden Trust*, 990 P.2d 1085, 1088 (Ariz. App. 1999) ("A fiduciary relationship therefore exists between a trustee and a beneficiary[.]").

## 2.     Defendant Breached Her Fiduciary Duty to Anna White.

Second, the Court finds that defendant breached her fiduciary duty to Anna White by failing to administer the authentic version of the Robert Trust according to its terms and failing to distribute to Anna White her share of the trust assets. More specifically, the Court finds that Version C of the Robert Trust is a counterfeit that defendant created in order to take control of forty-seven percent of the trust estate to which she was not entitled. As a necessary corollary, the Court finds that Versions A and B are authentic and identical versions of the Robert Trust. Finally, the Court finds that defendant failed to distribute to Anna White her one-third share of the forty-seven percent of the trust estate for which the authentic trust instrument does not designate a named beneficiary, and to which Anna White was therefore entitled under Arizona's intestacy laws.

### i.     Version C of the Robert Trust Is a Forgery.

To begin, the Court is convinced that Version C of the Robert Trust is a forgery that defendant created to steal the forty-seven percent of the trust estate for which Version A did not identify a named beneficiary. This finding is based primarily on the Court's conclusion that defendant's testimony about the supposed disappearance and re-emergence of Version C is completely incredible and entirely fabricated.

Defendant testified that, after she discovered Version C in a floor safe in her late uncle's home, she maintained that document at her home in Florida. At some date she could not remember, defendant testified, one of her clients stole the original Version C from her house. Defendant decided not to report the burglary to police, supposedly because of her need to keep her address secret due to her past involvement in an abusive relationship. Then, one day in early 2017, a copy of Version C appeared in defendant's mailbox, contained in a plastic grocery bag.

The Court does not believe a single piece of this testimony.

First, there is absolutely no evidence in the record to corroborate defendant's account about the creation of Version C, her possession of that document in her house in Florida, or the theft of that document from and its fortuitous return to her home. Second, the Court finds it incredible that defendant would not remember the date of the burglary–or even roughly when it had occurred–given her testimony that this was "the only time [her] home was subject to a theft," [451] 50, and the significance that such an event is likely to have for a homeowner. Third, the Court rejects as unconvincing defendant's claim that she could not report the burglary to police because of her past involvement in an abusive relationship–particularly when coupled with the fact that defendant must have disclosed her address to her former client-turned-burglar. While the Court has no reason to doubt defendant's claim that she had a genuine fear for her safety, the Court does not find that this fear would explain why defendant could not or would not report the crime to police. Fourth, the Court emphasizes the fantastical nature of defendant's claim that Thomas White

found the copy of Version C that defendant had allegedly sent to Anna White, hired a private investigator to find defendant's address, and planted the copy of Version C to "set [defendant] up." But this claim is not just fantastical; it is illogical. Based on their conversations with defendant, plaintiffs believed that Anna White was entitled to half of the Robert Trust's assets, including a one-half interest in the Carefree home. Under Version C, however, plaintiffs were in a worse position because that document distributes the Carefree home to defendant alone. The Court fails to see how plaintiffs stood to gain from "planting" a copy of Version C in defendant's mailbox, and the Court's concludes that defendant's preposterous account of the re-emergence of Version C only underscores her false and misleading testimony on this subject.

The Court also bases its credibility finding on the circumstances surrounding the production of Versions A and B of the Robert Trust. Fidelity Investments, the custodian of Robert's trust account, produced only these versions of the trust documents in response to plaintiffs' subpoena in May 2017. The Court concludes that Version A is the version Robert provided to Fidelity in order to open the trust account, while Version B is the version that defendant faxed to Fidelity in order to be recognized as the successor trustee after Robert was incapacitated. That Robert, defendant, and Fidelity all possessed the same version of the trust documents supports the Court's finding that Versions A and B are genuine, while Version C–which only defendant possessed–is a fake.

The Court recognizes that defendant testified that she did not discover Version C until "months after" her uncle died, and that defendant believed that Robert had

simply substituted a new version of paragraph 5.4.1 into the version of the trust he originally executed in June 2008. But there is no credible evidence to link Version C to Robert Richert; only defendant's testimony places Version C in Robert's house, and the Court does not find any part of defendant's testimony respecting Version C to be credible. Moreover, paragraph 4.1 of all versions of the Robert Trust provides that the trust could be amended "by an instrument in writing signed by the Settlor and delivered to the Trustee." [PX 26] 5 (Version A); [*id.*] 37 (Version B); [PX 29] 1 (Version C). There is no evidence that Robert ever sought to amend the trust in this fashion, and defendant's testimony that Robert decided to make a page substitution "rather than go to the trouble of re-executing a document and finding witnesses and a notary" [458] 37, is rejected as entirely self-serving and speculative.

The Court also finds that defendant's failure to disclose the existence or whereabouts of any version of the Robert Trust during the first year-and-a-half of the litigation further undermines the credibility of her testimony about Version C and supports the Court's finding that Version C is counterfeit. Defendant admitted that she never contacted Fidelity to obtain copies of the trust [450] 155-57, despite the Court's order of September 15, 2016 directing her to produce any copies of the trust that were in her possession, custody, or control. [71] 2-3. Likewise, defendant acknowledged at trial [451] 49-50, that none of her discovery responses mentioned the existence of Version C or defendant's contention that Version C had been taken during a burglary of her home. Defendant's failure to mention or produce Version C during the first seventeen months of this litigation is likewise consistent with the

Court's finding that defendant forged Version C in an effort to steal forty-seven percent of the trust assets.

Finally, although both sides submitted opinions from forensic document examiners as to the authenticity of Version C, the Court finds that these dueling opinions essentially cancel each other out.[18]

These examiners–Robin D. Williams for plaintiffs and Thomas W. Vastrick for defendant–compared known samples of Robert Richert's initials to the initials on page 3 of Version C, which contains what the Court has found to be the counterfeited paragraph 5.4.1 distributing an additional forty-seven percent of the trust estate to defendant. Williams opined that there were "differences" in "the initials on the bottom right of each page 3" (that is, of the authentic and counterfeit versions). [315-3] 2. In light of those differences, and the different dispositional language used in the two versions of paragraph 5.4.1 itself, Williams concluded that there had been a "page substitution" of page three. [*Id.*]. Vastrick, for his part, opined that "there are indications" that Robert Richert wrote the initials on page 3 of Version C. [314-1] 3. In support, Vastrick pointed to ten supposed similarities between the initials on page 3 of Version C and Robert's known initials. [*Id.*] 3-4. Vastrick's report acknowledged, however, that the term "indications" represents the lowest level of confidence of associative conclusions"–and is more or less synonymous with a "weak" conclusion–

---

[18] By stipulation, the parties presented this testimony via written expert reports in lieu of live testimony. [296]. During pretrial proceedings, the Court denied defendant's motion to strike plaintiff's expert under *Daubert* and granted in part and denied in part plaintiff's similar motion to strike defendant's expert report. *White v. Richert*, No. 15 C 8185, 2019 WL 4062539 (N.D. Ill. Aug. 28, 2019) (*White IV*).

under the standards for stating conclusions prescribed by the Scientific Working Group for Forensic Document Examination. [*Id.*] 3.

Given the limitations inherent in Vastrick's opinion, as well as the absence of any explanation by Williams to support his conclusion, the Court does not find this evidence helpful in deciding whether Version C is counterfeit. Based on its own examination of the known and questioned initials, the Court observes that the initials on Version C lack a forward slant that is present and quite obvious on Robert Richert's known initials, *see* [315-3] 2, and the Court believes that this difference is consistent with someone other than Robert Richert having placed his initials on page 3 of Version C. The Court emphasizes, however, that its own comparison of the known and questioned initials is merely corroboration of the Court's finding, based primarily on defendant's incredible testimony and the fact that Fidelity did not possess Version C, that defendant forged Version C to steal forty-seven percent of the trust assets.

