UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KATHLEEN WHITE MURPHY, ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> ELIZABETH RICHERT, <br><br> Defendant. | No. 15 CV 8185 <br><br> Magistrate Judge McShain |

### MEMORANDUM OPINION AND ORDER

Pending before the Court are motions for attorney's fees filed by plaintiffs Kathleen White Murphy and Thomas White [475][1] and by defendant Elizabeth Richert [497]. For the following reasons, plaintiffs' motion is granted in part and denied in part, and defendant's motion is denied.

## Background

After a bench trial, this Court entered judgment in favor of plaintiffs on their claim that defendant breached her fiduciary duty, as trustee of the Robert L. Richert Trust (the Robert Trust), to Anna White, a beneficiary of the Robert Trust who was also plaintiffs' mother and defendant's aunt. The Court found that plaintiffs proved that defendant "create[ed] a fake version of the Robert Trust in order to steal forty-seven percent of the trust estate to which she was not entitled" under the authentic trust instrument, "including $95,850.83 that belonged to Anna White." *Murphy v. Richert*, No. 15 CV 8185, 2021 WL 2156448, at *28 (N.D. Ill. May 27, 2021). The Court then found that plaintiffs proved that defendant "engaged in reprehensible conduct and acted with an evil mind," which entitled plaintiffs to an award of punitive damages under Arizona law. *Id.* (internal quotation marks omitted). Finally, the Court found that defendant–who at all relevant times was licensed to practice law by the State of Florida–failed to prove that the Receipt and Release (a document that she and Anna White had signed) either extinguished Anna White's claim against her or required plaintiffs to indemnify her for the attorney fees and costs she incurred in this case. The Court awarded plaintiffs $246,152.76, which comprised $95,850.83 in compensatory damages, $95,850.83 in punitive damages, and $54,451.10 in

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the blue CM/ECF header placed at the top of the filings.

prejudgment interest.[2] Thereafter, the Court denied both parties' post-trial motions. *Murphy v. Richert*, No. 15 CV 8185, 2021 WL 4963604 (N.D. Ill. Oct. 26, 2021).

## Discussion[3]

### I. Plaintiffs' Petition for Attorney's Fees and Costs

Plaintiffs seek an order directing defendant to pay all attorney's fees and costs they incurred during this litigation, for a total of $443,127 in fees and $19,541.82 in costs. [475] 1. Plaintiffs bring this request under 28 U.S.C. § 1927, which permits the Court to sanction an attorney who unreasonably and vexatiously multiplies the proceedings in a case, and under the Court's inherent authority to sanction bad-faith litigation conduct. [*Id.*] 2-3. They rely primarily on the Court's finding that defendant counterfeited a version of the Robert Trust that purported to award her 47% of the trust's assets while "concealing authentic copies of the Robert Trust[.]" [*Id.*] 1-2. Plaintiffs also contend that, throughout the litigation, defendant lied about her role in preparing Anna White's estate plan. [*Id.*].

In response, defendant first argues that the Court should strike plaintiffs' petition because it does not comply with certain requirements of Fed. R. Civ. P. 54(d).[4] *See* [497] 3. Defendant next contends that plaintiffs cannot recover the fees or costs they incurred in prosecuting count one of their amended complaint–which sought an accounting of the Robert Trust and an order transferring title to Anna White's home in Buffalo Grove from defendant, in her capacity as trustee of the Robert Trust, to Anna White–because defendant obtained summary judgment on that claim. [*Id.*] 3, 6, 7. [*Id.*] 6-7. Third, defendant objects that plaintiffs cannot recover certain costs incurred in connection with her February 2017 deposition because the Court previously awarded those costs to plaintiffs. [*Id.*] 6, 7 (citing [131]). Defendant also contends that the fees sought by plaintiffs are excessive under Illinois law. [*Id.*] 8.

---

[2] Defendant's appeal of the Court's judgment is pending in the Seventh Circuit.

[3] This decision presumes familiarity with the overall history of the litigation, the Court's Memorandum Opinion and Order entering judgment for plaintiffs, and its decision denying the parties' post-trial motions.

[4] Defendant did not file a timely response to plaintiffs' petition. *See* [466] (setting deadline for defendant's response to petition for July 10, 2021). Rather, when defendant filed her own motion for attorney fees in September 2021, she raised arguments in opposition to plaintiffs' petition. Despite their untimeliness, the Court will exercise its discretion to consider defendant's arguments.

2

### A. Legal Standards

#### 1. 28 U.S.C. § 1927

Under § 1927, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. "Sanctions awarded under § 1927 are to be paid by the lawyer, who must satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Estate of Perry v. Wenzel*, 872 F.3d 439, 463 (7th Cir. 2017) (internal quotation marks omitted). "The statute is applicable not only to lawyers who represent clients but also to a lawyer who represents himself." *Carr v. Tillery*, 591 F.3d 909, 919 (7th Cir. 2010).

To merit a fee award under § 1927, the attorney conduct "must multiply the proceedings, meaning prolong the case." *DR Distribs., LLC v. 21 Century Smoking, Inc.*, 513 F. Supp. 3d 839, 951 (N.D. Ill. 2021). In addition, "the attorney's actions must be both unreasonable and vexatious." *Id.* "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *Gravitt v. Mentor Worldwide, LLC*, 17 C 5428, 2021 WL 5564862, at *2 (N.D. Ill. Nov. 29, 2021) (internal quotation marks omitted). Fees may also be awarded where "a claim is without a plausible legal or factual basis and lacking in justification." *Estate of Perry*, 872 F.3d at 463. Any award of sanctions under § 1927 requires a "causal link between the misconduct and fees." *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 n.5 (2017).