Having determined that Version C of the Robert Trust is a counterfeit, the Court necessarily finds that Versions A and B of the Robert Trust are authentic. As noted above, Fidelity Investments possessed both Version A, which Robert must have provided to Fidelity to open his trust account, and Version B, which defendant provided to Fidelity to assume the trusteeship following Robert's incapacitation. The language of these documents is identical, and the fact that Robert, defendant, and Fidelity all possessed the same version of the trust documents corroborates their authenticity.

ii. **Defendant Failed to Distribute Anna White's Share of the Remaining Forty-Seven Percent of the Trust Estate.**

As noted above, Version A of the Robert Trust did not name a specific beneficiary to receive the remaining forty-seven percent of the trust estate. Paragraph 5.5 of the Robert Trust states that, should the trust fail to distribute any portion of the trust estate, Arizona intestacy law would determine how that portion of the estate should be distributed. Accordingly, under Ariz. Rev. Stat. 14-2103(3)– which applies because Robert's wife predeceased him and he did not have children, *see* [PX 23]–the descendants of Robert's parents, *i.e.*, his siblings, were entitled to an equal share of the undistributed forty-seven percent of the trust assets by representation. Because Robert had three siblings–Anna White, Mary Jane Richert, and Thomas Richert, and one of those siblings (Thomas) predeceased Robert–Anna and Mary Jane were each entitled to a one-third share, while defendant and her brother, as the children of Thomas Richert, were each entitled to a one-sixth share.

Thus, defendant was obligated by the terms of the Robert Trust to distribute to Anna White was entitled to receive $95,850.83 ($611,814.45 x 0.47 x 0.33 = $95,850.83). Because defendant failed to make this distribution, she breached her fiduciary duty to Anna and caused Anna to suffer damages in the amount of $95,850.83.

The Court recognizes that defendant distributed $154,823.09 in trust assets to Anna White in January 2010. [280] 5, ¶¶ 25, 27. However, the Court finds that these distributions represent payments toward the forty-seven percent of trust assets to

which Anna was entitled as a named beneficiary. For one thing, defendant's theory of the case is that Version C entitles her–rather than Anna and the other intestate beneficiaries–to receive the forty-seven percent of the trust assets at issue. Accordingly, any distribution that defendant made to Anna White must have represented a payment toward Anna's share as a named beneficiary. For another, defendant introduced no evidence–banking records, for example, or a trust accounting–to show that she made any distributions to the other intestate beneficiaries. Defendant therefore has no basis to claim–and, indeed, has not claimed–that any of the $154,823.09 previously distributed to Anna White should be apportioned toward the $95,850.83 that defendant wrongly withheld from her aunt.

### D. The Receipt and Release Does Not Bar Plaintiffs' Claim.

The Court further concludes that the Receipt and Release does not bar plaintiffs' claim because (1) there was no consideration for Anna White's promise to release defendant from liability for any claims relating to disposition of the trust property, and (2) Anna White did not know that there were multiple versions of the Robert Trust and could not have released a claim alleging that defendant had created a counterfeit version that stripped her of a distribution to which she was entitled under the authentic trust instrument.[19]

---

[19] The parties' briefs do not engage in a choice-of-law analysis with the respect to the enforceability of the Receipt and Release. Because no outcome-determinative difference between Illinois law and Arizona law has been shown, the Court applies Illinois law to decide whether the Receipt and Release in enforceable. *See ECHO, Inc.*, 52 F.3d at 707 (court should apply law of forum state unless party argues choice-of-law rules require court to apply another state's law). In any event, the Receipt and Release would be unenforceable under Arizona law because (1) Arizona law likewise provides that a promise to do something one is

1.  **There Was No Consideration for Anna White's Release of Her Claims Against Defendant.**

First, the Court finds that the Receipt and Release is unenforceable because there was no consideration for Anna White's promise to release defendant from all claims relating to defendant's distribution of the trust assets.

"A release is a contract wherein a party abandons a claim to the person against whom the claims exist." *Touhy v. Twentieth Century-Fox Film Corp.*, 387 N.E.2d 862, 865 (Ill. App. 1979). "Since a release is a contract, the interpretation and construction of it is governed by the rules of contract law." *Id.* Accordingly, "[t]o be efficacious in a court of law," a release "must be based upon consideration." *White v. Vill. of Homewood*, 628 N.E.2d 616, 618 (Ill. App. 1993). "Valuable consideration for a contract consists either of some right, interest, profit or benefit accruing to one party, or some forbearance, detriment, loss of responsibility given, suffered or undertaken by the other." *Id.*

At trial, defendant did not testify about the consideration, if any, she gave in exchange for Anna White's promise to release her from all claims arising from the distribution of the Robert Trust's assets. [458] 20-21. The only consideration recited in the Receipt and Release itself, moreover, was Anna's acknowledgment that she had received from defendant "the Property she is entitled to receive under the Last Will and Testament of Robert Louis Richert and the Robert Louis Richert Revocable Trust

---

already legally obligated to do is not consideration, *see Leone v. Precision Plumbing & Heating of S. Ariz., Inc.*, 591 P.2d 1002, 1003 (Ariz. App. 1979); and (2) a beneficiary's release of a claim against the trustee for breach of trust is invalid when "the beneficiary did not know of the beneficiary's rights or of the material facts relating to the breach," Ariz. Rev. Stat. § 14-11009(2).

. . . in full payment and satisfaction of the bequest(s) to her[.]" [PX 14] 1. However, defendant's distribution to Anna White of the assets to which Anna was entitled under the terms of the Robert Trust does not constitute consideration for the release because defendant had a preexisting duty to distribute those assets to Anna.

"The pre-existing duty rule provides that where a party does what it is already legally obligated to do, there is no consideration as there is no detriment." *White*, 628 N.E.2d at 618. Accordingly, "the performance by a party of a duty that he is already required to perform does not constitute consideration for a contract." *Adams v. Lockformer Co.*, 520 N.E.2d 1177, 1180 (Ill. App. 1988).

The decision in *Johnson v. Maki & Assocs., Inc.*, 682 N.E.2d 1196 (Ill. App. 1997), illustrates the point. In *Johnson*, plaintiff executed a listing agreement with defendant Maki in connection with a planned sale of plaintiff's home. *Johnson*, 682 N.E.2d at 1197. Plaintiff later entered into a separate contract to sell the home to two buyers, and the buyers deposited $2,000 in earnest money that was held by Maki in an escrow account. *Id.* This contract provided that "the plaintiff and buyers needed only to tender a written request to Maki in order for the earnest money to be disbursed." *Id.* at 1200. When the sale fell through, Maki refused plaintiff's demand to return the earnest money unless plaintiff signed a release stating that plaintiff would "indemnify, save, and hold harmless [Maki] from all claims, litigations, judgments, and costs arising from the cancellation of the Contract." *Id.* at 1198. Plaintiff signed the release but later sued Maki for various claims arising from the

failed sale of her home. *Id.* The trial court dismissed the suit, holding that the release barred plaintiff's claims. *Id.*

Plaintiff appealed, arguing that the release was unenforceable because she received no consideration in exchange for releasing her claims against Maki. *Johnson*, 682 N.E.2d at 1198. According to plaintiff, Maki was "acting as an escrowee and therefore had a preexisting legal obligation to return the earnest money . . . at [plaintiff's] directive," and its "preexisting legal obligation cannot constitute consideration for the release." *Id.* at 1199.

The Illinois Appellate Court agreed. As the court explained, "[a]n escrowee has been described as a 'trustee' of both the party making the deposit of property and the party for whose benefit it is made[.]" *Johnson*, 682 N.E.2d at 1199. "Like a trustee," the court continued, "the escrowee owes a fiduciary duty to act only in accordance with the terms of the escrow instructions." *Id.* Because the contract to sell plaintiff's home instructed Maki to disburse the earnest money at plaintiff's written request, the court held that Maki had "a preexisting legal duty under [that] contract" to release the escrow money, and that Maki's agreement to disburse the funds to plaintiff "could not constitute consideration for the release[.]" *Id.* at 1200.

Just like the escrowee in *Johnson* had a preexisting–and fiduciary–obligation to release the earnest money upon request, here defendant had a preexisting–and fiduciary–duty under the Robert Trust to distribute to Anna White her share of the trust assets. Because defendant was bound by the terms of the trust to make that distribution to Anna, the distribution of those assets does not constitute

consideration. Rather, defendant was simply "do[ing] what [she] [wa]s already legally obligated to do" as the trustee of the Robert Trust, and there was "no consideration because there [wa]s no detriment." *Gavery v. McMahon & Elliot*, 670 N.E.2d 822, 826 (Ill. App. 1996).