Section 1927 is "permissive, not mandatory. The court is not obligated to grant sanctions once it has found unreasonable and vexatious conduct. It may do so in its discretion." *Catalina Holdings (Bermuda) Ltd. v. Muriel*, Case No. 18-cv-5642, 2020 WL 1675464, at *14 (N.D. Ill. Apr. 6, 2020).

#### 2. Inherent Authority

The Court also has the inherent authority to impose sanctions for "conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). "[S]anctions imposed pursuant to the court's inherent authority must be premised on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Ebmeyer v. Brock*, 11 F.4th 537, 546 (7th Cir. 2021) (internal quotation marks omitted).

"[O]ne permissible sanction is an assessment of attorney's fees–an order . . . instructing a party that has acted in bad faith to reimburse legal fees and costs incurred by the other side." *Haeger*, 137 S. Ct. at 1186 (internal quotation marks

3

omitted). Because sanctions imposed under the Court's inherent authority "must be compensatory rather than punitive," a court can "shift only those attorney's fees incurred because of the misconduct at issue." *Id.* "That kind of causal connection . . . is appropriately framed as a but-for test: The complaining party . . . may recover only the portion of his fees that he would not have paid but for the misconduct." *Id.* at 1187 (internal quotation marks omitted). "This but-for causation standard generally demands that a district court assess and allocate specific litigation expenses–yet still allows it to exercise discretion and judgment." *Id.* In "exceptional cases," however, the but-for standard "permits a trial court to shift all of a party's fees, from either the start or some midpoint of a suit, in one fell swoop." *Id.* at 1188. In such a case, the Court "escapes the grind of segregating individual expense items (a deposition here, a motion there)–or even categories of such items (again, like expert discovery)–but only because all fees in the litigation, or a phase of it, meet the applicable test: They would not have been incurred except for the misconduct." *Id.*

### B. Defendant's Egregious Misconduct Warrants the Imposition of Sanctions.

The Court concludes that this is one of the "exceptional cases" envisioned by the Supreme Court in *Haeger* where a party should be required to pay all of its opponent's fees and costs from "some midpoint of a suit, in one fell swoop." 137 S. Ct. at 1188. This case began in late 2015 as a contentious but otherwise unremarkable intra-family dispute in which a beneficiary of a trust sought an accounting of the trust and an order compelling the trustee to turn over certain property that allegedly belonged to the beneficiary. *See* [1-1] 3-4. The case proceeded in the normal course through April 2016, during which time the parties expended substantial time on settlement efforts. *See, e.g.*, [20, 27, 29, 32, 37]. When settlement efforts faltered, "the litigation began in earnest," *Murphy*, 2021 WL 2156448, at *9, with multiple rounds of motion practice beginning in May 2016. [42, 53].

But this case became something entirely different on February 15, 2017, when defendant produced the document known as Version C of the Robert Trust. [146] 4. Holding this document out as the authentic trust instrument, defendant testified at her deposition the next month that the original Version C had been stolen from her home in Florida at a time she could not recall, and that a copy of Version C appeared one day inside a plastic bag that had been left in her mailbox. [*Id.*] 5-6. Version C purported to distribute to defendant not only Robert Richert's home in Carefree, Arizona, but also an additional 47% of the Robert Trust's assets, which amounted to $287,552.79. In response to this surprising development,[5] plaintiffs undertook

---

[5] Defendant never before disclosed the existence of Version C or that it had allegedly been stolen from her home, despite a September 2016 court order directing her to produce any copies of the trust in her possession, custody, or control. *See Murphy*, 2021 WL 2156448, at *21.

4

additional discovery related to Version C. *See* [146] (motion to compel supplemental deposition of defendant); [149] (plaintiffs' motion for leave to issue subpoenas to custodian of Robert Richert's trust account and designate expert to opine on authenticity of Version C). This discovery, in turn, led not only to the production of the authentic versions of the trust instrument (referred to as Versions A and B of the Robert Trust)–which distributed to defendant only the Carefree home–but also to plaintiffs' motion for leave to file an amended complaint, which alleged that defendant breached her fiduciary duties by creating a counterfeit trust instrument and using it to withhold trust assets that belonged to Anna White. [165]. At the bench trial, the Court found that the evidence overwhelmingly established that Version C was a forgery that defendant had created to justify her brazen theft of trust assets to which she had no claim:

> [T]he Court is convinced that Version C of the Robert Trust is a forgery that defendant created to steal the forty-seven percent of the trust estate for which Version A did not identify a named beneficiary. This finding is based primarily on the Court's conclusion that defendant's testimony about the disappearance and re-emergence of Version C is completely incredible and entirely fabricated.
>
> \* \* \*
>
> The Court does not believe a single piece of this testimony.
>
> First, there is absolutely no evidence in the record to corroborate defendant's account about the creation of Version C, her possession of that document in her house in Florida, or the theft of that document from and its fortuitous return to her home. Second, the Court finds it incredible that defendant would not remember the date of the burglary– or even roughly when it had occurred–given her testimony that this was "the only time [her] home was subject to a theft," [451] 50, and the significance that such an event is likely to have for a homeowner. Third, the Court rejects as unconvincing defendant's claim that she could not report the burglary to police because of her past involvement in an abusive relationship–particularly when coupled with the fact that defendant must have disclosed her address to her former client-turned-burglar. While the Court has no reason to doubt defendant's claim that she had a genuine fear for her safety, the Court does not find that this fear would explain why defendant could not or would not report the crime to police. Fourth, the Court emphasizes the fantastical nature of defendant's claim that Thomas White found the copy of Version C that defendant had allegedly sent to Anna White, hired a private detective to find defendant's address, and planted the copy of Version C to "set [defendant] up." But this claim is not just fantastical; it is illogical.