Because there was no consideration for Anna White's release of her claims against defendant, the Receipt and Release is invalid and unenforceable. *See Johnson*, 682 N.E.2d at 1199-1200. Consequently, the Receipt and Release does not bar plaintiffs' claim for breach of fiduciary duty.

### 2. Anna White Did Not Know She Had a Claim for Breach of Fiduciary Duty Based on Multiple Versions of the Trust Documents.

Even setting aside the absence of consideration, the Receipt and Release would not bar plaintiffs' breach-of-fiduciary-duty claim because it is undisputed that, when Anna White executed that document, she did not know that multiple versions of the Robert Trust existed. Anna thus did not know she had a potential claim for breach of fiduciary duty against defendant for forging Version C and failing to distribute her proper share of the trust estate, and the Receipt and Release is not effective to bar this claim.

### i. The Receipt and Release Must Be Strictly Construed Against Defendant.

Under Illinois law, a release is "strictly construed against the benefitting party and must spell out the intention of the parties with great particularity." *Janowiak v. Tiesi*, 932 N.E.2d 569, 586 (Ill. App. 2010) (internal quotation marks omitted). "The intention of the parties controls the scope and effect of the release, and this intent is

discerned from the release's express language as well as the circumstances surrounding the agreement." *Id.* "[N]o form of words, no matter how all encompassing, will foreclose scrutiny of a release or prevent a reviewing court from inquiring into surrounding circumstances to ascertain whether it was fairly made and accurately reflected the intention of the parties." *Ainsworth Corp. v. Cenco Inc.*, 437 N.E.2d 817, 821 (Ill. App. 1982) (internal citation omitted).

More specific to this case, Illinois law provides that "a release between a trustee and a beneficiary, like all transactions growing out of a fiduciary relationship, is subject to the closest scrutiny." *Janowiak*, 932 N.E.2d at 580. "Fiduciaries are not prohibited from having direct dealings with their beneficiaries, but such transactions are subject to special scrutiny by the courts, and the burden is on the fiduciary to show that the transaction was fair." *Id.* (internal quotation marks omitted). "[I]mportant factors in determining whether a particular transaction is fair include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had; (2) that the consideration was adequate; and (3) that the principal had competent and independent advice before completing the transaction." *Id.* (internal quotation marks omitted). These factors are known as the "*McFail* factors," after *McFail v. Braden*, 166 N.E.2d 46, 52 (Ill. 1960). *See Monco v. Janus*, 583 N.E.2d 575, 581-82 (Ill. App. 1991).

A defendant's claim that a release bars a plaintiff's cause of action is an affirmative defense. *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 764 (Ill. App. 2003); *O'Keefe v. Greenwald*, 574 N.E.2d 136, 140 (Ill. App. 1991). The burden of

proving that the Receipt and Release barred plaintiffs' claim was therefore on defendant. *Rosestone Inves., LLC v. Garner*, 2 N.E.3d 532, 539-40 (Ill. App. 2013).

The parties have not cited, and the Court has not found, any Illinois cases discussing what a trustee must prove to establish that a release purporting to bar a beneficiary's claim against the trustee is valid. But the Illinois Appellate Court has looked to the *McFail* factors, as well as the Restatement (Second) of Trusts, in the closely related context of deciding what a fiduciary must prove to sustain the affirmative defense of ratification.

In *Monco v. Janus*, the court held that a ratification defense was available to an attorney defending against a claim that he had improperly profited from a business transaction with a client that occurred during the attorney-client relationship. 583 N.E.2d at 583. Citing the "strong public policy considerations triggered by these attorney-client transactions," the court concluded that "an attorney asserting a ratification defense must make the same showing as he would in initially overcoming the presumption of undue influence," meaning that "the same three *McFail* factors are relevant to a ratification analysis[.]." *Id.* In so holding, the court relied on § 218 of the Restatement (Second) of Trusts, which provides that a beneficiary's ratification or affirmation of a transaction undertaken by the trustee in breach of trust will preclude a claim against the trustee unless "the beneficiary did not know of his rights and the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew[.]" Restatement (2d) of Trusts, § 218(2)(b). Thus, "a beneficiary's ratification of a

voidable trustee-beneficiary transaction requires at least full knowledge and fairness." *Monco*, 583 N.E.2d at 584.

The Illinois Appellate Court's decision in *Monco* that a ratification is not valid unless a fiduciary proves "at least full knowledge" on the beneficiary's part–and its reliance on the Restatement (Second) of Trusts in so holding–convinces the Court that the Illinois courts would likewise invalidate a beneficiary's release of claims against a trustee unless the trustee proved that the beneficiary had full knowledge of her rights and of the material facts known to the trustee. In analyzing the validity of the release here, the Court therefore looks, not only to the Illinois cases holding that releases must be strictly construed, but also to § 217 of the Restatement (Second) of Trusts. This section, titled Discharge of Liability by Release or Contract, also emphasizes that a beneficiary's release of a claim against the trustee is valid only if the beneficiary knew of her rights and the material facts known to the trustee:

> (1) A beneficiary may preclude himself from holding the trustee liable for a breach of trust by a release or contract effective to discharge the trustee's liability to him for that breach.

> (2) A release or contract is not effective to discharge the trustee's liability for a breach of trust, if

>> (a) the beneficiary was under an incapacity at the time of making such release or contract; or

>> (b) the beneficiary did not know of his rights and of the material facts which the trustee knew or should have known and which the trustee did not reasonably believe that the beneficiary knew; or

>> (c) the release or contract of the beneficiary was induced by improper conduct of the trustee; or

(d) the transaction involved a bargain with the trust which was
not fair or reasonable.

Restatement (Second) of Trusts, § 217.

"Restatements are not binding on Illinois courts unless adopted by [the Illinois Supreme Court]." *In re Estate of Lieberman*, 909 N.E.2d 915, 922 (Ill. App. 2009). Because there is no Illinois Supreme Court case specifically adopting § 217, that section "merely provides guidance." *Id.* But particularly in light of *Monco*, the Court is persuaded that the Illinois courts would follow § 217 in considering whether a release purporting to discharge the trustee's liability for breach of trust was effective.[20]

### ii. Anna White Did Not Know There Were Multiple Versions of the Robert Trust.

There is no evidence showing that Anna White knew, when she executed the Receipt in Release in July 2011, that multiple versions of the Robert Trust documents existed. Defendant testified only that she provided Anna with a copy of Version C sometime after Robert Richert's death. [458] 17. Because defendant failed to prove that Anna White had full knowledge of her rights and of the material facts known to defendant—namely that she was withholding the genuine trust instrument and had

---

[20] The Court observes that, on January 1, 2020, the Illinois Trust Code, 760 ILCS 3/101, *et seq.*, became effective, replacing the Illinois Trusts and Trustees Act, 760 ILCS 5/1, *et seq.* Section 1009 of the Trust Code provides that "[a] trustee is not liable to a beneficiary . . . for a breach of trust if the beneficiary . . . released the trustee from liability for the breach . . . unless . . . at the time of the . . . release . . . the beneficiary did not know of the beneficiary's rights or of the material facts relating to the breach." 760 ILCS 3/1009(a)(2). Although the Court does not apply that provision here, it is substantively identical to the Restatement standard relied on by the Court and consistent with *Monco v. Janus*.

created a fake version of the Robert Trust to steal forty-seven percent of the trust assets–the Receipt and Release is not effective to bar plaintiffs' claim.

### E.    Punitive Damages

Plaintiffs also seek an award of punitive damages for defendant's "intentional fraudulent breaches of fiduciary duty against Anna White" and her "intentional failure to answer discovery honestly." [328] 47.

As discussed above, the Court previously ruled that plaintiffs' claim for punitive damages did not survive Anna White's death as a matter of Illinois law. [348]. As the Court explained, "'[u]nder Illinois law, any right to common law punitive damages is lost once the injured party has died,' and a request for punitive damages will survive the injured party's death only if it is expressly authorized by statute." [*Id.*] 2 (quoting *Vincent v. Alden-Park Strathmoor, Inc.*, 948 N.E.2d 610, 617 (Ill. 2011)). The Court now reconsiders this issue in light of the memorandum filed by plaintiffs on September 12, 2019. [361].