5

Based on their conversations with defendant, plaintiffs believed that Anna White was entitled to half of the Robert Trust's assets, including the Carefree home. Under Version C, however, plaintiffs were in a worse position because that document distributes the Carefree home to defendant alone. The Court fails to see how plaintiffs stood to gain from "planting" a copy of Version C in defendant's mailbox, and the Court[ ] concludes that defendant's preposterous account of the re-emergence of Version C only underscores her false and misleading testimony on this subject.

The Court also bases its credibility finding on the circumstances surrounding the production of Versions A and B of the Robert Trust. Fidelity Investments, the custodian of Robert's trust account, produced only these versions of the trust documents in response to plaintiffs' subpoenas in May 2017. The Court concludes that Version A is the version Robert provided to Fidelity in order to open the trust account, while Version B is the version that defendant faxed to Fidelity in order to be recognized as the successor trustee after Robert was incapacitated. That Robert, defendant, and Fidelity all possessed the same version of the trust documents supports the Court's finding that Versions A and B are genuine, while Version C–which only defendant possessed–is a fake.

The Court recognizes that defendant testified that she did not discover Version C until "months after" her uncle died, and that defendant believed that Robert had simply substituted a new version of paragraph 5.4.1 into the version of the trust he originally executed in June 2008. But there is no credible evidence to link Version C to Robert Richert; only defendant's testimony places Version C in Robert's house, and the Court does not find any part of defendant's testimony respecting Version C to be credible. Moreover, paragraph 4.1 of all versions of the Robert Trust provides that the trust could be amended "by an instrument in writing signed by the Settlor and delivered to the Trustee." [PX 26] 5 (Version A); [*id.*] 37 (Version B); [PX 29] 1 (Version C). There is no evidence that Robert ever sought to amend the trust in this fashion, and defendant's testimony that Robert decided to make a page substitution "rather than go to the trouble of re-executing a document and finding witnesses and a notary" [458] 37, is rejected as entirely self-serving and speculative.

The Court also finds that defendant's failure to disclose the existence or whereabouts of any version of the Robert Trust during the first year-and-a-half of the litigation further undermines the credibility of her testimony about Version C and supports the Court's finding that Version C is counterfeit. Defendant admitted that she never contacted Fidelity

6

> to obtain copies of the trust [450] 155-57, despite the Court's order of September 15, 2016 directing her to produce any copies of the trust that were in her possession, custody, or control. [71] 2-3. Likewise, defendant acknowledged at trial [451] 49-50, that none of her discovery responses mentioned the existence of Version C or defendant's contention that Version C had been taken during a burglary of her home. Defendant's failure to mention or produce Version C during the first seventeen months of this litigation is likewise consistent with the Court's finding that defendant forged Version C in an effort to steal forty-seven percent of the trust assets.

*Murphy*, 2021 WL 2156448, at *20-21.

In its award of punitive damages, the Court emphasized that defendant obviously knew that Version C was a fake, but nevertheless fought the litigation for years by contending that it, rather than the authentic Versions A and B, governed the disposition of the Robert Trust's assets:

> Defendant possessed the authentic trust instrument and knew that she was entitled only to the Carefree home while Anna was entitled to both forty-seven percent of the trust estate and a further one-third share of the forty-seven percent of the trust estate not distributed to a named beneficiary. Nevertheless, or more likely because of this, defendant created a fake version of the trust document that redirected forty-seven percent of the trust estate to herself alone . . . Defendant could not but be consciously aware of the wrongfulness or harmfulness of her conduct, and yet she has persisted for years in claiming that the fake document controls.

*Murphy*, 2021 WL 2156448, at *28 (internal quotation marks, citation, and brackets omitted).

Based on these findings, which rest on clear and convincing evidence,[6] the Court now holds that defendant knowingly introduced false evidence into the case and perjured herself at trial in an effort to defeat plaintiffs' claims. This egregious, bad-faith litigation conduct cannot be tolerated and must be met with the imposition

---

[6] Plaintiffs were required to prove their claim for breach of fiduciary duty only by a preponderance of the evidence. *Murphy*, 2021 WL 2156448, at *18-19. To obtain punitive damages, however, Arizona law required that plaintiffs prove by clear and convincing evidence that defendant's breach was "truly reprehensible" and committed with "an evil mind." *Id.*, at 28-29. In finding that plaintiffs met that standard, the Court found that there was "clear and convincing evidence to prove that defendant breached her fiduciary duty by creating a fake trust instrument[.]" *Id.*, at *19 n.17.

of sanctions under the Court's inherent authority. Defendant will be ordered to pay all of plaintiffs' attorney's fees and costs that "would not have been incurred except for the misconduct." *Haeger*, 137 S. Ct. at 1188. Likewise, the Court will impose sanctions under § 1927 and order defendant to pay the attorney's fees and costs that plaintiffs incurred while defendant represented herself and in response to defendant's injection of the counterfeit trust document into the litigation. Defendant knowingly built her case around a piece of false evidence that she herself created and her own perjured testimony. Reasonable litigants–especially litigants who are themselves attorneys–do not build cases on fake documents and perjury, yet that is exactly what defendant did in an ultimately fruitless attempt to defeat plaintiffs' claim. The Court would be hard-pressed to identify a clearer example of unreasonable and vexatious litigation that needlessly drew out the proceedings, and defendant will be sanctioned accordingly.

Defendant's injection of the fake trust document into the case on February 15, 2017 fundamentally transformed the litigation. For purposes of its sanctions analysis, the Court has divided the litigation into four distinct phases and explains below whether plaintiffs are entitled to an award of fees and costs during that phase as well as the Court's authority for imposing sanctions.

> **1. Removal of the Case in September 2015 through Defendant's Production of the Counterfeit Trust Document on February 15, 2017**

Plaintiffs are not entitled to recover any of the attorney's fees and costs that were incurred from the removal of this case to federal court on September 18, 2015, *see* [1], through defendant's production of Version C on February 15, 2017.