Plaintiffs first argue that Arizona law, under which a claim for punitive damages survives an injured party's death, governs the request for punitive damages because the choice-of-law provision in the trust instrument states that the trust "shall be construed under and regulated by" Arizona law. [361] 1; *see also* [PX 26] 30 (Version A). Second, and apart from their reliance on the choice-of-law language, plaintiffs contend that Arizona law or Florida law (which also permits punitives after the injured party's death), rather than Illinois law, should apply because those states have a more significant interest in whether punitive damages should be awarded

against defendant. [361] 4-9. Finally, plaintiffs contend that the Court erred in ruling that their claim for punitive damages did not survive Anna's death as a matter of Illinois law. [*Id.*] 10-11.

### 1.    Choice of Law

As with the merits of plaintiffs' claim, the Court need engage in a choice-of-law analysis respecting punitive damages "only if there is a conflict between Illinois law and the law of another state such that a difference in law will make a difference in the outcome." *W. Side Salvage*, 878 F.3d at 223 (internal quotation marks omitted).

Here the Court finds that there is an actual conflict between Illinois law and Arizona law. As already established, Illinois law requires that there "be express statutory authorization for punitive damages in order for a punitive damage claim to survive the injured person's death," *Vincent*, 948 N.E.2d at 617, and plaintiffs have not identified a statute authorizing such damages for a breach of fiduciary duty. Plaintiffs argue that there is an equitable exception to *Vincent*, such that a court may award punitive damages in the absence of express statutory authority whenever there are "very strong equitable reasons" to do so. *Marston v. Walgreen Co.*, 907 N.E.2d 851, 857 (Ill. App. 2009); [361] 10-11. The Court disagrees: such a rule would be impossible to square with *Vincent*, and there is no case from the Illinois Supreme Court holding that punitive damages may be awarded in the absence of statutory authorization whenever a party can show that "very strong equitable reasons" supposedly justify an award of such damages.

In contrast, Arizona law clearly provides that a claim for punitive damages survives the injured party's death. *Quintero v. Rogers*, 212 P.3d 874, 878 (Ariz. App. 2009) ("Therefore, we hold that actions for punitive damages survive the death of the plaintiff as well as the death of the tortfeasor.").

Although the Court is faced with an outcome-determinative conflict between Illinois and Arizona law, the Court finds that the choice-of-law provision in the Robert Trust obviates the need to engage in an extended analysis. Illinois's choice-of-law rules instruct that "a court must honor a contractual choice of law unless the parties' choice of law would violate fundamental Illinois public policy and Illinois has a materially greater interest in the litigation than the chosen state." *Life Plans*, 800 F.3d at 357. Defendant has not tried to make either showing, and the Court doubts that any interest Illinois might have in the litigation would be "materially greater" than Arizona's, given that Robert Richert was an Arizona resident, the trust was created in Arizona, and the trust possessed and provides for the disposition of assets located in Arizona–namely, the Carefree home and the funds in the Fidelity trust account.

Accordingly, the Court will apply Arizona law in deciding whether plaintiffs are entitled to punitive damages.

## 2. Punitive Damages Under Arizona Law

"Punitive damages are awarded only in the most egregious of cases, where a plaintiff proves by clear and convincing evidence that the defendant engaged in reprehensible conduct and acted with an evil mind." *Medasys Acquisition Corp. v.*

*SDMS, P.C.*, 55 P.3d 763, 767 (Ariz. 2002) (internal quotation marks and brackets omitted).

"In deciding whether punitive damages are awardable, the inquiry should be focused upon the wrongdoer's mental state." *Linthicum v. Nationwide Life Ins. Co.*, 723 P.2d 675, 679 (Ariz. 1986). "To recover punitive damages, something more is required over and above the 'mere commission of a tort.'" *Id.* (quoting *Rawlings v. Apodaca*, 726 P.2d 565, 578 (Ariz. 1986)). "The wrongdoer must be consciously aware of the wrongfulness or harmfulness of his conduct and yet continue to act in the same manner in deliberate contravention to the rights of the victim." *Id.* "A defendant acts with the requisite evil mind when he intends to injure or defraud, or deliberately interferes with the rights of others, consciously disregarding the unjustifiable substantial risk of significant harm to them." *Hyatt Regency Phoenix Hotel Co. v. Winston & Strawn* 907 P.2d 506, 518 (Ariz. App. 1995).

A party seeking punitive damages must support its claim with clear and convincing evidence. *Linthicum*, 723 P.2d at 681. Clear and convincing evidence "reflects a heightened standard of proof that indicates that the thing to be proved is highly probable or reasonably certain." *Kent K. v. Bobby M.*, 110 P.3d 1013, 1018-19 (Ariz. 2005).

### 3. Punitive Damages Are Warranted in This Case.

The Court concludes that clear and convincing evidence supports plaintiffs' claim for punitive damages.

### i.     Defendant's Conduct Was Truly Reprehensible.

First, the evidence clearly and convincingly proved that defendant's breach of fiduciary duty represents truly "reprehensible conduct." *Medasys*, 55 P.3d at 767.

As the trustee of the Robert Trust, defendant owed Anna White a duty of loyalty and was obligated in her dealings with Anna to act with the utmost degree of fidelity and good faith. *Lane Title & Trust Co. v. Brennan*, 440 P.2d 105, 111 (Ariz. 1968) ("the trustee owes the beneficiary a duty of undivided loyalty"). Defendant also had a duty to distribute to Anna the share of the Robert Trust estate to which she was entitled under the trust documents. Ariz. Rev. Stat. § 14-10801 ("the trustee shall administer the trust in good faith, in accordance with its terms and purposes and the interests of the beneficiaries"). Defendant did not simply fail to live up to the high standards that the law of trusts imposed on her–though fail to do so she surely did. Defendant actively, purposefully violated those standards by creating a fake version of the Robert Trust in order to steal forty-seven percent of the trust estate to which she was not entitled, including $95,850.83 that belonged to Anna White. This conduct was truly outrageous and truly reprehensible

The reprehensible nature of defendant's betrayal of Anna White is only amplified by the close, trusting relationship that existed between aunt and niece. Kathleen White Murphy [451] 61, 70; Vicki Steciuk [456] 36; and defendant herself [449] 56, all testified that Anna and defendant were close. Defendant even stipulated that Anna "shared confidences with her" and that she believed Anna "trusted" her. [280] 4, at ¶¶ 11-12. Anna White was particularly vulnerable to defendant's

predations, moreover, because of her advanced age and declining mental capacity. That defendant committed such an egregious breach of her fiduciary duty to a close and elderly relative who defendant believed trusted her and to whom defendant professed affection supports the Court's finding that defendant's conduct was thoroughly reprehensible.

## ii. Defendant Acted with an Evil Mind.

Second, the evidence clearly and convincingly proved that defendant acted with an evil mind. Defendant's intent to "injure or defraud" Anna and "deliberately interfere[ ]" with her rights under the Robert Trust practically leaps off the pages of the trial record. *Hyatt Regency*, 907 P.2d at 518. Defendant possessed the authentic trust instrument and knew that she was entitled only to the Carefree home while Anna was entitled to both forty-seven percent of the trust estate and a further one-third share of the forty-seven percent of the trust estate not distributed to a named beneficiary. Nevertheless, or more likely because of this, defendant created a fake version of the trust document that redirected forty-seven percent of the trust estate to herself alone. The only conceivable purpose for doing so was to enrich herself at the expense of the rightful beneficiaries, including Anna White. Defendant could not but be "consciously aware of the wrongfulness or harmfulness of h[er] conduct," *Linthicum*, 723 P.2d at 679, and yet she has persisted for years in claiming that the fake document controls. This "[e]vidence of fraudulent and dishonest conduct . . . support[s] a finding that the 'defendant's conduct was guided by evil motives.'" *Rhue v. Dawson*, 841 P.2d 215, 227 (Ariz. App. 1992) (quoting *Rawlings*, 726 P.2d at 579).