First, § 1927 does not permit the Court to sanction defendant directly for any unreasonable multiplication of proceedings during this time because defendant was continuously represented by counsel. *See* [3, 4] (appearances of defendant's first and second attorneys on September 18, 2015); [90] (appearance of third attorney on October 25, 2016); [119] (appearance of fourth attorney on January 15, 2017). Section 1927 authorizes an award of sanctions against an attorney only; a represented client cannot be sanctioned. *See Carr*, 591 F.3d at 919; *see also Flip Side Prods., Inc. v. Jam Prods., Inc.*, 843 F.2d 1024, 1035 n.12 (7th Cir. 1988) ("§ 1927 provides only for the imposition of sanctions against counsel"); *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 396 n.6 (6th Cir. 2009) ("§ 1927 does not authorize the imposition of sanctions on a represented party").[7]

Second, sanctions are not warranted under the Court's inherent power because plaintiffs have not established that defendant was litigating the case abusively or in

---

[7] Plaintiffs' petition seeks an award of fees and costs against defendant personally, and not against any of the attorneys who represented her during the litigation.

8

bad faith before she produced Version C in February 2017. To begin, most of this phase of the litigation consisted of settlement discussions in which both sides were active participants. Moreover, once the parties' settlement efforts stalled, the only claim pending in the case was plaintiffs' claim for an accounting of the Robert Trust and an order transferring title to Anna White's Buffalo Grove home from defendant to Anna White. In sharp contrast to how she would later oppose the breach-of-fiduciary-duty claim, defendant opposed this claim on statute-of-limitations grounds. This defense was first raised in her motion to dismiss, filed in May 2016, *see* [42], and later in her answer to plaintiffs' complaint, filed in July 2016, *see* [49] 7-9. Furthermore, this defense ultimately proved to be a winner: in August 2018, the Court granted summary judgment for defendant on count one of the amended complaint because the undisputed evidence showed that it was time-barred. *See White v. Richert*, No. 15 CV 8185, 2018 WL 4101512, at *5-6 (N.D. Ill. Aug. 28, 2018). Defendant's reliance on a valid, and ultimately successful, statute-of-limitations defense is critical because it shows that defendant had a good-faith basis for litigating this phase of the case. *Cf. Ebmeyer*, 11 F.4th at 546 (district court abused its discretion by using inherent authority to sanction plaintiff "without finding that [he] willfully abused the judicial process or otherwise conducted the litigation in bad faith").

Plaintiffs–who acknowledge neither the different standards that apply to § 1927 and the Court's inherent sanctioning power nor their own obligation to prove a causal connection between defendant's misconduct and the requested fees–appear to suggest that other instances of defendant's misconduct justify a fee award during this phase of the case. They observe that, while settlement negotiations were underway in 2015, defendant had "already drained the Robert Trust," failed to disclose that "she had made no accounting to the Whites," and had misled "everyone by having them think that [under the authentic trust document] the Carefree home would be sold and they would get a share of the house." [475] 2. However blameworthy this conduct may be, it cannot form the basis of a sanctions award under the Court's inherent power because it occurred "in the events giving rise to the litigation[,]" and not during the litigation itself. *Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., Inc.*, 313 F.3d 385, 391 (7th Cir. 2002). As the Seventh Circuit explained in *Zapata*, "[t]he inherent authority of federal courts to punish misconduct before them is not a grant of authority to do good, rectify shortcomings of the common law . . . or undermine the American rule on the award of attorneys' fees to the prevailing party in the absence of statute." *Id.* at 390-91. Rather, a federal court's inherent power "is a residual authority, to be exercised sparingly, to punish misconduct (1) occurring in the litigation itself, not in the events giving rise to the litigation (for then the punishment would be a product of substantive law—designed, for example, to deter breaches of contract), and (2) not adequately dealt with by other rules[.]" *Id.* at 391; *see also Carr*, 591 F.3d at 919 ("section 1927 is inapplicable to misconduct that occurs before the case appears on the federal court's docket, or in other words to improper conduct in the run up to litigation"). Here, the misconduct

9

alleged by plaintiffs occurred long before the litigation began: defendant had drained the Robert Trust by February 2010; it was defendant's failure to provide an accounting of the trust that precipitated plaintiffs' lawsuit in August 2015; and both plaintiffs testified that, in conversations with defendant after Robert Richert's death in November 2009, she told them that Anna White would receive a one-half interest in the Carefree home. *See Murphy*, 2021 WL 2156448, at *3, *6. Such instances of pre-litigation conduct do not support a sanctions award. *Carr*, 591 F.3d at 919; *Zapata*, 313 F.3d at 391.

Third, the Court observes that defendant filed an amended counterclaim on August 2, 2016. *See* [51]. The counterclaim included eight counts, including (1) a claim against Anna White that was voluntarily dismissed by defendant on August 28, 2019, *see* [332, 333]; and (2) the indemnification claim that defendant failed to prove at the bench trial. Plaintiffs do not contend that defendant's filing of the counterclaim was abusive or in bad faith, and the Court finds that the substance of the counterclaim was essentially independent of, and unrelated to, defendant's later production of Version C. Therefore, plaintiffs are not entitled to recover any fees or costs incurred in connection with the counterclaim during this or any other phase of the litigation.

Finally, defendant specifically disputes whether plaintiffs can recover the costs they incurred in connection with counsel's travel to Florida in early February 2017 to take defendant's deposition. *See* [497] 6-7. As defendant notes, the Court previously awarded some of these costs to plaintiffs, *see* [131], but later rescinded that order as a sanction for plaintiffs' counsel's violation of a court order barring any disclosure of defendant's personal medical information to Thomas White. *See* [151]; [158] 5-8. The Court concludes that defendant's argument is moot considering the Court's determination that plaintiffs are not entitled to recover any fees or costs they incurred before February 16, 2017.