### iii. Punitive Damages Cannot Be Based on Defendant's After-Occurring Conduct.

Plaintiffs contend that an award of punitive damages should account for defendant's "more recent untoward conduct," which includes "repeatedly changing the locks on the Buffalo Grove home, posting a NO TRESPASS note on the front door requiring visitors to contact her and refusing to allow the recovery of personal property" from the home that defendant "knows she does not own." [460] 14. Plaintiffs also argue that punitive damages should be imposed for defendant's "intentional failure to answer discovery honestly." [328] 47.

Plaintiffs' contentions, for which they cite no Arizona law, lack merit. Under Arizona law, "it is the quality of the character of the tortious act itself which gives rise to the assessing of punitive damages, not the character of the wrongdoer[.]" *Forquer v. Pinal Cnty.*, 526 P.2d 1064, 1067 (Ariz. App. 1974). "It follows that acts of the wrongdoer occurring after the liability creating event are normally not material on the issue of punitive damages unless such acts constitute evidence as to either the manner in which the liability-creating event occurred or to the aggravation of the victim's injuries." *Id.*

Nowhere in their briefs do plaintiffs try to show how defendant's recent conduct vis-à-vis the Buffalo Grove property, or her alleged misconduct during discovery in this case, relates to the manner in which she forged Version C or the aggravation of Anna White's injury. Nor can the Court conceive of how defendant's actions in recent years respecting the Buffalo Grove home "tend to prove that defendant had an 'evil

mind' when she injured plaintiff[s]" years ago by counterfeiting Version C. *Warfel v. Cheney*, 758 P.2d 1326, 1334 (Ariz. App. 1988).

Accordingly, the Court does not base its award of punitive damages on the conduct post-dating the creation of the fake trust document cited by plaintiffs.

### iv. Arizona Case Law Confirms That Punitive Damages Are Warranted in This Case.

The Court's award of punitive damages is consistent with other Arizona cases awarding such damages for a breach of fiduciary duty.

Punitive damages "may be imposed in . . . breach-of-fiduciary-duty cases." *Sec. Title Agency, Inc. v. Pope*, 200 P.3d 977, 995 (Ariz. App. 2008). To be sure, the Court has not found another case featuring as bold a breach of fiduciary duty as that committed by defendant here. But the Arizona cases awarding punitive damages in more run-of-the-mill cases support the Court's finding that defendant's reprehensible conduct here merits such damages.

In *Rhue v. Dawson*, the parties formed a partnership to acquire land and develop the parcels into shopping centers. 841 P.2d at 218. Rhue was the partner "with shopping center development expertise and was to handle the day-to-day details," while Dawson was the "financial partner, contributing the bulk of the capital and facilitating financing." *Id.* Shortly after Dawson obtained an appraisal showing that the partnership was likely to realize a $3.77 million profit on two properties it had purchased, Dawson "pressured" Rhue to sign a joint venture agreement. *Id.* This agreement, which Rhue signed without reading, contained a buyout provision allowing Dawson to buy Rhue's interest in the partnership simply by returning any

capital contribution Rhue had made. *Id.* at 219. "Because Rhue contributed primarily expertise but not capital and would be entitled to an equal share of the project's equity upon dissolution, this provision was highly unfavorable to Rhue." *Id.* When Rhue later sought to contest the provision, Dawson–who had boasted about his plans to oust Rhue from the partnership–notified Rhue of his intent to exercise the buyout and locked Rhue out of the partnership offices. *Id.*

A jury found that Dawson breached his fiduciary duty to Rhue "by failing to exercise the utmost good faith and by breaching the obligation of loyalty, fairness and honesty," and the Arizona Court of Appeals affirmed the jury's award of punitive damages. *Rhue*, 841 P.2d at 226. As the court explained, the circumstances surrounding the execution of the buyout provision, as well as Rhue's boasts and his decision to lock Rhue out of the partnership offices, proved that "Dawson deliberately misled Rhue and intended to injure Rhue." *Id.* at 227. Furthermore, Dawson's "deliberate[ ] fail[ure] to disclose that the agreement . . . contained a buyout provision" constituted "evidence of fraud and dishonest conduct" from which the jury could have "infer[red] that Dawson acted with an evil mind." *Id.*

In *Security Title Agency v. Pope*, the plaintiff title insurance company suffered a seventy-percent loss in revenue after a competitor, defendant First American, began soliciting plaintiff's clients with the help of co-defendant Pope, who had managed one of the plaintiff's most profitable branches. 200 P.3d at 981-82, 986. The evidence showed that Pope "secretly solicited key managerial employees to join a competitor," *id.* at 992, directed those employees to copy "pending escrow files" and "take them to

their homes so Security Title would not discover them," *id.* 987, and secured commitments from Security Title's clients to do business with First American, *id.* at 986-87. The evidence further established that First American aided and abetted Pope's actions by "substantially assist[ing] Pope to solicit key Security Title employees by participating in recruiting meetings arranged by Pope," *id.* at 992, discussing potential salaries and benefits the employees would receive if they moved to First National, and "agreeing to indemnify Pope" for the breaches of fiduciary duty she had committed "while still employed by Security Title," *id.* at 993.

The Arizona Court of Appeals affirmed the jury's award of punitive damages against First American for aiding and abetting Pope's breach of her fiduciary duty to Security Title. *Sec. Title*, 200 P.3d at 995-97. Despite knowing that Security Title's "loss of Pope and the rest of [her branch's employees] would be a 'blow' to" Security Title's parent company and "cause substantial harm to Security Title," the court found that First American actively facilitated Pope's breach of fiduciary duty in order to "obtain for itself the $8 million in annual revenue generated by" Pope's branch. *Id.* at 995-96. This conduct provided "clear and convincing evidence that First American committed the outrageous conduct necessary to support an award of punitive damages." *Id.* at 997.

Defendant's conduct is at least on par with the reprehensible conduct that warranted punitives in *Rhue* and *Security Title Agency*. Like the defendant in *Rhue*, who crafted and pressured his partner to sign a one-sided buyout agreement to assume control over the partnership–and his partner's nearly $1.9 million share of

the partnership's expected profits–defendant here created a fake trust document to assume control over forty-seven percent of the trust estate to which she was not entitled under the authentic trust instrument. And like the corporate defendant in *Security Title Agency*, which aided and abetted another's breach of fiduciary duty despite knowing that it would be a "blow" and cause "substantial harm" to its rival, defendant here persisted in defrauding Anna White out of her rightful share of the trust estate despite the obviously wrongful and injurious nature of her conduct. The Court is therefore satisfied that an award of punitive damages in this case not only rests on clear and convincing evidence, but also is consistent with awards of punitive damages in other Arizona cases involving a breach of fiduciary duty.

### v.      A 1:1 Ratio of Compensatory Damages to Punitive Damages Is Appropriate.

Finally, the Court agrees with plaintiffs that punitive damages should be awarded on a 1:1 basis with the award of compensatory damages. [460] (asking for entry of judgment "awarding punitive damages at the ratio of 1:1 based on all compensatory damages").

The Court recognizes that "[t]here is no bright-line ratio between compensatory and punitive damages" because "[a]n appropriate award of damages is a fact-sensitive inquiry." *Arellano v. Primerica Life Ins. Co.*, 332 P.3d 597, 605 (Ariz. App. 2014). But a number of Arizona cases have authorized awards of punitive damages at a 1:1 ratio with the award of compensatory damages. *See, e.g.*, *Sec. Title Agency*, 200 P.3d at 1001 (reducing punitive damages to 1:1 ratio with $6,100,290 in compensatory damages); *Nardelli v. Metro. Grp. Prop. & Cas. Ins. Co.*, 277 P.3d 789,

809 (Ariz. App. 2012) (reducing punitives to 1:1 ratio with $155,000 compensatory damage award); *Hudgens v. Southwest Airlines, Co.*, 212 P.3d 810, 830 (Ariz. App. 2009) (punitives reduced to 1:1 ratio with $500,000 compensatory damages award). These cases are not precisely on point because they address the propriety of a punitive damages award in the context of whether the award was unconstitutionally excessive. But the endorsement of the 1:1 ratio in other Arizona cases confirms the Court's decision that the 1:1 ratio is reasonable–especially because the Court is convinced that a substantial award of punitive damages is warranted for defendant's thoroughly reprehensible conduct.