In sum, plaintiffs are not entitled to recover any fees or costs incurred from September 18, 2015 through February 15, 2017.

### 2. Production of the Forged Trust through the Court's August 28, 2018 Summary Judgment Ruling

Plaintiffs are entitled to an award of attorney's fees and costs they incurred from February 16, 2017, the day after defendant produced Version C to plaintiffs' counsel, through August 28, 2018, when the Court granted summary judgment to defendant on count one of plaintiffs' amended complaint. Under *Haeger*, however, plaintiffs may recover only those fees and costs that "would not have been incurred except for the misconduct," 137 S. Ct. at 1188–that is, the fees and costs that plaintiffs incurred responding to defendant's production of Version C. *Haeger*, 137 S. Ct. at 1188.

10

First, as was true of the first phase of the litigation, no fees or costs may be awarded under § 1927 during this second phase because defendant was represented by counsel through the time of the Court's summary judgment ruling on August 28, 2017. *See* [229] (defense counsel's motion to withdraw filed September 11, 2018).

Second, defendant's knowing use of a forged trust instrument to defend this suit was an egregious abuse of the judicial process that warrants the imposition of sanctions under the Court's inherent power. The "submission of falsified evidence" is among "the most egregious abuses of the judicial process[.]" *Kinzy v. Howard & Howard, PLLC*, No. 16 C 8230, 2017 WL 168480, at *2 (N.D. Ill. Jan. 17, 2017). "[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). That defendant held a license to practice law at this time only exacerbates the wrongfulness of her conduct. *See In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 CV 864, 2018 WL 6413199, at *3 (N.D. Ill. Dec. 6, 2018) (courts expect attorneys to "abide by . . . the highest duties and ethical standards required of them as members of the bar"). The Court is therefore well within its discretion to order defendant to pay the attorney's fees and costs that plaintiffs incurred in response to her injection of false evidence into the case. *See Martin v. Redden*, 34 F.4th 564, 568 (7th Cir. 2022) (affirming district court's imposition, pursuant to inherent sanctioning authority, of two-year filing ban on litigant who "knowingly submitted a fraudulent grievance form" in effort "to defeat summary judgment"); *Jackson v. Murphy*, 468 F. App'x 616, 620 (7th Cir. 2012) (affirming district court's use of inherent sanctioning power to dismiss plaintiff's claims where plaintiff "both perjured himself and forged a document critical to the prosecution of his case").

Third, as *Haeger* instructs, the sanctions award may include only those attorney's fees and costs that plaintiffs "would not have paid but for the misconduct." 137 S. Ct. at 1187. Consequently, plaintiffs must exclude from their request any fees or costs that were incurred in connection with either their prosecution of count one of their amended complaint or their defense of the amended counterclaim. As the Court discussed above, defendant had a good-faith basis for opposing count one of the amended complaint and ultimately prevailed on that claim. Likewise, plaintiffs have not shown (or even tried to show) that the fees and costs incurred in defending the counterclaim was caused by defendant's production of the fake trust document.

Accordingly, for the period from February 16, 2017 through August 28, 2018, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust instrument into the case. Plaintiffs may not recover any fees or costs incurred in their prosecution of count one of the amended complaint or their defense of the amended counterclaim.

11

### 3. August 29, 2018 through the December 21, 2020 Conclusion of Post-Trial Briefing

The same reasons that warranted the imposition of sanctions during the second phase of the litigation also warrant the imposition of sanctions from August 29, 2018 through December 21, 2020, when the final post-trial briefs were filed. The Court reiterates its finding that defendant knowingly used false evidence to defend this case, and the Court necessarily concludes that defendant's trial testimony about the origins of Version C, its theft from her home, and its reappearance in her mailbox shortly before her deposition was perjured. *See Martin*, 34 F.4th at 568; *Jackson*, 468 F. App'x at 620. "Perjury is among the worst kinds of [litigation] misconduct," *Rivera v. Drake*, 767 F.3d 685, 686 (7th Cir. 2014), and "no one"–especially not an attorney– "needs to be warned not to lie to the judiciary." *Ayoubi v. Dart*, 640 F. App'x 524, 528-29 (7th Cir. 2019). In imposing sanctions for this stage of the litigation, the Court relies primarily on its inherent authority. However, for the periods when defendant represented herself–September 18, 2018 through February 4, 2019, and May 28, 2019 through May 27, 2021[8]–the Court also bases its sanctions award on § 1927. Defendant needlessly and unreasonably prolonged the proceedings in this case by choosing to oppose plaintiffs' breach-of-fiduciary-duty claim with a counterfeit trust document and her own perjured testimony.

Accordingly, from August 29, 2018 through December 21, 2020, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust document into the case. Plaintiffs may not recover any fees or costs incurred with their defense of the amended counterclaim.

The Court's ruling for this phase of the litigation is subject to the following limitation. For the period between September 1, 2020 and December 21, 2020, plaintiffs are entitled to recover only one-third of the fees and costs that are claimed in the motion and supporting declarations currently before the Court. The Court concludes that this across-the-board reduction–which will apply to counsel's work during the month in which the bench trial began (presumably when counsel were seriously preparing for trial), the trial itself, and the post-trial briefing–is warranted because only a small fraction of the case that plaintiffs presented to the Court during the bench trial concerned whether Version C of the Robert Trust was a fake. The Court bases this determination primarily on its experience presiding over the bench trial and its review of the trial record that was conducted as the Court prepared its May 2021 Memorandum Opinion and Order. *Cf. REXA, Inc. v. Chester*, 42 F.4th 652,

---

[8] *See* [233] (order of September 18, 2018 granting motion by defendant's fourth attorney to withdraw from representation); [242] (order of February 5, 2019 granting motion by defendant's fifth attorney to file appearance); [279] (order of May 28, 2019 granting motion by defendant's fifth attorney to withdraw from representation and entering defendant's pro se appearance).