### F.     Prejudgment Interest

Plaintiffs argue that they are entitled to prejudgment interest under Illinois law at a rate of five percent, calculated from "January 10, 2010 when [defendant] dissipated the Robert Trust assets into her personal account[.]" [328] 47.[21]

"Under Illinois law, the general rule is that prejudgment interest cannot be awarded unless by statute or agreement of the parties." *Sterling Nat'l Bank v. Block*, No. 16 C 9009, 2019 WL 5085715, at *3 (N.D. Ill. Oct. 10, 2019). To be entitled to prejudgment interest, the amount due must be "a fixed amount or easily computed." *Bank of Chi. v. Park Nat'l Bank*, 640 N.E.2d 1288, 1296 (Ill. App. 1994).

---

[21] In a diversity case, state law determines whether prejudgment interest is available. *Sunny Handicraft (H.K.) Ltd. v. Envision This!, LLC*, 14 C 1512, 2020 WL 1812384, at *2 (N.D. Ill. Apr. 9, 2020). Because plaintiffs have asked for prejudgment interest under Illinois law only, the Court need not consider whether plaintiffs would be entitled to prejudgment interest under Arizona law. *Cf. ECHO, Inc.*, 52 F.3d at 707 (court should apply law of forum state unless party argues choice-of-law rules require court to apply another state's law).

Because there is no agreement in this case respecting prejudgment interest, the Court looks to the Illinois Interest Act, which provides that:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

815 ILCS 205/2.

The Court concludes that an award of prejudgment interest is proper in this case. Initially, the Court finds that the sum at issue–Anna White's share of the forty-seven percent of the trust estate–is "liquidated and subject to easy calculation." *Illinois Nat'l Ins. Co. v. Ace Stamping & Mach. Co., Inc.*, No. 17 C 7567, 2021 WL 323785, at *1 (N.D. Ill. Feb. 1, 2021). Moreover, while plaintiffs' briefs do not identify which section of the Interest Act entitles them to prejudgment interest, the Court concludes that prejudgment interest is proper under either the "money received to the use of another and retained without the owner's knowledge" provision or the "money withheld by an unreasonable and vexatious delay of payment" provision.

Regarding the former provision, the money that defendant obtained from Robert Richert's Fidelity account belonged to the beneficiaries of the Robert Trust, including Anna White, yet defendant withheld that money without disclosing that Version C was a forgery or that Anna was entitled to an additional $95,850.83 under the authentic trust instrument. *See Flynn v. Maschmeyer*, 156 N.E.3d 540, 563-64 (Ill. App. 2020) (affirming award of prejudgment interest under "money received to

the use of another" and "unreasonable and vexatious delay of payment" provisions in breach-of- fiduciary-duty case where defendant usurped business opportunities that belonged to partnership).

Regarding the latter provision, defendant–having forged Version C in an attempt to steal forty-seven percent of the trust's cash assets–had absolutely no good-faith basis for withholding Anna White's share of those funds and has fought for years to avoid distributing this money to her. *Cf. Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 834 (7th Cir. 2020) (recognizing that "a good faith dispute about liability necessarily defeats a claim for interest" under "unreasonable and vexatious delay of payment" provision).

Finally, the Court finds that prejudgment interest should be calculated from January 15, 2010, the date by which defendant transferred all but $94.26 from the Robert Trust's Fidelity account into her own account. *See* [460] 14; [280] 5, ¶¶ 18-23. By that date, defendant had complete control over the Robert Trust's cash assets and was unquestionably able to distribute Anna White's share of those funds. Accordingly, for the period from January 15, 2010 until January 15, 2021, plaintiffs are entitled to $52,717.94 in prejudgment interest ($95,850.53 x .05 = $4,792.54 x 11 = $52,717.94). From January 15, 2021 until May 27, 2021, plaintiffs are entitled to $1,733.16 in prejudgment interest (annual interest of $4,792.54 / 365 days = $13.13 per day x 132 days = $1,733.16). In total, plaintiffs are entitled to $54,451.10 in prejudgment interest.

*   *   *

In sum, the Court finds that plaintiffs proved by a preponderance of the evidence that defendant breached her fiduciary duty to Anna White by creating Version C of the Robert Trust and failing to distribute to Anna White her intestate share of the forty-seven percent of the trust estate–$95,850.83–not distributed to a named beneficiary. The Court further finds that plaintiffs proved by clear and convincing evidence that defendant's breach involved reprehensible conduct and was committed with an evil mind, and that punitive damages should be awarded at a 1:1 ratio with the award of compensatory damages. Plaintiffs are therefore entitled to $95,850.83 in compensatory damages, $95,850.83 in punitive damages, and $54,451.10 in prejudgment interest.

## IV. Indemnification

Count II of defendant's first amended counterclaim was her sole claim left for adjudication at the bench trial. [51] 10-11. Relying on the Receipt and Release, defendant contends that she is entitled to indemnification from plaintiffs for the attorney's fees and costs she incurred in defending this lawsuit.[22]

### A. Elements of the Claim

Because defendant's claim alleges that the Receipt and Release agreement creates an express right of indemnification from plaintiffs, the Court treats this claim as a claim for breach of contract. *See, e.g., Travelers Cas. & Sur. Co. v. Bowman*, 893 N.E.2d 583, 589 (Ill. 2008) ("Obligations arising out of indemnification agreements

---

[22] Because the parties have not made any choice-of-law arguments with respect to this claim, the Court applies Illinois law. *See Burdett v. Miller*, 957 F.2d 1375, 1382 (7th Cir. 1992) ("the district judge . . . will apply the substantive law of the forum state if the case is a diversity case and neither party argues choice of law").

require proof of a breach of contract[.]"). "Under Illinois law, a plaintiff looking to state a colorable breach of contract claim must allege four elements: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610, 614 (7th Cir. 2019) (internal citations omitted).

The Court is mindful that "indemnity contracts are to be strictly construed, and any ambiguity is to be construed most strongly against the indemnitee." *Blackshare v. Banfield*, 857 N.E.2d 743, 746 (Ill. App. 2006). "Strictly construing these provisions not only 'provides certainty in the law,' but also gives parties 'notice to include precise language on attorney fees when negotiating a contract.'" *Tsai v. Karlik*, No. 14 C 5709, 2016 WL 5373075, at *2 (N.D. Ill. Sept. 26, 2016) (quoting *Downs v. Rosenthal Collins Grp., LLC*, 895 N.E.2d 1057, 1061 (Ill. App. 2008)).

## B. Defendant Is Not Entitled to Indemnification.

The Court's resolution of this claim is controlled by its earlier decision granting in part and denying in part plaintiffs' motion to dismiss defendant's first amended counterclaim. *White II*, 2016 WL 6139929, at *5. In holding that Count II survived the motion to dismiss, the Court determined that the Receipt and Release was ambiguous as to whether the parties intended to indemnify defendant only for claims raised by third parties or whether they also intended to indemnify her against claims raised by Anna White:

> In this case, the language of the indemnity agreement is ambiguous; we cannot determine whether it was intended to indemnify Richert for claims against her that were allegedly caused by her own behavior. It

will be for Richert to ultimately offer evidence to show that both parties intended that result.

*Id.*

As explained below, however, defendant failed to prove with any evidence—let alone by a preponderance of the evidence—that she and Anna White intended the indemnification provision to apply to a claim brought against defendant by Anna herself. Furthermore, because there was no consideration for Anna's promise to indemnify defendant, the indemnification provision is invalid and unenforceable.

1.      **Defendant Introduced No Evidence That Anna White Intended to Indemnify Defendant for Claims Brought By Anna Herself.**

Because of the Court's earlier ruling that the Receipt and Release was ambiguous, the Court may consider extrinsic evidence of the parties' intent. *Lexington Ins. Co. v. RLI Ins. Co.*, 949 F.3d 1015, 1020 (7th Cir. 2020) (applying Illinois law). Likewise, the Court was free to consider "preliminary negotiations between the parties in order to determine the meaning of contract provisions and the intent of the parties." *Regency Comm. Assocs., LLC v. Lopax, Inc.*, 869 N.E.2d 310, 316 (Ill. App. 2007). Nevertheless, defendant failed to introduce any evidence on this critical issue.