673 (7th Cir. 2022) ("A district court is accorded significant deference in matters concerning attorneys' fees because," *inter alia*, "the trial court possesses a superior understanding of the factual matters at issue.").

As the Court explained in its decision entering judgment for plaintiffs–and as the Court reiterated in its ruling denying the parties' post-trial motions–the scope of the bench trial was narrow. The only claims to be adjudicated were plaintiffs' claim for breach of fiduciary duty and defendant's indemnification claim. *See Murphy*, 2021 WL 2156448, at *1; *Murphy*, 2021 WL 4963604, at *8-12; *see also* [333] (order of August 28, 2019 identifying these as "the only remaining claims in the case"). Nevertheless, plaintiffs' presentation of their case went well beyond that narrow scope, and plaintiffs devoted substantial trial time to introducing evidence that (they hoped) would entitle them to recover, not only the $95,850.83 that defendant stole from Anna White, but also title to Anna White's home in Buffalo Grove and an interest in the Carefree home. *See Murphy*, 2021 WL 2156448, at *6-7, *8 (summarizing some, but by no means all, of the trial testimony concerning ownership of Buffalo Grove home); *id.*, at *6 (summarizing testimony on which plaintiffs would base their equitable claim to one-half interest in Carefree home); *see also id.*, at *9 n.8 (observing that conflicting evidence of whether defendant had acted as Anna White's estate-planning attorney was only "arguably relevant" to enforceability of Receipt and Release).[9] Even recognizing that plaintiffs were entitled to a certain amount of latitude in deciding how best to present their case to the Court, much of that case had nothing to do with establishing that Version C was a counterfeit.[10]

The Court further finds that plaintiffs' pretrial and post-trial submissions confirm this conclusion. For example, in their pretrial proposed findings of fact and conclusions of law and their post-trial brief, plaintiffs asked the Court to order defendant to transfer title to the Buffalo Grove home to them, appoint a receiver to take custody of and sell the Carefree home, and award them an additional $228,550.63 in compensatory damages. *See* [328] 39; [460] 1-5. The Court dismissed these requests, holding that (1) plaintiffs were precluded by the August 2018 summary-judgment ruling from obtaining any relief respecting the Buffalo Grove home; (2) plaintiffs had never sought control of the Carefree home during the

---

[9] The Court rejects plaintiffs' argument that defendant's "lies" during the litigation that she was not Anna White's estate attorney warrant sanctions. The Court has made no finding whether defendant was Anna White's attorney, as that issue was largely immaterial to the two claims tried at the bench trial. Plaintiffs have not shown that defendant's decision to dispute their claim that she was, in fact, Anna White's attorney was abusive or in bad faith, such that the Court declines to impose additional sanctions on that basis.

[10] In hindsight, the Court also recognizes that it should have exercised a tighter grip on each side's presentation of evidence at the bench trial, and that it is thus partly responsible for the trial time expended on extraneous matters. But any error in that regard does not permit plaintiffs to recover attorney's fees and costs that were not causally connected to defendant's use of false evidence and perjury. *See Haeger*, 137 S. Ct. at 1186 n.5, 1187-88.

litigation (and had even "represented to the Court . . . that the home was 'off the table' because it 'goes to the defendant'" under all three versions of the Robert Trust); and (3) any failure by defendant to distribute Anna White's forty-seven-percent share of the trust assets as a named beneficiary was "not causally connected to the breach of fiduciary duty that plaintiffs proved in this case." *Murphy*, 2021 WL 2156448, at *36. Similarly, plaintiffs' Rule 59(e) motion argued that the Court should have awarded them a 62.51% interest in the Buffalo Grove home, entered an order quieting title to the Buffalo Grove home in their favor, reinstated count one of their amended complaint based on evidence developed at trial, and conformed the amended complaint to the trial evidence supposedly establishing their entitlement to a one-half interest in the Carefree home. *See Murphy*, 2021 WL 4963604, at *7-12. None of these issues had anything to do with defendant's production and use of the forged trust instrument.

Based on its experience presiding over this case and the bench trial, the Court determines that a two-third reduction in the amount of fees and costs claimed by plaintiffs from September 1, 2020 through December 21, 2020 is warranted.

### 4. December 22, 2020 through Entry of Judgment and Adjudication of Post-Judgment Motions

Finally, in accordance with § 1927 and the Court's inherent sanctioning authority, the Court orders that plaintiffs are entitled to an award of attorney's fees and costs incurred in response to defendant's injection of the fake trust document into the litigation between December 22, 2020 and the Court's decision denying the parties' post-judgment motions on October 27, 2021. *See Haeger*, 137 S. Ct. at 1188. However, the Court orders that plaintiffs may not recover any fees and costs incurred with the following: (1) plaintiffs' responses to defendant's motions to enforce judgment and for judgment on Count I [463, 477]; and (2) plaintiffs' motion to alter judgment and reply in support [483, 488]. The associated fees and costs are excluded from the sanctions award because they were incurred in connection with plaintiffs' pursuit of relief on count one of the amended complaint or other theories that were unrelated to defendant's injection of the forged trust instrument into the case.

### C. Reasonableness of Counsel's Rates

"In order to arrive at the amount to be awarded as reasonable fees, this court must determine the reasonable hourly rate to be applied and the number of hours reasonably expended, and then multiply the two figures." *Haywood v. Wexford Health Sources, Inc.*, No. 16 CV 3566, 2021 WL 2254968, at *10 (N.D. Ill. Jun. 3, 2021) (internal quotation marks omitted). "This calculation, known as the lodestar rate, yields a presumptively reasonable fee, but the court may nevertheless adjust the fee based on factors not included in the computation." *Id.* (internal quotation marks omitted).