Defendant testified that she had discussed the Receipt and Release with Anna sometime before defendant traveled to Illinois for James's ninetieth birthday party. [458] 21. "I asked my aunt if she would sign a release," defendant testified, "in case something should happen to her and her children decided to sue me so I would not have to be involved in another out-of-state lawsuit." [*Id.*]. According to defendant,

when she brought the release to James's party, Anna was "happy to execute the receipt and release for me." [*Id.*].

Vicki Steciuk also testified about the execution of the Receipt and Release. According to Vicki, defendant wanted the Receipt and Release in place "so that there weren't any problems in the future" respecting the Robert Trust. [456] 20. She added that defendant "wanted to protect" herself in the event of a trust-related dispute. [*Id.*] 21. Regarding Anna White's intentions, Vicki testified that Anna "didn't want any disputes with anything and she wanted to sign [the Receipt and Release] to protect [defendant] as well." [*Id.*] 26.

This evidence comes nowhere close to satisfying defendant's burden of proof, especially when Illinois law requires the Court to construe the ambiguity in the contract "most strongly against" her. *Blackshare*, 857 N.E.2d at 746.

Defendant testified only that the indemnification provision would apply if "something should happen" to Anna and "her children decided to sue me." But this case was brought by Anna herself, and Anna's children have continued to litigate the case only in their representative capacities after Anna's death.[23] Therefore, even if the Court accepted defendant's testimony at face value, it would not establish that

---

[23] The fact that plaintiffs may have assisted Anna bring or manage this litigation before they were substituted as the named plaintiffs does not bring this case within the scope of the indemnification agreement as allegedly understood by defendant and Anna White–*i.e.*, barring a suit brought by Anna's children. As discussed above, Kathleen was acting under a valid power of attorney executed by her mother, and Kathleen's actions were thus taken in her mother's name. [PX 27] 2 (Anna's execution of power of attorney appointed Kathleen "as my attorney-in-fact ('my agent') to act for me and in my name").

the indemnification provision applies: this is not a case where Anna's "children decided to sue" defendant; this is a case where Anna herself sued defendant.

More importantly, the Court does not credit defendant's self-serving and biased testimony on the scope of the indemnification provision. Having found that defendant created a fake version of the Robert Trust in a deliberate attempt to steal more than $95,000 from Anna White, the Court simply cannot believe that defendant forthrightly disclosed to Anna that, in the event Anna herself brought a claim against defendant–including a claim based on defendant's forging of the trust instrument–the indemnification provision would oblige Anna to fund defendant's defense.

Nor does defendant's testimony clarify the kind of claims to which the indemnification provision was meant to apply: did it apply only to claims challenging decisions made by the trustee in the ordinary course of managing the trust, or did it also extend to a beneficiary's claim that the trustee created a fake version of the trust in order to strip a beneficiary of her lawful share of the trust estate? Defendant simply failed to address this question.

For her part, Vicki understood from a single conversation between Anna and defendant that Anna "didn't want any disputes with anything" and wanted to "protect" defendant. But how much protection did Anna want defendant to have, and from what? Did she want defendant protected in the event defendant incurred costs and fees defending against a run-of-the-mill suit challenging a distribution from the Robert Trust? Or did Anna also want to pay for defendant's defense in the event–now realized–Anna sued defendant to recover the $95,850.83 that defendant stole from

her by creating a counterfeit version of the Robert Trust documents? Based on her trial testimony, Vicki Steciuk has no answers to these questions. Despite witnessing the execution of the Receipt and Release, moreover, Vicki did not corroborate defendant's claim that she told Anna that the indemnity provision would bar a suit if "something should happen" to Anna and "her children decided to sue me."

Finally, Anna's statement that she "didn't want any disputes with anything" is not inconsistent with agreeing to indemnify defendant only against claims brought by third parties. In other words, while Anna may very well have hoped there would be no disputes over the distributions from the Robert Trust, this fact sheds absolutely no light on what Anna did want vis-à-vis the indemnification provision once a dispute with defendant concerning the validity of the Robert Trust documents arose.

The Court accordingly finds that defendant failed to prove that the Receipt and Release obligates Anna White to indemnify defendant for costs and fees she incurred in this litigation, which involves Anna's proved claim that defendant breached her fiduciary duty to Anna by creating a forged trust document and refusing to distribute Anna White's lawful share of the trust estate. The Court will enter judgment in favor of plaintiffs and against defendant on Count II of defendant's first amended counterclaim.[24]

---

[24] After the trial concluded, and simultaneously with the filing of their post-trial brief, plaintiffs moved under Fed. R. Civ. P. 52(c) for judgment based on partial findings on the indemnification claim. [459]. A Rule 52(c) motion, which is "the bench trial equivalent of its more well-known cousin, a motion for judgment as a matter of law (or a directed verdict) under Rule 50(a)," allows a trial court to "resolve an issue after a party has been fully heard but before the trial has concluded." *Stop Illinois Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 748 (7th Cir. 2020). Because the purpose of a Rule 52(c) motion is to resolve an issue

## 2.    There Was No Consideration for the Indemnity Agreement.

Even if defendant had carried her burden of proof on this issue, plaintiffs would still be entitled to judgment in their favor because there was no consideration for Anna White's promise to indemnify defendant. As the Court explained above, defendant did not testify about any consideration she gave Anna in exchange for Anna entering into the Receipt and Release, and the Receipt and Release itself refers only to defendant's pre-existing legal duty to distribute Anna White's share of the Robert Trust estate. Because there was no consideration, the indemnity provision in the Receipt and Release is invalid and unenforceable. *Corroon & Black of Illinois, Inc. v. Magner*, 494 N.E.2d 785, 792 (Ill. App. 1986) ("A promise to do something one is already obligated to do is no consideration and creates no new obligation.").

## V.    Plaintiffs' Requests for Additional Damages

In their proposed findings of fact and conclusions of law, as well as in their post-trial brief, plaintiffs request that the Court award them the following forms of relief beyond the damages associated with defendant's breach of her fiduciary duty based on her creation of the forged trust instrument:

- An order directing defendant to prepare and record a quitclaim deed transferring the Buffalo Grove property to plaintiffs;

- An order appointing a receiver to take custody of and sell Robert Richert's home in Carefree, Arizona, thereafter remitting half the net proceeds to plaintiffs and half to defendant; and

---

during trial, the Court doubts that plaintiffs' motion is timely. In any event, the Court will deny the motion as moot based on the findings and conclusions set forth herein that defendant failed to prove that she is entitled to indemnification.

- $228,550.63 in compensatory damages, "which represents Anna White [*sic*] entitlement to forty-seven percent of the Robert Trust."

[328] 39; [460] 14-15.

Plaintiffs are not entitled to any of this relief. First, title to the Buffalo Grove home was the subject of count one of plaintiffs' first amended complaint [1-1] 5, but the Court dismissed that claim as time-barred nearly three years ago. *See White III*, 2018 WL 4101512, at *5-6.[25]

Second, plaintiffs have never sought control of the Carefree home during the litigation. To the contrary, plaintiffs represented to the Court when the first amended complaint was filed that the home was "off the table" because it "goes to the defendant whether–under any of the three scenarios" established by the different versions of the trust documents. [192] 16. In their post-trial brief, plaintiffs announced that they would "make [an] equitable estoppel claim for half the value of the Carefree home," and that this claim would be asserted in an "imminent motion to amend the pleadings to conform to the proofs shown at trial[.]" [460] 7; *see also* [*id.*] 13. The bench trial concluded more than six months ago, however, and no such motion has been filed. Accordingly, nothing before the Court affords plaintiffs any relief respecting the Carefree home.

---

[25] The Court acknowledges that it permitted plaintiffs to introduce a significant amount of evidence concerning Anna White's purchase of the Buffalo Grove home, defendant's involvement in that transaction, and other matters related to the Buffalo Grove home. While this evidence might have had some relevance to establishing the relationship between defendant and Anna White, and the trust Anna placed in defendant when it came to financial matters, the Court's summary-judgment ruling clearly foreclosed plaintiff from obtaining title to the Buffalo Grove home.