"The Seventh Circuit has defined a reasonable hourly rate as one that is derived from the market rate for the services rendered." *Melikhov v. Drab*, No. 16 C 9332, 2018 WL 3190824, at *3 (N.D. Ill. May 21, 2018) (internal quotation marks omitted). "The best evidence of the market rate is the amount the attorney actually bills for similar work, but if that rate can't be determined, then the district court may rely on evidence of rates charged by similarly experienced attorneys in the community and evidence of rates set for the attorney in similar cases." *Montanez v. Simon*, 755 F.3d 547, 553 (7th Cir. 2014); *see also People Who Care v. Rockford Bd. of Educ., Sch. Dist. No. 205*, 90 F.3d 1307, 1310 (7th Cir. 1996) ("The attorney's actual billing rate for comparable work is 'presumptively appropriate' to use as the market rate."). The fee applicant "has the burden of proving the market rate; however, once the attorney provides evidence of the market rate, the burden shifts to the opposing party to show why a lower rate should be awarded." *Vega v. Chicago Park Dist.*, 12 F.4th 696, 705 (7th Cir. 2021).

Plaintiffs have submitted declarations from their primary attorneys, Paul Koacky and Christopher Saternus, in support of their claimed hourly rates. *See* [475-1, 475-2]. In his declaration, Kozacky, who has been licensed for more than 35 years and focuses his practice on civil and maritime litigation in state and federal court, states that his billing rate is $425. [475-1] 1-2, at ¶¶ 1, 5. Kozacky's declaration also provides the billing rates for three associates in his firm who also worked on the case:

- Jessica Fricke Garro: licensed for 11 years and billed at $175 per hour until October 10, 2018, when her rate increased to $275 per hour. [*Id.*] 2, at ¶ 2.

- Brian P. O'Connor: licensed for more than 7 years and billed at $165 per hour until August 28, 2018, when his rate increased to $225 per hour. [*Id.*], ¶ 3.

- Elizabeth Sawyer: newly licensed attorney who billed at $150 per hour. [*Id.*], at ¶ 4.

For his part, Saternus, who has been licensed since 1977, states that his ordinary billing rate grew to $250 during the course of the litigation, but that he charged Anna White and plaintiffs only $200 per hour because the White family was among his long-time clients. [475-2] 2, at ¶ 8. Saternus also states that plaintiff Thomas White has paid Saternus's billed rate for 123.85 of the 307.10 attorney hours that Saternus expended on this case, after which Saternus and plaintiffs shifted to a contingency agreement. [*Id.*] 1, at ¶ 3.

The Court concludes that the declarations from Kozacky and Saternus are sufficient to meet their burden to establish the reasonableness of their rates. *See Shakman v. Cook Cnty. Clerk*, No. 1:69-cv-2145, 2021 WL 5140500, at *6 (N.D. Ill. Nov. 4, 2021) (attorneys' affidavits constituted "credible evidence of their firms'

15

billable rates"); *City of Chicago v. Garland*, Case No. 18 C 6859, 2021 WL 1676387, at *5 (N.D. Ill. Apr. 28, 2021) (relying on "evidence of the firm's 2018 billable rates via attorney affidavit" to award fees at requested hourly rates); *Herrera v. Grand Sports Arena, LLC*, 2018 WL 6511155, at *3 (N.D. Ill. Dec. 11, 2018) ("Because an attorney's actual billing rate is presumptively appropriate for use as the market rate, the billing statements and attorneys' affidavits are sufficient to shift the burden to the Defendants to show that Plaintiff's requested rates are not reasonable and that lower rates are appropriate."); *see also Montanez*, 755 F.3d at 553; *People Who Care*, 90 F.3d at 1310.

However, defendant has not provided the Court with any convincing basis to conclude that lower hourly rates are warranted. For example, defendant argues that attorney Sawyer did not enter an appearance in this case, that attorney O'Connor's appearance was limited to the bench trial, and that attorney Garro allegedly made "false representations to the Court during [a] July 18, 2017 hearing." [497] 5. However, these allegations have nothing to do whether the attorneys' claimed rates are reasonable. Defendant also claims that Kozacky's and Saternus's fees are "excessive pursuant to Il. Sup. Ct. R. 1.5(a)" [497] 6, 8, but defendant offers no argument or evidence to support that contention–nor does she explain why an Illinois procedural rule would apply to the Court's assessment of attorney's fees as a sanction under § 1927 and its inherent power. Nor does defendant argue that any of the attorney hours claimed by plaintiffs were unreasonable or unnecessarily incurred.

Accordingly, the Court holds that, to the extent plaintiffs are entitled to an award of attorney's fees, those fees may be recovered at the following rates: Kozacky–$425 per hour; Saternus–$200 per hour[11]; Garro–$175 per hour until October 10, 2018, and $275 per hour thereafter; O'Conner–$165 per hour until August 28, 2018, and $225 per hour thereafter; and Sawyer–$150 per hour.

### D.    Defendant's Rule 54(d) Arguments Lack Merit

Defendant's argument that plaintiffs' fee application is improper because it is labeled a "petition," rather than a "motion," is baseless. *See* [497] 3. Local Rule 54.3(a)(1) recognizes that a request for attorney's fees may be made by "motion, complaint or any other pleading seeking only an award of attorney's fees[.]" Defendant does argue that plaintiffs' captioning of the fee request as a petition, rather than a motion, prejudiced her in any way. And "in the federal courts, pleadings, motions, and supporting memoranda are measured by their content, not their title." *In re Sulfuric Acid Antitrust Litig.*, 446 F. Supp. 2d 910, 914 (N.D. Ill. 2006). Likewise, defendant's arguments that the fee petition fails to identify "the judgment and the statute, rule or other grounds entitling the movant to the award," Fed. R. Civ P. 54(d)(2)(B)(ii), is frivolous. *See* [497] 3. The petition refers to the Court's entry of

---

[11] Because this is the rate at which Saternus billed plaintiffs, the Court declines to set his fee at his claimed market rate of $250 per hour.

judgment in plaintiffs' favor and expressly invokes both § 1927 and the Court's inherent authority to sanction bad-faith litigation conduct. *See* [475] 2-3, 4-5.