Third, plaintiffs cannot recover the forty-seven percent of the Robert Trust's assets to which Anna White was entitled as a named beneficiary because that relief is not causally connected to the breach of fiduciary duty that plaintiffs proved in this case. Rather, defendant's breach of fiduciary duty–creating a fake version of the trust and using it to steal nearly half of the Robert Trust's assets–caused Anna White to lose only her one-third share of the forty-seven percent of the trust estate that the Robert Trust did not distribute to a named beneficiary. *See* [173] 3 (requesting entry of judgment "disgorging the trust proceeds to which Elizabeth Richert was not entitled"). To the extent plaintiffs sought to recover any portion of Anna White's forty-seven-percent share of the trust estate that defendant failed to distribute, that relief was associated with count one of their amended complaint, which the Court dismissed as time-barred. *See* [1-1] 5 (prayer for relief requesting "an accounting for the Robert L. Richert Trust"). Because the only claim that might have entitled plaintiffs to recover the outstanding portion of Anna White's share as a named beneficiary of the Robert Trust was dismissed with prejudice, plaintiffs are not entitled to the requested relief.

## VI.    Defendant's Motion for Sanctions

When the parties filed the proposed final pretrial order in June 2019, each side stated that it would seek sanctions against the other side for alleged misconduct during pretrial proceedings. [280] 12. At the final pretrial conference on July 9, 2019, the Court stated that it would defer the issue of sanctions until after trial so that the parties could focus on getting the case trial-ready. [311] 14. "If, after the trial,

somebody wants to raise" the issue of sanctions, the Court continued, "you can raise that issue then." [*Id.*].

Two months later, however, plaintiffs sought a default judgment against defendant based on alleged misconduct relating to defendant's request to continue the trial date due to a medical condition. [355] 10. In denying that request, the Court stated that it would "not entertain any further motions or requests for sanctions or dismissal based on alleged misconduct prior to trial, and we will entertain any such motions after trial only with leave of Court on a showing of good cause." [359] 4.

Defendant's post-trial brief renews her sanctions request, but the Court finds that there is no basis to impose sanctions on plaintiffs. First, to the extent that defendant's sanctions request is based on plaintiffs' alleged pretrial misconduct, defendant has not sought leave of Court or made a showing of good cause for renewing the motion, as required by the Court's order of September 11, 2019. [359] 4. Second, and setting aside this procedural deficiency, defendant's request for sanctions has no merit.

Defendant contends that "the Court found that Plaintiff's [*sic*] lied in their July 17, 2015 Petition for Production of Deed and Accounting, when they alleged that Defendant was an attorney licensed to practice in the state of Illinois." [462] 2. Defendant contends that this "lie" was the "*only* basis" for plainiffs' filing this suit in Illinois and claiming that defendant had acted as Anna White's attorney. [*Id.*] (emphasis in original). This sanctions request is based on a misrepresentation of a statement by the Court during the July 18, 2017 hearing. At that hearing the Court

82

observed that both parties have "*accused* every–each other of all sorts of things, you know, lying about the–Ms. Richert being an attorney in Illinois." [192] 20 (emphasis supplied). Furthermore, plaintiffs' allegation that defendant was licensed to practice law in Illinois was hardly the only basis supporting the plaintiffs' decision to bring this case in Illinois: Anna White resided here, and some of the most important events underlying plaintiffs' original petition–the signing of the loan agreement, the purchase of the Buffalo Grove home, and the execution of the Receipt and Release– all occurred here.

Next, defendant argues that plaintiffs should be sanctioned for the circumstances under which they obtained copies of Versions A and B of the Robert Trust. [462] 3-6. Because Judge Schenkier addressed this issue multiple times and found that no sanctions were warranted, the Court denies this request. *See*, *e.g.*, [357] 2 ("The issues raised by Ms. Richert regarding the Fidelity subpoenas have been raised and ruled upon over the long course of this litigation, and we have found nothing sanctionable with respect to the subpoenas.").

Defendant also argues that plaintiffs "suborned the perjury of Gary Steciuk." [462] 11. Yet nothing in defendant's post-trial brief shows that Gary's testimony concerning an August 8, 2016 email he sent to one of plaintiffs' attorneys was false, nor does defendant explain how plaintiffs supposedly suborned this perjured testimony.

Defendant next claims that plaintiffs violated Fed. R. Civ. P. 11 by filing a motion to admit Plaintiffs' Exhibit 15 at trial. [462] 11-12. The proposed exhibit was

an envelope containing copies of Anna and James White's estate documents that defendant allegedly mailed to Anna in 2006. [436] 1. At the final pretrial conference, Judge Schenkier excluded this exhibit as cumulative [*id.*], and the Court adhered to that ruling and denied the motion to admit the exhibit. [439]. Defendant contends that Thomas White tampered with this exhibit, but she provides neither evidence to support this claim nor a basis to impose sanctions—especially given that this evidence was not admitted at trial.

Defendant also contends that Thomas White lied when he testified that his father's ninetieth birthday party took place on July 31, 2011, as opposed to July 30, 2011. [462] 12. But defendant offers nothing to establish that Thomas's testimony on this collateral issue was purposefully untruthful, as opposed to being honest but mistaken. Defendant takes issue with the accuracy and credibility of other parts of Thomas's testimony [*id.*], but the Court again finds that defendant has not shown that any part of Thomas's testimony warrants imposing sanctions.

Finally, defendant contends that plaintiffs "engaged in a multitude of breaches of the Stipulation during trial" and "poured out inadmissible, hearsay testimony, to their heart' [*sic*] content." [462] 13. The "Stipulation" at issue was an agreement executed by plaintiffs and defendant (at a time during the litigation when she was represented by counsel) under which Anna White "will not be called as a witness in this matter and no testimony from Anna White will be proffered or introduced at any trial or hearing in this matter," in exchange for which "Defendant agrees not to depose Anna White." [PX 35] 1-2. Because defendant has not cited the trial record to support

her contention that plaintiffs repeatedly breached this Stipulation by introducing hearsay statements from Anna White, the Court need not consider the issue any further. *See United States v. Rodgers*, 89 F.3d 1326, 1339 (7th Cir. 1996) ("King cites no portion of the record nor any authority to support his claim, and we will therefore not address the merits of his argument.").[26]

For all of these reasons, the Court denies defendants' request to sanction plaintiffs.

## Conclusion

In accordance with the foregoing findings of fact and conclusions of law, the Court finds that plaintiffs proved by a preponderance of the evidence that defendant breached her fiduciary duty to Anna White and that plaintiffs are entitled to $95,850.83 in compensatory damages. The Court further finds that plaintiffs proved by clear and convincing evidence that defendant's breach of fiduciary duty involved reprehensible conduct and was committed with an evil mind, entitling plaintiffs to punitive damages at a 1:1 ratio with compensatory damages, in the amount of $95,850.83. The Court also finds that plaintiffs are entitled to prejudgment interest in the amount of $54,451.10. Accordingly, the Clerk of Court is directed to enter judgment on Count II of plaintiffs' first amended complaint in favor of plaintiffs and against defendant in the amount of $246,152.76.

---

[26] In any event, the Court is not persuaded that the stipulation, which forbade only the introduction of Anna White's "testimony," applied to the statements attributed to Anna White that were admitted at trial either because they were non-hearsay statements (*i.e.*, they were statements of a party-opponent) or subject to a hearsay exception. Notably, defendant herself elicited testimony from several witnesses that called for the witness to recount a statement by Anna White.

The Court also finds that defendant failed to prove by a preponderance of the evidence that plaintiffs are required to indemnify her for the costs and fees she incurred in this litigation. The Clerk of Court is therefore directed to enter judgment on Count II of defendant's first amended counterclaim in favor of plaintiffs and against defendant.

Plaintiffs' request for leave to file a petition for attorney fees under Fed. R. Civ. P. 54(d)(2), [460] 14, is granted. The motion shall be filed by June 10, 2021, defendant's response shall be filed by July 10, 2021, and plaintiffs' reply shall be filed by July 24, 2021. Plaintiffs' related request to file their attorney time entries in camera is denied, and all materials supporting the petition for fees must be filed on the Court's docket.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: May 27, 2021**