### E.     Summary

In sum, the Court grants plaintiffs' fee petition in part and denies it in part as follows:

- Plaintiffs are not entitled to recover any fees or costs incurred from September 18, 2015 through February 15, 2017.

- For the period from February 16, 2017 through August 28, 2018, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust instrument into the case. Plaintiffs may not recover any fees or costs incurred in their prosecution of count one of the amended complaint or their defense of the amended counterclaim.

- For the period from August 29, 2018 through December 21, 2020, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust document into the case. Plaintiffs may not recover any fees or costs incurred with their defense of the amended counterclaim. However, for the period between September 1, 2020 and December 21, 2020, plaintiffs are entitled to recover only one-third of the fees and costs that are claimed in the motion and supporting declarations currently before the Court.

- For the period from December 21, 2020 through October 27, 2021, plaintiffs are entitled to an award of attorney's fees and costs incurred in response to defendant's injection of the fake trust document into the case. However, the Court orders that plaintiffs may not recover any fees and costs incurred with the following filings: (1) plaintiffs' responses to defendant's motions to enforce judgment and for judgment on Count I [463, 477]; and (2) plaintiffs' motion to alter judgment and reply in support [483, 488].

The fees will be awarded at the rates claimed by plaintiffs in their supporting declarations. Within fourteen days of the date of this decision, plaintiffs must submit a revised fee statement that complies with the Court's ruling, and any supporting materials must be sufficiently specific to demonstrate that the claimed fees and costs were incurred in response to defendant's injection of the fake trust instrument into the case. The Court will not entertain any further submissions from defendant regarding the amount of plaintiffs' attorney's fees and costs that will be awarded. Defendant not only failed to file a timely opposition to the original fee petition, but her untimely response brief failed to identify any hours or costs claimed by plaintiffs that, in defendant's view, were not reasonably incurred or were unnecessary,

17

duplicative, or otherwise non-compensable. Defendant has thus forfeited any such objections, and defendant will not be given another opportunity to raise arguments that she should have raised earlier. *See John K. MacIver Inst. for Pub. Policy, Inc. v. Evers*, 994 F.3d 602, 614 (7th Cir. 2021) ("A party who does not sufficiently develop an issue or argument forfeits it.").

## II.   Defendant's Motion for Attorney's Fees

In her own motion for attorney's fees, defendant makes the remarkable claim that plaintiffs should be required to pay her at least $557,152.94 in attorney's fees and $3,709.99 in costs. *See* [497-4] 1-2. Defendant appears to base her request on the fact that the Court awarded her summary judgment on count one of plaintiffs' first amended complaint. [497] 11. Defendant also suggests that the Robert Trust itself and the Receipt and Release also authorize an award of fees. [*Id.*] 12.

The Court has no trouble in concluding that defendant's fee request is frivolous. The Court has laid out in detail, both in this decision and its prior decisions, the overwhelming evidence showing that defendant forged a trust instrument to steal assets of the Robert Trust to which she had no valid claim. This Court entered a judgment of $246,152.76 against defendant. The American Rule bars her from recovering any of the fees she incurred in this litigation, even though she prevailed on one of the claims in this case. *See Garland*, 2021 WL 1676387, at *2 ("The American Rule is that parties to litigation pay their own fees."). Paragraph 7.1.9 of the Robert Trust, relied on by defendant, merely authorizes the trustee to engage an attorney's services on behalf of the trust; it does not purport to shift the legal fees that the trust incurs onto another party. *See* [PX 26] 21. And defendant's contention that the Receipt and Release entitles her to an award of fees fails to come to grips with the reality that the Court found that document to be unenforceable for multiple reasons.

Defendant's motion for attorney's fees is accordingly denied.

18

## Conclusion

For the reasons set forth above, plaintiffs' petition for attorney's fees and costs [475] is granted in part and denied in part, and defendant's motion for attorney's fees and costs [497] is denied.

Plaintiffs are not entitled to recover any fees or costs incurred from September 18, 2015 through February 15, 2017. For the period from February 16, 2017 through August 28, 2018, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust instrument into the case. Plaintiffs may not recover any fees or costs incurred in their prosecution of count one of the amended complaint or their defense of the amended counterclaim. For the period from August 29, 2018 through December 21, 2020, plaintiffs are entitled to an award of attorney's fees and costs that were incurred in response to defendant's injection of the fake trust document into the case. Plaintiffs may not recover any fees or costs incurred with their defense of the amended counterclaim. However, for the period between September 1, 2020 and December 21, 2020, plaintiffs are entitled to recover only one-third of the fees and costs that are claimed in the motion and supporting declarations currently before the Court. For the period from December 21, 2020 through October 27, 2021, plaintiffs are entitled to an award of attorney's fees and costs incurred in response to defendant's injection of the fake trust document into the case. However, the Court orders that plaintiffs may not recover any fees and costs incurred with the following filings: (1) plaintiffs' responses to defendant's motions to enforce judgment and for judgment on Count I [463, 477]; and (2) plaintiffs' motion to alter judgment and reply in support [483, 488]. The fees will be awarded at the rates claimed by plaintiffs in their supporting declarations.

Within fourteen days of the date of this decision, plaintiffs must submit a revised fee statement that complies with the Court's ruling, and any supporting materials must be sufficiently specific to demonstrate that the claimed fees and costs were incurred in response to defendant's injection of the fake trust instrument into the case. No further submissions from defendant regarding the amount of attorney's fees and costs to be awarded to plaintiffs will be entertained.

*Heather K. McShain*
_____
**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: September 6, 2022**